CT Corporation

**Service of Process Transmittal**
07/19/2018
CT Log Number 533720194

TO: Myrna Goodrich, Paralegal
Aetna, Inc.
Law U23S, 1425 Union Meeting Road
Blue Bell, PA 19422

RE: **Process Served in Mississippi**

FOR: American Health Holding, Inc.  (Domestic State: OH)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Heather Toche, Pltf. vs. VT Halter Marine, Inc., etc., et al., Payor-Dfts. And M.D. Anderson Cancer Center and The Gardens Pharmacy, LLC, Payee-Dfts. // To: American Health Holding, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachment, Exhibit(s) |
| **COURT/AGENCY:** | Jackson County Chancery Court, MS<br>Case # 30CH117CV02072DNH |
| **NATURE OF ACTION:** | Insurance Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Flowood, MS |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/19/2018 at 10:33 |
| **JURISDICTION SERVED :** | Mississippi |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days from the date of service |
| **ATTORNEY(S) / SENDER(S):** | Matt G. Lyons, Esq<br>910 Washington Avenue<br>Ocean Springs, MS 39564<br>228-872-1855 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/20/2018, Expected Purge Date: 07/25/2018<br><br>Image SOP<br><br>Email Notification, Desiree Beatty  beattyd@aetna.com<br><br>Email Notification, Jacqueline West  WestJ2@AETNA.com |
| **SIGNED:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | C T Corporation System<br>645 Lakeland East Drive<br>Suite 101<br>Flowood, MS 39232<br>214-932-3601 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# EXHIBIT A

## IN THE CHANCERY COURT OF JACKSON COUNTY, MISSISSIPPI

Heather Toche                                                                                    Plaintiff

V.                                                                                    **No.17-2072-DNH**

VT Halter Marine, Inc. Employee Welfare Benefit Plan [aka VT Halter Marine, Inc. Group Benefit Plan]; VT Halter Marine, Inc.; Hub International, Inc.; Hub International Healthcare Solutions, LLC; MCMC, LLC; American Health Holding, Inc.; Doe Defendants 1-5; [Herein "**The Payor-Defendants**"];

And

M.D. Anderson Cancer Center and The Gardens Pharmacy, LLC ["**The Payee-Defendants**"]

Defendants

### SUMMONS

TO ANY SHERIFF OR ANY OTHER PERSON AUTHORIZED BY THE MISSISSIPPI RULES OF CIVIL PROCEDURE: You are hereby commanded to serve this **Summons** and copy of the **AMENDED AND SUPPLEMENTAL COMPLAINT** filed in this action upon the following:

**AMERICAN HEALTH HOLDING, INC.**, Defendant may be served with process through its registered agent, CT CORPORATION, 631 Lakeland East Drive, Suite 101, Flowood, MS 39232, or to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process where found here, or in any other manner permitted under the Mississippi Rules of Civil Procedure - - by promptly locating the Respondent and handing to them copies of this **Summons** and AMENDED AND SUPPLEMENTAL COMPLAINT.

### NOTICE TO RESPONDENT

THE **AMENDED AND SUPPLEMENTAL COMPLAINT** WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU ARE REQUIRED TO MAIL OR HAND-DELIVER A COPY OF A WRITTEN RESPONSE TO THE **AMENDED AND SUPPLEMENTAL COMPLAINT** TO **MATT G. LYONS, ATTORNEY** FOR PLAINTIFFS, WHOSE ADDRESS IS **910 WASHINGTON AVENUE, OCEAN SPRINGS, MS 39564**. YOUR RESPONSE MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND **AMENDED AND SUPPLEMENTAL COMPLAINT**, OR A JUDGMENT BY DEFAULT WILL BE ENTERED AGAINST YOU FOR THE RELIEF, REMEDIES, MONEY AND/OR OTHER THINGS DEMANDED IN THE **AMENDED AND SUPPLEMENTAL COMPLAINT**. YOU MUST ALSO FILE THE ORIGINAL OF YOUR RESPONSE WITH THE CLERK OF THIS COURT WITHIN A REASONABLE TIME AFTERWARD.

ISSUED UNDER MY HAND AND SEAL OF SAID COURT, THIS $3^{th}$ DAY OF JULY 2018.

**CHANCERY CLERK**
Jackson County, Mississippi
3104 South Magnolia St.
Pascagoula, MS 39567
BY: _____
DEPUTY CLERK

## IN THE CHANCERY COURT OF JACKSON COUNTY, MISSISSIPPI

Heather Toche                                                                    Plaintiff

V.                                                                       **No.17-2072-DNH**

VT Halter Marine, Inc. Employee Welfare Benefit Plan [aka VT Halter Marine, Inc. Group Benefit Plan]; VT Halter Marine, Inc.; Hub International, Inc.; Hub International Healthcare Solutions, LLC; MCMC, LLC; American Health Holding, Inc.; Doe Defendants 1-5; [Herein *"The Payor-Defendants"*];

And

M.D. Anderson Cancer Center and The Gardens Pharmacy, LLC [*"The Payee-Defendants"*]
                                                                          Defendants

### Amended and Supplemental Complaint for Accountings, Declaratory And Other Relief

Plaintiff, **Heather Toche** [herein "Toche," "Plaintiff," "Beneficiary" ], by counsel, files her

*Amended and Supplemental Complaint for Accountings, Declaratory and Other Relief* versus

*I.*      ***The Payor-Defendants*** are *VT Halter Marine, Inc. Employee Welfare Benefit Plan*

[aka *VT Halter Marine, Inc. Group Benefit Plan*, herein the "Plan," "Trust" and "VTHMEWP"]; *VT*

*Halter Marine, Inc.* [herein "VTHM," a "sponsor" and an "administrator" of said Plan]; *Hub*

*International, Inc.*, and *Hub International Healthcare Solutions, LLC* [herein "Hub"]; *MCMC,*

*LLC*; *American Health Holding, Inc.*; *Doe Defendants 1-5*; [All herein individually and

collectively ***The Payor-Defendants***]; and Plaintiff sues for *Accountings* by

*II.*     ***The Payee-defendants***, **M. D. Anderson Cancer Center** and **The Gardens**

**Pharmacy, LLC** and by all of ***The Payor-Defendants*** and shows good causes versus ***The***

***Payor-Defendants*** on the following factual, Equitable and other grounds to be shown, to-wit:

### I. PARTIES, JURISDICTION, VENUE, FACTS, EQUITY, LAWS, CLAIMS AND CAUSES

1.      At all material times here, Plaintiff, **Heather Toche,** is a resident citizen of Ocean

Springs, Jackson County, Mississippi, with her husband, William R. Toche, and their children,

S. A. T. [age 8] and J. W. T. [age 6] .

2.    A.      This Chancery Court has Jurisdiction of the subject matter [1] and parties here.
Venue is proper here.

      B.      At all material times here, Plaintiff, **Heather Toche,** with her husband, William
R. Toche, and their children, S. A. T. [age 8] and J. W. T. [age 6] are **beneficiaries** of (and
fully covered by) the **VT Halter Marine, Inc. Employee Welfare Benefit Plan** [aka aka **VT
Halter Marine, Inc. Group Benefit Plan,** the **"Plan"** and "Trust" and "**VTHMEWP**"], an alleged
health and welfare benefit Plan and Trust called the **VT Halter Marine, Inc. Employee
Welfare Benefit Plan** and **VT Halter Marine, Inc. Group Benefit Plan,** was allegedly
sponsored and purportedly "funded" by Toche's husband's employer, **VT Halter Marine, Inc.,**
which Plan and Trust was funded by **contributions of covered employees,** inter alia,
Toche's husband's VTHM-employment fringe benefits and premiums deducted via Toche's
husband's years of periodic VTHM-pay-roll deductions - as well as other VTHM-employees'
years of VTHM-employment fringe benefits and premiums from periodic pay-roll deductions.

      C.      At all material times here, Plaintiff, **Heather Toche,** with her husband, William
R. Toche, and their children, S. A. T [age 8] and J. W. T. [age 6] are are third-party,
contractual, equitable and legal **beneficiaries** of (and fully covered by) **VT Halter Marine,
Inc. Employee Welfare Benefit Plan's** and/or Trust's [a] welfare benefit plan of Health,
Medical and Hospital Benefits, and of [b] **VT Halter Marine, Inc. Employee Welfare Benefit
Plan's** and/or Trust's related Insurance Policies and Contracts and Benefits administered by
**The Payor-Defendants,** owed and owing to Heather Toche through her husband's, William

---

[1]

Miss. Code Ann. § 91-8-203. *Subject-matter Jurisdiction*

"(a) * * * the **chancery court** has exclusive jurisdiction of proceedings in this state **brought
by a** trustee or **beneficiary** concerning the administration of a trust. * * *
SOURCES: Laws, 2014, ch. 421, § 15, eff from and after July 1, 2014."

R. Toche's, employment with **VT Halter Marine, Inc.**

D.      At all material times here, Plaintiff, **Heather Toche,** is a _third-party_, equitable and legal **_beneficiary_** of **(and** fully covered by) [a] all laws, equities, _contracts_ directly relating to the administration of such "Plan" and "Trust," and of [b] all laws and equities **not** directly relating to said Plan and Trust, and of [c] all **The Payor-Defendants'** duties to Toche which arise by [i] Equity, [ii] Contract and [iii] Law - regardless of whether such Equities, Laws or Contracts do or do **not relate to the Plan or Trust.** [2]

E.      At all material times here, all premiums were duly, timely, fully paid, and all conditions for Toche's coverages and benefits fulfilled, and all conditions precedent to the filing of this suit _(e.g.,_ administrative, pre-suit Appeals, etc.) have occurred, been performed or waived by operation of Equity or Law, or are conditions created by The Payor-Defendants that were unreasonable, inequitable or unlawful - and futile or impossible to attempt to comply with - particularly given Toche's **_brain cancer_** and impaired condition.

3.      A. In early December 2014, on **The Payor-Defendants' mis-representations** and **inducements** that Toche's **_brain cancer_** treatments and Toche's medical and hospital bills for cancer treatments at **M. D. ANDERSON CANCER CENTER**, Houston, Texas were **approved** by, **authorized** by and **promised** to be paid by and through The Payor-Defendants, VT Halter Marine, Inc. Employee Welfare Benefit Plan ['insurer']; VT Halter Marine, Inc. [Plan

---

[2]

See _Gardner v. Heartland Indus. Partners, LP_, 715 F.3d 609, 614 (6th Cir. 2013) (concluding that a state law claim for **tortious interference** with an ERISA plan is not preempted because "[n]obody needs to interpret the plan to determine whether th[e] duty [to not interfere] exists"); see _Lone Star OB/GYN Assocs. v. Aetna Health Inc._, 579 F.3d 525, 531-532 (5th Cir. 2009) (concluding that claims implicating the rate of payment under the Texas Pay Prompt Act are not preempted because they do not duplicate ERISA claims) (cited in) _Wurtz v. Rawlings Co._, 761 F.3d 232, at 244 (2d Cir. 2014) citing _Aetna Health Inc. v. Davila_, 542 U.S. 200, 210, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). See also _Brown v. Granatelli_, 897 F. 2d 1351 (5th Cir. 1990) (No preemption if certain _stop loss_ coverages insures plan or payments of benefits at relatively low attachment points).

3

'sponsor'/co-administrator]; and Hub International, Inc. and Hub International Healthcare Solutions, LLC [herein "Hub"], Toche was admitted to **M. D. ANDERSON CANCER CENTER**, Houston, Texas, for the treatment of Toche's *brain cancer* - and Toche, in detrimental reliance on The Payor-Defendants' **approval, authorizations** and **promises**, incurred more than **\$100,000+ in medical bills.**

B. In early December 2014, The Payor-Defendants, VT Halter Marine, Inc. Employee Welfare Benefit Plan ['insurer']; VT Halter Marine, Inc.['sponsor'/co-administrator]; and Hub **approved** and **authorized payment**s for **M. D. ANDERSON CANCER CENTER**'s medical orders of **proton** beam therapy / radiation treatments for Toche's *brain cancer*. Toche, in **detrimental reliance** on The Payor-Defendants' **approval, authorizations** and **promises**, Toche inequitably incurred \$100,000+ in debt for covered, medically-necessary (and life-saving), but unpaid, medical care *bills.*

C.  However, when time came for The Payor-Defendants' payments to **M. D. ANDERSON CANCER CENTER** for Payor-Defendants' **pre-12-22-2014**, **approved proton** beam therapy / radiation treatments by **M. D. ANDERSON CANCER CENTER** , The Payor-Defendants wrongfully acted in concert to arbitrarily, negligently, wrongfully **renege** on The Payor-Defendants' **pre-12-22-2014 approval, authorization** and **promises** to pay for such **approved proton** beam therapy / radiation treatments by **M. D. ANDERSON CANCER CENTER**, and The Payor-Defendants wrongfully breached their promises, arbitrarily **reversed** their approval and wrongfully denied payment for such treatments via The Payor-Defendants' **initial, 12-22-2014 denial,** which erred, arbitrary, wrongful denial was arbitrarily, negligently, wrongfully repeated by *Payor-Defendants* in *Payor-Defendants*' wrongful, continuing "denials" of such earned benefits to Toche in 2015 through 2018, **despite**

1. Substantial Evidence to the contrary, *inter alia*, that exhibited hereto and that wrongly withheld by *Payor-Defendants* from Toche (to be shown by Discovery) and **despite**

2. Substantial, full, timely, **Appeals correspondence** to Payor-Defendants in 2014-18

4

[a] by **M. D. Anderson Cancer Center's** Physicians (Drs. Ghia, et al.)

[b] by **SRHS Cancer Center's** Physicians (Drs. Brian Persing, et al.)

[c] by Hon. Steve Mullins, of Luckey & Mullins, and others, and

[d] by Toche, her family and others - whereby Toche fully, timely **exhausted**

all "administrative remedies" via **Appeals** of The Payor-Defendants' capricious **denials** of

payments for Toche's **brain cancer** treatments, inter alia, shown by **part** of the "**Administrative**

**files**" or **Appeals files**" possessed by Toche attached as **Exhibit "1"** hereto.

D.      **All Payor-Defendants wrongfully withheld,** failed and refused to provide Toche

with needed, required copies of the following documents, despite Toche's multiple Requests for -

[and all of the four (4) Toches' rights to] copies of required documents, inter alia:

1. the "**Administrative Files" (aka "Appeals Files**")

2. the **Master Plan Document** in effect for 2014-2016

3. the **Summary Plan Description (SPDs)** in effect for 2014-2016

4. the **Trust Agreement** in effect for 2014-2016 and

5. Toche's **Benefits Files** and **Claims Files** and

6. Other documents due Toche here - despite Toche's repeated Requests to the

Payor-Defendants in 2015-2018. See **Toche's Requests**, inter alia, in **Exhibits 1, 2, 3, 4** hereto.

See **Payor-Defendants'** non-responsive "replies" to Toche's **Requests** to them in **Exhibit 5**

**hereto.** All such files and documents remain **wrongly withheld by said The Payor-**

**Defendants.** By this suit in nature of a Bill of discovery, R. 26-37 Discovery and other judicial

mechanisms, The Payor-Defendants must **produce all such documents** to Toche and **The**

**Court** - for proper use herein. Also,

E.      **Penalties are due** Toche from all Payor-Defendants, inter alia, of **$110/day per**

**Toche/ from Each Request** - from all Payor-Defenants - until the date all documents are

provided and Penalties paid, i.e., for all Payor-Defendants' failure and refusal to produce the

**Master Plan Document**, the **Trust Agreement**, the **SPDs**, **Benefits Files** and **Claims Files** and

**other documents Requested and** required to be produced to Toche by law under Toche's prior

5

Requests, *inter alia*, in **Exhibits 1, 2, 3, 4** hereto. Further,

F.    **Penalties of $110/day/perToche/from each Request are due Toche** from all Payor-Defendants, *inter alia*, for said The Payor-Defendants' **not timely providing** Toche **all** requisite, full, written, disclosures, *inter alia*, of

[a] description of plan's **review procedures**,

[b] **time limits** applicable to all procedures,

[c] **time limits** for **administrative appeals** and

[d] **time limits** for suit -

all of which must be fully furnished in each written Notice of "Denials" of benefits. See, i.e., *Mirza v. Ins. Adm'r of America, Inc.*, 800 F.3d 129, 134 (3rd Cir. 2015); *Harris Methodist Fort Worth v. Sales Sup. Servs., Inc., Emp. Health Care Plan*, 426 F.3d 337 (5th Cir. 2005); *Kujanek v. Houston Poly Bag I, Limited*, 658 F.3d 483 (5th Cir. 2011) (penalties, fees & damages of $243,000+) and *Robbin Cromer -Tyler, M. D., Plaintiff v. Edward R. Teitel, M. D., P. C., et al., Defendants*, USDC Case No. 1:01-cv-1077-MEF (M.D. Ala., Sept 11, 2007); aff'd in part, No. 07-14752, (11th Circuit Sept. 24, 2008) ($179,960 penalties) (rev'd denial of other relief due).

G.    Further, during Toche's Appeals of a 12-22-14 **initial** "denial letter" and Toche's Appeals of other, subsequent "denial letters" in from 2015 to date, the Payor-Defendants [a] **VT Halter Marine, Inc.'s said medical Plan** and [b] **VT Halter Marine, Inc.** and [c] **Hub** all **wrongfully utilized** *unqualified*, purported "claims review agents," *inter alia*, [d] **MCMC, LLC**; [e] **American Health Holding, Inc.** and [f] **Doe-Defendants 1-5** who wrongfully aided and abetted other **Payor-Defendants** - in all of the **Payor-Defendants'** wrongful interference with and denials of due medical plan benefits to Toche. Further,

H.    a.    **No Payor-Defendant** ever examined Toche.

b.    **No Payor-Defendant** fully and fairly and knowledgeably considered all of Toche's records and conditions.

c.    **No Payor-Defendant** was ever **licensed to practice medicine** in Mississippi (the State of Toche's initial medical care) or ever **licensed to practice medicine** in

6

Texas (the State of Toche's final care). [3]

I.          Aside from low-level-insurance-benefit-denial-personnel and purported "nurses"

a.          **Ming Zeng** is the *only* alleged "M. D." mentioned in *Payor-Defendants*'

"denials-letters" for purportedly "contradicting" the Proton Beam Therapy Medical Orders of

Toche's attending Physicians at **M. D. ANDERSON CANCER CENTER** (Drs. Ghia, etc.) and

Toche's attending Physicians at **SRHS CANCER CENTER** (Drs. Brian Persing, etc.).

b.          Contrary to *Payor-Defendants*' "denials-letters" **Ming Zeng's** alleged

"qualifications" to purportedly "contradict" Toche's attending Physicians at **M. D. ANDERSON**

**CANCER CENTER** (Drs. Ghia, etc.) and at **SRHS CANCER CENTER** (Drs. Persing, etc.) are,

i.          at best, suspect: **Ming Zeng** alleges to have graduated in 1986 from **"Fourth**

**Military Medical University**," Xi'an, Shaanxi, Peoples Republic **China**. Per Medicare's site:

ii.          "eRx -  He does not participate in Medicare Electronic Prescribing Incentive Program.
EHR -  He does not use electronic health records (EHR).

MOC - He does not participate in the Medicare Maintenance of Certification Program. The "Maintenance of Certification Program" encourages board certified physicians to continue learning and self-evaluating throughout their medical career." Id.

iii.          **Zeng** is just a biased, unqualified, Ohio-based "hired gun" for *Payor-Defendants*.

iv.          **Zeng** was **_not_** qualified by Ohio Law to perform a "review." See **END NOTE** [1].

v.          **Zeng** made **unfounded and unreasonable claims and conclusions**, without

fully, fairly and knowledgeably examining Toche or Toche's relevant medical records. **Zeng**

wrongly cited **Out-Dated studies** (1966; 1974) *and* **mis-cited other studies**. **Zeng** wrongfully

attempted to undermine sound medical treatment prescribed by Toche's Treating Physicians at

---

[3]

See"Miss. Code Ann. § 73-25-1  (2017) **Duty to obtain license**

Every person who desires **to practice medicine** must first **obtain a license** to do so **from the state board of medical licensure**, but this section shall not apply to physicians now holding permanent license, the same having been recorded as required by law." *Porter v. Pandey*, 423 So.2d 126 (Miss. 1982) held:
"By statute the right to practice medicine in this state may be granted only to qualified persons after examination by the State Board of Medical Licensure. Sections 73-25-1, et seq., Mississippi Code Annotated (1972 as amended). Hospitals are not authorized to engage in the practice of medicine." Id. Since Hospitals are not authorized to engage in the practice of medicine," then, it follows that *Payor-Defendants* "are not authorized to engage in the practice of medicine." *Porter v. Pandey*, Id.

7

**M. D. Anderson Cancer Center** (Dr. Ghia,[4] etc.) and **SRHS Cancer Center** (Dr. Persing, etc.).

vi.   **Ming Zeng's credibility** was refuted, rejected in the only Case found re: **Zeng,** i.e., *Ming Zeng v. Commissioner of Internal Revenue*, T.C. Summary Opinion 2010-77 (U. S. Tax Court June 17, 2010), attached as **Exhibit 7** hereto.

J.   In addition to this Plan, other health plans and insurers (Aetna, BCBS, UHC) and "**Medicare** generally **covers proton therapy**." See *Principles and Reality of Proton Therapy Treatment Allocation, Int J Rad. Oncol Biol Phys.* **2014** Jul 1; 89(3): 499–508. See Thaker et al, *Variations in Proton Therapy Coverage in State of Texas: Defining Medical Necessity for a Safe and Effective Treatment, Int'l J of Particle Therapy* **2015** Aug 5: 500-508, attached hereto as **Exhibit 8.**

K.   **"Proton beam therapy (PBT) is an evolution in radiation therapy (RT) that is considered both safe and effect** (9. Delaney, T F, *Proton Therapy in the Clinic*, Front Radiation Therapy, 2011; 43:465-85). **Proton beam therapy has superior ability to spare surrounding normal healthy tissues owing to its unique physical porpertis as compared with traditional photon RT (radiation therapy), such as IMRT** (intensity-modulated-radiation-therapy: 11. Kandula, et al. *Spot-scanning Beam Proton Therapy Vs. IMRT for Ipsa Lateral Head and Neck Malignancies: a Treatment Planning Comparison*; Med Dosim. **2013**; 38:390-4.See Thaker et al, *Variations in Proton Therapy*, at p. 500, **Exhibit 8** hereto. Id

L.   All the *Payor-Defendants* wrongly *acted-in-concert* and contrary to **acceptable standards** in the medical industry and insurance industry to wrongfully attempt to "justify" said **Payor-Defendants' wrongful  denials of Proton Beam Therapy medical benefits due and owing to Toche.**

M.   All of the *Payor-Defendants* wrongfully acted in concert with and/or wrongfully conspired with all other *Payor-Defendants, inter alia*, to wrongfully, negligently and/or

---

4

Comparing qualifications of M. D. Anderson Cancer Center's **Amol J. Ghia, M.D. [Exhibit 6** hereto] to that of **MIng Zeng, M.D.,** further defeats Zeng's opinions and all denials of Toche's PBT.

8

**tortuously interfere** with Toche's rights, claims, interests in having said $100,000+ of medical benefits timely, fully paid by The Payor-Defendants to **M. D. ANDERSON CANCER CENTER** and other providers, causing loss of the $100,000+ of medical benefits paid by Toche that are due from The Payor-Defendants with interest and Toche's resulting losses, fees and costs.

N.    Further, in all "claims processes," review "processes," "appeal processes" and "notice processes" below, all of the **Payor-Defendants** committed serious **procedural irregularities** - as will be shown herein and at trial. Cf. *Janssen v. Minneapolis Auto Dealers Benefit Fund*, 447 F.3d 1109 (8th Cir. 2006) held: Procedural irregularity exists where there was **"no evidence that the Trustees performed a meaningful review"** prior to denying benefits. Such **procedural irregularities**, and more, transpired as shown herein.

II.    **The Payor-Defendants**:

4.    A.    Payor-Defendant, **VT Halter Marine, Inc. Employee Welfare Benefit Plan** [aka VT Halter Marine, Inc. Group Benefit Plan]:

B.    Plaintiff re-alleges and incorporates all above and within said allegations here.

C.    At all material times here, Payor-Defendant, **VT Halter Marine, Inc. Employee Welfare Benefit Plan** [aka VT Halter Marine, Inc. Group Benefit Plan, and the **"Plan"** and **"Trust"**], located in Pascagoula, Mississippi, is a non-ERISA, purported **Welfare Benefit Plan** (a **Mississippi Trust** ) purportedly established to provide health, medical, hospital and other benefits to beneficiaries like Toche, who suffered from **brain cancer,** as well as sustained further injury, suffering (and near death) from each and all of the The Payor-Defendants' wrongful, capricious denials of said Plan's required and needed health benefits in 2014 and 2015, and that each Payor-Defendant negligently acted in concert with and otherwise wrongfully conspired with the other said   Payor-Defendants, *inter alia*, by each **Payor-Defendant negligently and tortuously interfering** with Toche's rights, claims, interests [*inter alia*, more than $100,000+ of medically necessary health care and  plan benefits (*inter alia, proton beam* brain cancer therapy / radiation treatments) **ordered by** Toche's health providers (*inter alia,* **M. D. ANDERSON CANCER CENTER**) and due unto Toche as shown by all **Exhibits hereto.**

9

D.      Nevertheless, Toche's rights, interests, benefits were wrongfully and **negligently interfered with** and denied by all Payor-Defendants as *allegedly* and falsely (a) "not medically necessary" and as purportedly (b) as "experimental" / "investigational" - as Payor-Defendants wrongly claim, when Payor-Defendants, Payor-Defendants' employees and Doe Defendants who rendered such wrongful **denials** of needed cancer benefits, *were* [a] **not duly *licensed to practice medicine*** and/or [b] **not** duly **qualified** to render the opinions and denials rendered, yet, rendered such "medical opinions" and **denials** of such Toche's benefits [i.e., as allegedly (a) "not medically necessary" and purportedly (b) "experimental" / "investigational"] which Payor-Defendants' arbitrary, erroneous and **negligent-per-se** "opinions" were **contrary to** the sound, life-saving, **medical orders** of **M. D. ANDERSON CANCER CENTER** that such *proton beam* brain cancer therapy / radiation treatments (a) **were "medically necessary"** and (b) **not** "experimental"/"investigational" (but, long-approved by the FDA).

E.      By Payor-Defendants' **Breaches** of **Contract, Law, Trust and Fiduciary Duties** to Toche related herein and by their **negligence-per-se** (and Payor-Defendants' other misconduct shown here and at trial) **Payor-Defendants** breached said certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche, and in wrongly denying Toche certain **medically-necessary**, **FDA-approved**, proton beam / radiation therapy and other **brain cancer** treatment benefits, among other benefits, due Toche under the Plan, Trust, Contract, Equity and Law, *inter alia*, Laws of Mississippi, while Payor-Defendants were bound to duties of Mississippi Law and engaged in handling and/or administering health plans and/or insurance and deciding health claims of and/or related to Toche. **Payor-Defendants** shall be served as prescribed by law and required to appear, answer and prove that$100,000+ of therapy denied by them [a] was "not medically necessary" and [b] was "experimental"/"investigational" as **Payor-Defendants** wrongfully claim.

5.      A.      Payor-Defendant, **VT Halter Marine, Inc.**:

B.      Plaintiff re-alleges and incorporates all above and within said allegations here.

10

C.     At all material times, Payor-Defendant, **VT Halter Marine, Inc. ["VTHM"]** with its principal place of business in Pascagoula, Mississippi, is a subsidiary of Vision Technologies Systems, Inc., a wholly owned subsidiary of Singapore Technologies Marine LTD (ST Marine), among others, and that **VTHM is both** an alleged "**sponsor**" and "an **administrator**" of the said *VT Halter Marine, Inc. Employee Welfare Benefit Plan*, and that **VTHM** negligently acted in concert with, and otherwise wrongfully conspired with, the other said Payor-Defendants in breaching said certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche, who suffered from brain cancer, as well as sustained further injury, suffering (and near death) from each and all of the Payor-Defendants' wrongful, capricious denials of said Plan's required and needed health benefits in 2014 and 2015, and that each Defendant negligently acted in concert with and otherwise wrongfully conspired with the other said Payor-Defendants, *inter alia*, by each Defendant **negligently and tortuously interfering** with Toche's rights, claims, interests [*inter alia*, more than $100,000+ of medically necessary health care and plan benefits (*inter alia, proton beam* brain cancer therapy / radiation treatments) **ordered by** Toche's health providers (*inter alia,* **M. D. ANDERSON CANCER CENTER**) and due Toche, but her rights, interests, benefits were wrongfully and **negligently interfered with** and denied by all Payor-Defendants as *allegedly* and falsely (a) "not medically necessary" and as purportedly (b) as "experimental" / "investigational" - as Payor-Defendants wrongly claim, when Payor-Defendants, Payor-Defendants' employees and Doe Defendants who rendered such wrongful *denials* of needed cancer benefits, *were* [a] *not duly licensed to practice medicine* and/or [b] *not* duly **qualified** to render the opinions and denials rendered, yet, rendered such "medical opinions" and **denials** of such Toche's benefits [i.e., as allegedly (a) "not medically necessary" and purportedly (b) "experimental" / "investigational"] which Payor-Defendants' arbitrary, erroneous and *negligent-per-se* "opinions" were **contrary to** the sound, life-saving, **medical orders** of **M. D. ANDERSON CANCER CENTER** that such *proton beam* brain cancer therapy / radiation treatments (a) **were "medically necessary" and** (b) **not**

11

"experimental"/ "investigational" (but, long-approved by the FDA).

D.    By Payor-Defendants' *Breaches* of *Contract, Law, Trust and Fiduciary Duties* to Toche related herein and by their *negligence-per-se* (and Payor-Defendants' other misconduct shown here and at trial) **Payor-Defendants** breached said certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche and in wrongly denying Toche certain **medically-necessary, FDA-approved,** proton beam / radiation therapy and other *brain cancer* treatment benefits, among other benefits, due Toche under the Plan, Trust, Contract, Equity and Law, *inter alia,* Laws of Mississippi, while Payor-Defendants were bound to duties of Mississippi Law and engaged in handling, administering health plans and/or insurance and deciding health claims of and/or related to Toche.    **Payor-Defendants** shall be served as prescribed by law and required to appear, answer and prove that$100,000+ of therapy denied by them [a] was "not medically necessary" and [b] was "experimental"/"investigational" as **Payor-Defendants** wrongfully claim.

6.    A.    Payor-Defendants, **Hub International, Inc.** and **Hub International Healthcare Solutions, LLC** [ herein "**Hub**" - f/d/b/a *Fox-Everett, Inc.*]:

B.    Plaintiff re-alleges and incorporates all above and within said allegations here.

C.    At all material times here, Payor-Defendants, **Hub International, Inc.** and **Hub International Healthcare Solutions LLC** [aka "**Hub**" - f/d/b/a *Fox-Everett, Inc.*] with their principal place of business in Mississippi, was a Third-Party Administrator ("TPA") and/or Contract Administrator ("CA") and/or other Administrator of said *VT Halter Marine, Inc. Employee Welfare Benefit Plan,* and said **Hub** negligently acted in concert with, and otherwise wrongfully conspired with, the other said Payor-Defendants in breaching said certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche, who suffered from brain cancer, as well as sustained further injury, suffering (and near death) from each and all of the Payor-Defendants' wrongful, capricious denials of said Plan's required and needed health

12

benefits in 2014 and 2015, and that each Payor-Defendants negligently acted in concert with and otherwise wrongfully conspired with the other said Payor-Defendants, *inter alia*, by each Payor-Defendants **negligently and tortuously interfering** with Toche's rights, claims, interests [*inter alia*, more than $100,000+ of medically necessary health care and plan benefits (*inter alia, proton beam* brain cancer therapy / radiation treatments) **ordered by** Toche's health providers (*inter alia,* **M. D. ANDERSON CANCER CENTER**) and due Toche, but her rights, interests, benefits were wrongfully and **negligently interfered with** and denied by all Payor-Defendants as *allegedly* and falsely (a) "not medically necessary" and as purportedly (b) as "experimental" / "investigational" - as Payor-Defendants wrongly claim, when Payor-Defendants, Payor-Defendants' employees and Doe Defendants who rendered such wrongful *denials* of needed cancer benefits, *were* [a] *not duly licensed to practice medicine* and/or [b] *not duly qualified* to render the opinions and denials rendered, yet, rendered such "medical opinions" and **denials** of such Toche's benefits [i.e., as allegedly (a) "not medically necessary" and purportedly (b) "experimental" / "investigational"] which Payor-Defendants' arbitrary, erroneous and *negligent-per-se* "opinions" were **contrary to** the sound, life-saving, **medical orders of M. D. ANDERSON CANCER CENTER** that such *proton beam* brain cancer therapy / radiation treatments (a) **were "medically necessary"** (b) **not** "experimental"/"investigational" (but, long-approved by FDA).

D. By Payor-Defendants' *Breaches* of *Contract, Law, Trust and Fiduciary Duties* owed to Toche related herein and by their *negligence-per-se* (and Payor-Defendants' other misconduct shown here and at trial) **Payor-Defendants** breached said certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche and in wrongly denying Toche certain **medically-necessary, FDA-approved**, proton beam/radiation therapy and other *brain cancer* treatment benefits, among other benefits, due Toche under the Plan, Trust, Contract, Equity and Law, *inter alia*, Laws of Mississippi, while Payor-Defendants were bound to duties of Mississippi Law and engaged in handling and/or administering health plans and/or insurance and deciding health claims of and/or related to Toche. **Payor-Defendants** shall be served as

13

prescribed by law and required to appear, answer and prove that$100,000+ of therapy denied by them [a] was "not medically necessary" and [b] was "experimental"/"investigational" as **Payor-Defendants** wrongfully claim.

7.    A.    Payor-Defendants, **MCMC, LLC** and **American Health Holding, Inc.** :

      B.    Plaintiff re-alleges and incorporates all above and within said allegations here.

      C.    At all material times, Payor-Defendants, **MCMC, LLC** <u>and</u> **American Health Holding, Inc.** (an AETNA, Inc. entity) were <u>not</u> licensed physicians, but "medical-benefits-denials-support functionaries" and/or purported "claims review administrators and/or contractors" for the other Payor-Defendants, all of which Payor-Defendants negligently acted in concert with, and otherwise wrongfully conspired with, the other Payor-Defendants in breaching certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche, who suffered from brain cancer, as well as further suffering (and near death) from each and all of the Payor-Defendants' wrongful, capricious denials of said Plan's required and needed health benefits in 2014 and 2015, and that each Payor-Defendants negligently acted in concert with and otherwise wrongfully conspired with the other said Payor-Defendants, *inter alia*, by each Payor-Defendants **negligently and tortuously interfering** with Toche's rights, claims, interests [*inter alia*, more than $100,000+ of medically necessary health care and plan benefits (*inter alia, proton beam* brain cancer therapy / radiation treatments) **ordered by** Toche's health providers (*inter alia,* **M. D. ANDERSON CANCER CENTER**) and due Toche, but her rights, interests, benefits were wrongfully and **negligently interfered with** and denied by all Payor-Defendants as *allegedly* and falsely (a) "not medically necessary" and as purportedly (b) as "experimental" / "investigational" - as Payor-Defendants wrongly claim, when Payor-Defendants, Payor-Defendants' employees and Doe Defendants who rendered such wrongful **denials** of needed cancer benefits, *were* [a] ***not*** **duly *licensed to practice medicine*** and/or [b] ***not*** duly **qualified** to render the opinions and denials rendered, yet, rendered such "medical opinions" and **denials** of such Toche's benefits [i.e., as allegedly (a) "not medically necessary" and purportedly (b) "experimental" or /

14

"investigational"] which Payor-Defendants' arbitrary, erroneous and *negligent-per-se* "opinions" were **contrary to** the sound, life-saving, **medical orders of M. D. ANDERSON CANCER CENTER** that such *proton beam* brain cancer therapy / radiation treatments (a) **were "medically necessary"** (b) **not** "experimental" / "investigational" (but, long-approved by FDA).

     D.    By Payor-Defendants' *Breaches* of *Contract, Law, Trust and Fiduciary Duties* owed to Toche and by their *negligence-per-se* (and Payor-Defendants' other misconduct shown here and at trial) **Payor-Defendants** breached said certain **promises** and **representations** to Toche, in addition to Payor-Defendants' further breaches of Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche and in wrongly denying Toche certain **medically-necessary, FDA-approved**, proton beam / radiation therapy and other *brain cancer* treatment benefits, among other benefits, due Toche under the Plan, Trust, Contract, Equity and Law, *inter alia*, Laws of Mississippi, while Payor-Defendants were bound to duties of Mississippi Law and engaged in handling and/or administering health plans and/or insurance and deciding health claims of and/or related to Toche. The said **Payor-Defendant**s shall be served as prescribed by law and required to appear, answer and prove that the more than $100,000+ of therapy denied by Payor-Defendants [a] was "not medically necessary" and [b] was "experimental" / "investigational" - as Payor-Defendants wrongfully claim. Further, Payor-Defendants, **MCMC, LLC** and **American Health Holding, Inc.,** in aiding and abetting the other Payor-Defendants' pretext for "justification" of all denials of benefits, negligently failed to adhere to certain requisite standards of the medical industry - and certain requisite standards of their own multimillion-dollar/year "industry" which has led to said purported "*external reviewers*" unconscionable *profiteering* off of such Cancer Patients as Toche - shown in the **2006-10 Charts** attached as **Exhibit 9** hereto - and the adverse effects of *Denial-Entities' profiteering* off of such Cancer Patients - and Cancer Patients families - as the Toches - shown in **Exhibit 10** hereto.

E.    Toche's case is nearly identical to *West v. The Corning Inc. Pension Plan, et al*,

C. A. No. 08-cv-6230 CJS (W.D. N.Y. Sept. 23, 2009) which held:

> "The Corning Incorporated Benefits Committee ("the Committee") was the Plan
> Administrator. However, the Committee **delegated** its authority to a third-party
> corporation, CORE, INC., whose Peer Review Analysis division was in turn
> acquired by another entity, **MCMC, LLC** ("MCMC"). **Consequently, MCMC
> assumed the role of claims administrator for. . . claims under the Plan.** For
> the sake of convenience, and except as otherwise noted, in this Decision and
> Order the Court will refer to the Committee, CORE, and MCMC, collectively, as
> "the Committee."* * * Plaintiff maintains that the Committee acted arbitrarily and
> capriciously by **failing to obtain *independent* . . . physical examinations.** In
> support of this argument, Plaintiff cites *Westphal v. Eastman Kodak Co.*, No.
> 05-CV-6120, 2006 WL 1720380 (W.D.N.Y. Jun. 21, 2006) (Telesca, J.). In
> *Westpha*l, the court reversed a plan's denial of benefits, after the plan administrator
> rejected the opinions of **two treating doctors . . .** , and instead **relied on the
> contrary opinions** of two **doctors who had never examined the plaintiff.** Id.,
> 2006 WL 1720380 at *3-4 (. . ."it is an **abuse of discretion** to rely solely on [the
> opinions of **non-treating, non-examining doctors**], particularly in a case such as
> this, where the opinion of every physician who actually examined the plaintiff
> agreed . . . . "(and **found contrary** to the opinions of **non-treating,
> non-examining doctors.**)).* * *Plan's **failure to conduct its own . . .
> examination of Plaintiff** . . . is a significant factor in determining whether the
> decision was arbitrary and capricious. . . . ("Defendant's failure to conduct an
> 'in-person' . . . evaluation is a critical element in establishing an arbitrary and
> capricious denial."). Based on the specific facts of this case, the Court agrees. "

*West v. The Corning Inc. Pension Plan*, Id. [Emphasis and edit added].

8.    A.    *None of the Payor-Defendants* (and none of Payor-Defendants' employees,

agents or functionaries) who rendered "medical opinions" *contrary* to M. D. ANDERSON's

physicians' orders [a] were *licensed to practice medicine* in Texas, Kentucky, Mississippi [5]

- nor [b] were otherwise **qualified** to render opinions and denials rendered **contrary to** sound,

life-saving, **medical orders** of **M. D. Anderson Cancer Center's world-acclaimed physicians**.

---

5

See TITLE 73. PROFESSIONS AND VOCATIONS - CHAPTER 25. PHYSICIANS - GENERAL PROVISIONS -"Miss.
Code Ann. § 73-25-1  (2017) **Duty to obtain license**

**Every person who desires to practice medicine must first obtain a license to do so from the state board
of medical licensure**, but this section shall not apply to physicians now holding permanent license, the same
having been recorded as required by law."

9.    A.    **The Payor-Defendants,** VT Halter Marine, Inc. Employee Welfare Benefit Plan; VT Halter Marine, Inc., wrongly abdicated all their duties by "**delegating**" any authority they had to **Payor-Defendants,** Hub, MCMC, LLC and American Health Holding, Inc. **If** Hub, MCMC, LLC and American Health Holding, Inc. are **licensed physicians,** still, all **Payor-Defendants:**

(1) failed to **perform physical examinations** of Toche;

(2) failed to fully, fairly, knowledgeably **consider Toche's entire medical record;**

(3) failed to give appropriate weight to **Toche's Treating Physicians' contrary findings and opinions at M. D. Anderson Cancer Center** (Dr. Ghia's Reports, i.e., in **Exhibit 1** hereto) **and at SRHS Cancer Center** (Dr. Persing's Reports, i.e., in **Exhibit 1** hereto); **Payor-Defendants** also

(4) failed to have Toche's claims reviewed by qualified, independent Cancer specialists; and    (5) failed to **provide Toche with** full, timely **Notices** and **Disclosures.** Among other Notices and Disclsoures required, Payor-Defendants **failed to provide** Toche with the following required, full, timely, **Notices** and **Disclosures:**

a.  **Notice** and **Disclosure** of Plan's **Review Procedures,**

b.  **Notice** and **Disclosure of All Time Limits** applicable to all Plan procedures,

c.  **Notice** and **Disclosure of All Time Limits** for **Administrative Appeals,** and

d.  **Notice** and **Disclosure of Time Limits** for Filing **Suit** - All required Notices and Disclosures that must be fully furnished in **EACH** written Notice of **"denial"** of benefits. Thus, fees, costs, losses, and **penalties,** inter alia, of \$110/day/Toche/Request, **are now due** until all penalties and documents are received from Payor-Defendants. Mirza v. Ins. Adm'r of America, Inc., 800 F.3d 129, 134 (3rd Cir. 2015) and Harris Methodist Fort Worth v. Sales Sup. Servs., Inc., Emp. Health Care Plan, 426 F.3d 330, 337 (**5th Cir. 2005**).

10.    Further, fees, costs, losses and **penalties are also due** from Payor-Defendants, inter alia, **penalties of \$110 per day, per Toche beneficiary, from date of each Request until paid in full,** for Payor-Defendants' failure and refusal to produce the **Master Plan Document,** the **Trust**

17

**Agreement**, the **Benefits Files** and **Claims Files** and **other documents** required to be produced to Toche by law under Toche's prior Requests, *inter alia*, in **Exhibits 1, 2, 3, 4** hereto.

11.    A.    Plaintiff re-alleges and incorporates all above and within said allegations here.

B.    At all material times here, **Doe Defendants 1-5** are unidentified persons and entities who acted in concert with the other Payor-Defendants and that each negligently acted in concert with and otherwise wrongfully conspired with the other said Payor-Defendants by each Defendant **negligently and tortuously interfering with** Toche's rights, claims, interests [*inter alia*, more than $100,000+ of medically necessary health care and plan benefits (*inter alia, proton beam* brain cancer therapy / radiation treatments) **ordered** by Toche's health providers (*inter alia*, **M. D. ANDERSON CANCER CENTER**) and due Toche, but her rights, interests and benefits were wrongfully and **negligently interfered with and denied by all Payor-Defendants** as falsely and **allegedly** (a) "not medically necessary" and as purportedly (b) as "experimental" / "investigational" - as Payor-Defendants wrongly claim - when all of the Payor-Defendants [and all of the Payor-Defendants' employees (Doe Defendants)] who rendered such wrongful *denials* of needed cancer benefits, *were* [a] ***not duly licensed to practice medicine*** and/or [b] ***not*** duly **qualified** to render the opinions and denials rendered, yet, rendered such "medical opinions" and **denials** of such Toche's benefits [i.e., as allegedly (a) "not medically necessary" and purportedly (b) "experimental" / "investigational"] which Payor-Defendants' arbitrary, erroneous and ***negligent-per-se*** "opinions" were **contrary to** the sound, life-saving, **medical orders of M. D. ANDERSON CANCER CENTER** that such *proton beam* brain cancer therapy/radiation treatments (a) **were "medically necessary" and** (b) **not** "experimental" / "investigational" (but, long-approved by the FDA).

C.    By Payor-Defendants' *Breaches* of *Contract, Law, Trust and Fiduciary Duties* owed to Toche and by their ***negligence-per-se*** (and all of Payor-Defendants' other misconduct shown herein and at trial) **all Payor-Defendants** breached certain Trust, Contract, Equity and Law duties owed by Payor-Defendants to Toche and in wrongly denying Toche certain

18

**medically-necessary, FDA-approved,** proton beam / radiation therapy and other **brain cancer** treatment benefits, among other benefits, due Toche under the Plan, Trust, Contract, Equity and Law, *inter alia*, Laws of Mississippi, while Payor-Defendants were bound to duties of Mississippi Law and engaged in handling and/or administering health plans and/or insurance and deciding health claims of and/or related to Toche. The said **Doe Defendants** - when found - shall be served as prescribed by law and required to appear, answer and prove that the more than $100,000+ of therapy denied by Payor-Defendants [a] was "not medically necessary" and [b] was "experimental" / "investigational" - as Payor-Defendants wrongly claim. Each **Doe Defendant** is made such a defendant pursuant to Equity and law, and whose full, correct names the Plaintiff is ignorant of, and are unidentified persons who may be identified in discovery pursuant to Equity, law, or otherwise ascertained through the use of judicial mechanisms, *inter alia,* are the agents, administrators, trustees, joint-venturers of Payor-Defendants who also caused or contributed to the harm and losses of Plaintiff - and when identified each will duly be made named parties here and served as by law prescribed.

12.   In December 2014, Toche's medical provider, **M.D. ANDERSON CANCER CENTER,** duly and timely filed with the Payor-Defendants for prompt and requisite **payments,** certain life-saving, medically necessary **orders** that Toche's particular **brain cancer** condition required **proton** beam therapy / radiation treatments, which **payments, totaling** more than $100,000+ for such cancer therapy at **M.D. ANDERSON CANCER CENTER,** was wrongfully and arbitrarily **denied** by the Payor-Defendants, initially on December 22, 2014, and finally [after Toche duly pursued multiple Appeals] on or about February 15, 2015, repeatedly and ostensibly upon the Payor-Defendants' purported, but conflicted, self-serving, arbitrary, wrongful, erroneous "excuses" of "not medically necessary" and/or "experimental"/"investigational"- despite **M.D. ANDERSON CANCER CENTER's** sound medical orders for such $100,000+ of **proton** beam

19

therapy /radiation treatment that was based on sound, established, medical science, *inter alia*,

(a) **proton** beam therapy (compared to photon beam therapy) had a greater probability of saving Toche's life given the particulars of her critical, life-threatening condition (like the location of the tumor, molecular composition of the tumor, etc.);

(b) **proton** beam therapy (compared to photon beam therapy) lessened the probability of Toche suffering serious side-effects (e.g., with photon beam therapy there is an increased probability of paralysis and/or cognitive dysfunction, increased probability of second malignancy, and/ or an increased probability of cataract formation); and

(c) Toche stood to have (and, so far to date, has experienced) a longer life-expectancy by undergoing **proton** beam therapy (compared to photon beam therapy) because the dosage of radiation to Toche's brain required by **proton** beam therapy was at least 33% less than photon beam therapy; and

(d) **proton** beam therapy has been **approved** by the United States Food and Drug Administration ("**FDA**") for use in such *brain cancer* (as suffered by Toche) for decades.

13.    Since Toche naturally desired to increase her chances of remaining alive (and she desired not to "fry her brain" with other, alternative treatment *not recommended nor ordered* by **M.D. ANDERSON CANCER CENTER** ), and Toche naturally followed the sound *medical orders* of such a world-renown health provider as **M.D. ANDERSON CANCER CENTER - versus** the Payor-Defendants' unsound, conflicted, self-serving, pecuniary-driven, denials and "excuses" that such **proton** beam therapy /radiation treatment was "not medically necessary" and/or "investigational" / "experimental," - Toche necessarily pursued the treatment plan prescribed by **M.D. ANDERSON CANCER CENTER** and Toche received **proton** beam therapy /radiation

20

treatment, resulting in Toche sustaining the $100,000+ **cost** of **proton** beam therapy/radiation treatment which should have been born by Payor-Defendants, yet, was arbitrarily, wrongfully, erroneously **denied** by Payor-Defendants - for Payor-Defendants' unsound, conflicted, self-serving, pecuniary-driven 'excuses.' '

14.     Via her family, her former counsel and **M. D. ANDERSON CANCER CENTER**,

**Toche** duly and timely **appealed** the Payor-Defendants' erred "denials" through correspondence in December 2014 through mid-January 2015, Toche's duly attempted to receive **Payor-Defendants' [i] pre-certification and [ii] payments** of the needed **proton** beam therapy /radiation treatment, yet, Payor-Defendants arbitrarily, wrongfully, erroneously refused to pre-certify or pay same, and Toche duly carried out her December 2014 and January 2015 **appeals** of Payor-Defendants' denials *with Payor-Defendants* to no avail. Toche ultimately was wrongly forced (by Payor-Defendants' neglect and breaches of trust) to pay more than $100,000+ out-of-pocket for the **proton** beam therapy / radiation treatments in accord with the medical counseling, prescription and orders of **M.D. ANDERSON CANCER CENTER's** well-trained, world-renown, medical personnel (rather than the arbitrary, pecuniary-driven, conflicted, self-interests of Payor-Defendants' paper-pushing personnel, contractors, functionaries and joint-venturers - who never examined Toche in-person nor considered the relevant, medical data from any objective, informed and non-conflicted position). Toche's proton beam therapy/radiation treatments were carried out by such well-trained, world-renown, medical personnel **at M.D. ANDERSON CANCER CENTER** in Houston, Texas, saving Toche's life, but leaving Toche with $100,000+ of **medically-necessary**, **non**-experimental, **non**-investigational, care costs *despite* **M.D. ANDERSON CANCER CENTER PHYSICIANS' fully-supported, world-acclaimed, qualified,**

21

**medical opinions.** See **Exhibit 1 and other Exhibits attached** hereto and incorporated herein by reference. See www.youtube.com/watch?v=HUwnUAxXDXw. See **MAYO CLINIC'S PHYSICIANS'** **fully-supported, medical opinions at www.youtube.com/watch?v=OTd5dv3VDws**. See **AMERICAN BRAIN TUMOR ASSOCIATION'S PHYSICIANS'** **fully-supported, medical opinions**, i.e., www.youtube.com/watch?v=k2kXKDJs5QY. See **PENN UNIV. MEDICINE'S medical opinions**, i.e., www.youtube.com/watch?v=KK8MNVlqdqk&index=4&list=PLaLaxJuvlay8IAzer-5w80z8EeyTs6V8v.

All of these opinions **support Toche's treating Physicians'** medical **orders for medically-necessary**, non-experimental, **Proton Beam Therapy** - that **saved Toche's life!**

15.      Throughout Toche's **Proton** Beam Therapy, the said Payor-Defendants, in quite inequitable and inconsistent fashion, afforded coverage on the one hand *(e.g.,* MRIs and X-rays performed as part of the **proton** beam therapy) - yet, Payor-Defendants arbitrarily, wrongfully, erroneously refused coverage on the other hand *(e.g.,* the **proton** beam therapy / radiation itself). Payor-Defendants are legally precluded from this kind of whimsical coverage and claims decision-making. By timely, thorough, substantial, **Appeals correspondence** in 2014 - 2015 to *the Payor-Defendants*

[A] by Toche,

[B] by Toche's family,

[C] by Hon. Steve Mullins, of Luckey & Mullins,

[D] by **M. D. Anderson Cancer Center's** world-acclaimed Physicians,

[E] by **Singing River Cancer Center's** physicians and personnel and [F] by others - Toche fully, timely carried out all *Appeals* of Payor-Defendants' wrongful, capricious denials of payments for Toche's brain cancer treatments. Id.

22

16.      Despite Toche's multiple **Appeals** (supported by sound, medical literature and other evidence from **M.D. ANDERSON CANCER CENTER** and others) - the Payor-Defendants arbitrarily, wrongfully, erroneously clung to Payor-Defendants' aberrant coverage defenses (namely an "investigational" / "experimental" and/or "not medically necessary" theories), issuing Payor-Defendants' "final claim denial/right to sue letter" on Appeal in 2015. Payor-Defendants continue to arbitrarily, wrongfully, erroneously cling to Payor-Defendants' aberrant coverage "theories" (namely an "investigational"/ "experimental" or "not medically necessary" theories) for Payor-Defendants' arbitrary, wrongful, erroneous claims denials totaling more than $100,000+ in costs paid by Toche and due and payable by Payor-Defendants to Toche.

17.      For all the reasons set forth in the Appeals packages (fully incorporated herein by reference) and likely more reasons not yet discovered, Payor-Defendants' claim denials do not pass legal and/or factual muster even under the most friendly of Defendant-standards of review that might someday apply in this litigation; *i.e.,* Payor-Defendants' claim denials are the epitome of "arbitrary and capricious." For example, and in sum, Payor-Defendants' "investigational" / "experimental" and/or "not medically necessary" "theories" [not "bases"] for claims denials are so woefully antiquated; *i.e.,* out of touch with modern, accepted medicine and science.

18.      A.      As another example, the practice of medicine is not a "one size fits all" endeavor where the fate of a human being (here, Toche) can always be dictated by Payor-Defendants' arbitrary interpretation of pieces of paper (Payor-Defendants' "guidelines") upon which Payor-Defendants' antiquated "investigational"/"experimental" and/or "not medically necessary" theories' nonsense are memorialized.

         B.      Here, one of the world's very best medical providers, **the M. D. ANDERSON CANCER CENTER,** and its world renown physicians, carefully and thoroughly assessed the

23

particulars of Toche's brain cancer and made a sound, educated, informed decision as to how to best go about saving Toche's life in a manner less likely to result in debilitating or life-ending side-effects ... **proton** (not photon) beam therapy/ radiation treatments. Yet, here, quite simply, the same plainly cannot be said for Payor-Defendants (and / or their salaried or hired "medical personnel") who never examined Toche in-person (as just one example of Payor-Defendants' claim handling and decision-making blunders) and robotically applied antiquated, written "guidelines" as if Toche was a mere sub-number of a Plan number rather than a living, breathing, real life person deserving of individualized (rather than cookie-cutter) sound, medical care.

C.     Moreover, **M.D. ANDERSON CANCER CENTER** did not assess or attempt to pass on to Payor-Defendants any "extra-ordinary", "unusual" or "excessive" costs of the **proton** beam therapy /radiation treatments.

D.     Payor-Defendants cannot be legitimately heard to complain that they had any 'contractual' or 'legal' right or duty to force Toche into inferior, riskier medical treatment solely **"to save Payor-Defendants money**."

## 19. **PAYOR-DEFENDANTS' BIAS & CONFLICTS OF INTERESTS VITIATE ALL "DENIALS"**:

A.     Plaintiff re-alleges and incorporates all above and within said allegations here.

B.     Given that Payor-Defendants also "decide claims" as well as "deny or pay claims," this is a "conflicts of interests case" subject to a *heightened standard of review* - such as pronounced in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008).

C.     Where a plaintiff, such as Toche here, shows "probative evidence demonstrating that (1) a palpable *conflict of interest* or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty," the level of deference is adjusted to take those factors into consideration. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998).

When circumstances justify application of the sliding scale approach, "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." 144 F.3d at 1162.

D. Toche shows [1] that there were procedural irregularities in the administrative handling of this case sufficient to justify sliding scale analysis and [2] that a conflict of interest exists in this case because VTHM claims to be both [a] a 'funding sponsor' *and* [b] an administrator of the Plan, and [c] Payor-Defendants erred denial of benefits 'saved' VTHM and the Plan $100,000+.

E. As pointed out by the medical literature enclosed herewith and in the Appeals packages Toche sent to Payor-Defendants (received by Payor-Defendants along with the medical literature provided by **M.D. ANDERSON CANCER CENTER** to Payor-Defendants, among other literature supporting proton beam therapy that was readily available to the Payor-Defendants supporting proton beam therapy ), **M.D. ANDERSON CANCER CENTER** was / is not alone in recognizing the propriety of proton beam therapy/ radiation (rather than photon beam therapy/ radiation), especially in critical situations like Toche's, where a tumor is surrounded by a vital organ (the brain) that simply cannot be compromised during radiation.

F. When the Plan is appropriately applied to modern medicine and the particulars of Toche and her condition, **M.D. ANDERSON CANCER CENTER** 's **proton** beam therapy /radiation treatments orders for Toche plainly triggered the Plan's coverage grants, Payor-Defendants' duties to Toche and Payor-Defendants arbitrarily and wrongfully erred in deciding and acting otherwise.

20. A. At all material times, Toche's premiums were duly, timely paid in relation to the Plan, i.e., by Toche's husband's payroll deductions or otherwise paid by the cumulative sums of all other employees' payroll deductions, and such Plan was an employee welfare benefit plan.

B.     At all material times, the Plan was in full force and effect and was a legally valid

and binding Contract and Trust, entitling Toche to Equitable and legal relief of every kind.

C.     At all material times, Toche complied with all reasonable *conditions precedent*

required for Payor-Defendants' authorizations and payments for **M.D. ANDERSON CANCER**

**CENTER**'s $100,000+ of said **proton** beam therapy/radiation treatments -Toche incurred.

20.     Toche exhausted any 'Appeal process' in efforts to get The Payor-Defendants'

"to do the right thing" (i.e., paying the $100,000+ in cancer treatments and/or indemnifying

and reimbursing Toche for paying same) - without litigation - to no avail. Hence, this lawsuit is

Toche's last resort for recovery of all of Toche's more than $100,000+ of due and unpaid health

benefits (paid to M.D. ANDERSON, et al., wrongfully and/or erroneously denied by Payor-

Defendants), attorneys fees, court costs, her physical injury, emotional distress, and her financial

losses suffered as the direct, proximate result of Payor-Defendants' conflicts-of-interest, Payor- .

Defendants' grossly-negligent claims-handling and arbitrary, wrongful, capricious, erroneous

decision-making, and Payor-Defendants' Breaches of Trust, Contract, Equity and Law.

21.     A. Following no response to Toche's **2015 Requests (Exhibit 1)**, Toche futilely

requested by Toche's 2017 -2018-**Letter Requests in Exhibits 2, 3, 4**, that all of the Payor-

Defendants ". . . please send full, true copies of the **2013 - through - 2015 versions** of the

following needed documents" required by law and the facts to be timely, fully produced to Toche:

1. the VT Halter Marine, Inc. Employee Welfare Benefit **Plan Document** [*'Master Plan Document'*]
2. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Plan Descriptions** ["SPDs"]
3. the latest VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Annual Report**;
4. the latest **Terminal Report**;
5. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Trust Agreement**;
6. the contracts between VT Halter Marine, Inc. Employee Welfare Benefit Plan [or VT Halter Marine, Inc.]
   and [A] Fox-Everett, Inc. [now Hub International, Inc.]
   and [B] MCMC, LLC
   and [C] other third-party administrators, claims administrators, vendors, contractors of said **Plan**.
II. Please send full, true copies of the following, needed documents:
7. All evidence the VT Halter Marine, Inc. Employee Welfare Benefit **Plan** is wholly-funded by VT Halter
Marine, Inc. **assets** - and

26

8. All evidence of the sums of health, medical, hospital insurance **premiums** paid during the years **2013-through-2015**

    [a] paid by VT Halter Marine, Inc.,

    [b] paid by/on behalf of Heather Toche, including that paid by my husband, Wm R Toche, by payroll deductions,

    [c] paid by other employees of VT Halter Marine, Inc.

9. All documents pertaining to me, **Heather Toche**, and pertaining to claims for health, medical, hospital and cancer treatment benefits for and/or on behalf of me, **Heather Toche** - including my entire **Benefits Files** and **Claims Files** and

10. All other documents relating to the denials of more than $100,000 of unpaid cancer treatments of Heather Toche."

See Toche's **Letter-Requests Exhibits 1, 2, 3, 4 and Payor-Defs' non-responses, Exhibit 5.**

    B.    Toche got no response from **MCMC, LLC or American Health Holding Inc.**

    C.    Toche got a *non-responsive* letter, dated 12-12-17, from **Hub**. See **Exhibit 5 hereto.**

    D.    Toche got a *non-responsive* letter, dated 11-29-17, from **VT Halter Marine, Inc.** (Plan

Sponsor and co-Administrator) attached as **Exhibit 5**.

    E.    Toche got **NONE of the above-needed items requested** by Toche. Id.

    F.    Required, needed copies of **all items Requested**, *inter alia*, the **Master Plan**

**Document, Trust Agreement, premiums** records, the **Benefits Files** and **Claims Files** (aka

the "Appeals package"), etc. **remain in the possession and control of Payor-Defendants** and

**wrongly withheld** by Payor-Defendants from Toche, despite Toche's entitlement to such

documents and despite Toche's repeated, proper, lawful requests to Payor-Defendants for such

needed records by Heather Toche, as dependent beneficiary of the Plan, whose said document-

request letters [**Exhibits 1, 2, 3, 4**] duly gave notice to all Payor-Defendants: "Failure to comply

with these requests may result in a penalty assessment versus you of up to $110 per day." Id.

See $110/day penalties imposed in *Kujanek v. Houston Poly Bag I, Limited*,  658 F.3d 483 (5th

Cir. 2011) (penalties, fees & damages of $243,000+) and *Robbin Cromer-Tyler, M. D., Plaintiff*

*v. Edward R. Teitel, M. D., P. C., et al., Defendants*, USDC Case No. 1:01-cv-1077-MEF (M.D.

Ala., Sept 11, 2007); aff'd in part, No. 07-14752, (11th Circuit Sept. 24, 2008) ($179,960

penalties) (rev'd denial of other relief due).

G.     Toche prays that penalties be assessed versus all of *the Payor-Defendants*,

*VT Halter Marine, Inc. Employee Welfare Benefit Plan; VT Halter Marine, Inc.; Hub; MCMC, LLC;*

*American Health Holding, Inc.,* equal to the maximum of \$110/day X 4 Toche-Beneficiaries X 2

Requests until fully paid in this case.

22.     The entire Appeals package is presently possessed by or readily available to all

Payor-Defendants. The entire Appeals package is fully incorporated herein by reference, rather

than attached hereto as an exhibit, and will be provided to the Court upon receipt from Payor-

Defendants and put to use in this litigation under seal or via a *Protected Health Information*

("PHI") confidentiality agreement, given the "PHI" contained therein.

23.     At all material times here, **M. D. ANDERSON CANCER CENTER** was Toche's

cancer treatment health provider of last resort, which provided medically-necessary **orders** for

Toche to Payor-Defendants that Toche's particular brain cancer condition required proton beam

therapy / radiation treatments and which medically-necessary **orders** the Payor-Defendants

arbitrarily, wrongfully,  erroneously rejected - resulting in more than \$100,000+ of plan benefits

that were arbitrarily, wrongfully, erroneously "denied" by Payor-Defendants, which \$100,000+

was incurred and/or *paid by Toche*  to the said **M.D. ANDERSON CANCER CENTER** - and

which \$100,000+ continues to be arbitrarily, wrongfully, erroneously denied by all of the Payor-

Defendants - upon said Payor-Defendants' wrongful, conflicted, self-serving, denials' erroneous

and     arbitrary     "excuses"     of     allegedly     "not     medically     necessary"     and/or

"experimental"/"investigational" "theories."

24.     All burdens of proof are on Payor-Defendants to prove Payor-Defendants'

alleged health coverage exclusions, i.e., the proton beam therapy was "not medically necessary"

and is "experimental" / "investigational" by Payor-Defendants' alleged theories of same - by which

Payor-Defendants wrongly denied Toche's requests for payments of \$100,000+ of due benefits.

28

25.     **M. D. ANDERSON CANCER CENTER** has shown to Payor-Defendants, and will prove to the Court, that Toche's more than $100,000+ of *brain cancer therapy benefits* denied by Payor-Defendants [a] <u>was</u> "medically necessary" and [b] was <u>not</u> "experimental" / " investigational" - as the Payor-Defendants arbitrarily, wrongfully, erroneously claim.

26.     In a nutshell:  Since such a world-renown health provider as **M. D. ANDERSON CANCER CENTER** is "right" and "correct," and all of the **Payor-Defendants** are "wrong" and "erroneous" in their postures denying such $100,000+ in Plan benefits to  Toche, each of the **Payor-Defendants** must be adjudged liable to Toche for her benefits, fees, interest, and Toche's other injuries, losses and damages recoverable here.

27.     All conditions precedent to the institution of this action *(e.g.,* administrative, pre-suit Appeals, etc.) have occurred, been performed or waived, or were futile.

## III.     ACCOUNTINGS ARE DUE FROM ALL OF THE DEFENDANTS TO TOCHE

28.     Plaintiff re-alleges and incorporates all above and within said allegations here.

29.     Toche files this action for **Accountings** from **ALL Defendants**, *inter alia*,

A.     **Accountings** of [a] all of Toche's medical bills *received* by each and all of the Defendants, and [b] all of Toche's medical bills *paid* by each of the Defendants and [c] all of Toche's  medical bills *denied*  by each of the Defendants and [d] the Defendants' purported reasons for denying Toche's medical bills for Toche's *brain cancer* treatments **in 2014 and 2015** since: "(1) there is a need of discovery of such to resolve the payments and reimbursements due from such extensive and complicated medical billings, and (2) given the complicated character of the accounts, and (3) given the existence of a fiduciary or trust relation" (and/or *constructive trust* **relation** [6] ) between the Defendants (jointly and/or severally) and the Plaintiff, Toche. See

---

[6]

A constructive trust is an invention of equity where "one who unfairly holds a property interest may be compelled to convey that interest to" a party justly entitled to the property. *In re Estate*

29

*Re/Max Real Estate Partners, Inc. v. Lindsley*, 840 So. 2d 709, 712 (Miss. 2003) (citing *Henry v. Donovan*, 114 So. 482, 484 (Miss. 1927) "an **Accounting is necessary to determine the amount due by the defendant(s)**." Id.); and

B.     Toche also files this action to secure **Accountings** by **ALL Defendants** of all of the sums, **premiums** and other **compensation** paid and received by each Defendant relative to Toche and Toche's medical care, to show Payor-Defendants' joint, arbitrary and wrongful denial of more than $100,000+ of brain cancer treatment benefits due to and/or for Toche, *inter alia*, [a] all sums of **health plan and medical and other** insurance **premiums** paid by and/or for Toche in **2013, 2014 and 2015**, *inter alia,* [i] all **premiums** paid by Toche's husband, William R. Toche, paid via Mr. Toche's *payroll deductions* or otherwise during his employment with VT Halter Marine, Inc. (and affiliates), and [ii] all **premiums** and other **compensation** paid *by other employees'* of VT Halter Marine, Inc. (and affiliates) via employees' payroll deductions, **or otherwise**, for the benefit of all Plan beneficiaries (*inter alia*, Heather Toche); and [iii] any and all health plan **premiums** paid by VT Halter Marine, Inc., and [iv] any and all other **premiums** [*inter alia*, "stop loss" insurance premiums] and [v] all other **compensation** paid and received by the Payor-Defendants, and [vi] all sums paid and received by [a] the Plan, Plan Sponsor and others relative to the Plan Funds purportedly held for the benefit of all Plan Beneficiaries (*inter alia*, Toche).

_____

*of Horrigan*, 757 So. 2d 165, 170 (Miss. 1990) (citing *Allgood v. Allgood*, 473 So. 2d 416 (Miss. 1985); *Sojourner v. Sojourner* ,153 So. 2d 803, 807 (Miss. 1963)). A constructive "trust arises by implication from the relationship and conduct of the parties." Id. (citing *Saulsberry v. Saulsberry*, 78 So. 2d 758, 761 (Miss. 1955)). "It is the relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." Id. (citing *Lipe v. Souther*, 80 So. 2d 471, 471 (Miss. 1955).

30

## IV.    Payor-Defendants' *Breaches* of *Trust* Duties to Toche

30.    Plaintiff re-alleges and incorporates all above and within said allegations here.

31.    Toche files this action for **Payor-Defendants'** wrongful **breaches of Trust**

**duties owed** to Toche by Payor-Defendants, and for Toche's recovery of all Equitable and **trust** remedies and relief which Toche may recover versus all said Payor-Defendants, jointly and severally, for Payor-Defendants' arbitrary, capricious, wrongful and erroneous denials and non-payment of more than $100,000+ of Toche's **brain cancer** treatments. Plaintiff brings this action versus Payor-Defendants for Payor-Defendants' **Breaches of Trust** and *Fiduciary Duties* due Plaintiff, *inter alia*, *Breach of Fiduciaries' Disclosure Duties*, *inter alia*, breaches of duties under M.C.A. §§ 91-8-101, *et seq.*, *inter alia*, M.C.A. §91-8-106. *Common Law of Trusts; Principles of Equity* , and §§ 91-8-203 [7], *et seq.*, §§ 91-8-1001, *et seq.*, Miss. Const. Ann. Art. 6, § 159, and *Equity*, *inter alia*, for **Surcharge** versus *Payor-Defendants*, for *Payor-Defendants'* wrongs shown herein in detail and in discovery and at trial hereof, as Equity and Trust Laws "require a 'fiduciary' to 'discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries.'" [Case citation omitted];   "The duty of loyalty is one of the common law trust principles that apply to fiduciaries, and it encompasses a duty to disclose." *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823 (9th Cir. 2007) (internal citations omitted) (footnote omitted). "A fiduciary has an obligation to convey complete and accurate information material to the plan beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397,

---

[7]

Miss. Code Ann. § 91-8-203. *Subject-matter Jurisdiction*
"(a) * * * the **chancery court** has exclusive jurisdiction of proceedings in this state **brought by a** trustee or **beneficiary** concerning the administration of a trust. * * *
SOURCES: Laws, 2014, ch. 421, § 15, eff from and after July 1, 2014."

31

1403 (9th Cir. 1995). "[F]iduciaries breach their duties if they mislead plan participants or misrepresent the terms or administration of a plan." Id. All of the Payor-Defendants are Fiduciaries, as a "fiduciary with respect to a plan" to include a person who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan **is a fiduciary**" and "an agent "who has the final authority to authorize or disallow benefit payments in cases where a dispute exists" **is a fiduciary**. Scott, *Law of Trusts*, Id.

32.    Payor-Defendants, as Benefit Plan insurers and administrators are fiduciaries if "they are given the discretion to manage plan assets or to determine claims made against the plan." Id. "While the mere provision of contractual benefits does not make an insurance company a fiduciary . . . , an insurer will be found to be a fiduciary if it has the authority to grant, deny, or review denied claims." Id. at 518 (internal citations omitted). A plan's characterization of a claim administrator's or insurer's duties as "ministerial" is not determinative: Courts look past the plan's characterization to determine what duties the administrator actually performs." *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419–20 (9th Cir. 1997). *King v. BCBS of Illinois; UPS of America, Inc, et al.*, 871 F.3d 730 (9th Cir. 2017).

## V.    Payor-Defendants' Breaches of *Contract, Equity* & *Law* Duties Owed Toche

33.    Plaintiff re-alleges and incorporates all above and within said allegations here.

34.    Toche files this action for **Payor-Defendants'** wrongful **breaches of contract and Equity and Law duties owed** to Toche by Payor-Defendants, and for Toche's recovery of all said and other remedies and relief which Toche may recover versus all said Payor-Defendants, jointly and severally, for Payor-Defendants' arbitrary, capricious, wrongful and erroneous denials and non-payment of more than $100,000+ of Toche's **brain cancer**

32

treatments which Toche is entitled to versus the Payor-Defendants here, *inter alia*:

A. Toche's recovery and reimbursement of her loss of more than $100,000+ expended on Toche's un-reimbursed, **brain-cancer** treatments, and

B. Toche's attorneys fees, suit costs and expenses, and

C. Toche's consequential losses and compensatory damages due from Payor-Defendants' breaches of trust, contract, equity and law duties, and

D. all penalties and damages due Toche for the Payor-Defendants' breaches of duties owed to Toche, and

E. pre-judgment, compound interest on all sums, fees, losses and damages, due at the rate of 1 and ½ % per month pursuant to law, *inter alia*, **Miss. Code Ann. §§ 83-9-5 (1) (h) (3), et seq.** and post-judgment interest and other relief and remedies thereon for Toche as the Court deems Equitable, lawful and just.

## VI.    Initial Declaratory Relief Due Toche

35.    Plaintiff re-alleges and incorporates all above and within said allegations here.

36.    Toche files this action for Declaratory Judgment relief for Toche, *inter alia*,

determining and declaring the duties owed by Defendants to Toche in *Equity* and by Law, *inter alia*, under *Trust* duties, *contract* duties, *statutory* and *other* duties owed to Toche by Defendants, *inter alia*, duties created by the Laws of the State of Mississippi, *inter alia*, TITLE 83, CHAPTER 9. ACCIDENT, HEALTH AND MEDICARE SUPPLEMENT INSURANCE, *inter alia*, Miss. Code Ann. §§ 83-9-1, et seq., and TITLE 83. INSURANCE CHAPTER 18. INSURANCE ADMINISTRATORS, Miss. Code Ann. § 83-18-1, et seq., *inter alia*,

i.    Miss. Code Ann. § 83-9-8. *Coverage of Drugs Not Approved by Federal Food and Drug Administration; Drugs Used in Treatment of Cancer* [Eff. from and after July 1, 1997]; and

ii.    Miss. Code Ann. § 83-9-22. *Health Coverage Plans Prohibited*

33

*from Restricting Coverage for Medically Appropriate Treatment Prescribed by Physician Based on Insured's Diagnosis with Terminal Condition* [Eff. from and after July 1, 2014] ; and

iii.      Miss. Code Ann. § 83-9-36. *Process by Which Prescribing Practitioner May Request Override of Restriction on Medication Restricted for Use by Insurer Step Therapy or Fail-first Protocol; Circumstances under Which Insurer to Grant Override* [Eff. from and after Jan. 1, 2012]; and all other relief Toche may have.

## VII.      Specific Performance of Payor-Defendants' Promises to Toche

37.      Plaintiff re-alleges and incorporates all above and within said allegations here.

38.      Toche also files this action for Payor-Defendants' **specific performance** of, and

wrongful **breaches** of, the Payor-Defendants' **said 2014 promises to Toche** and **M.D.**

**ANDERSON CANCER CENTER** - as well as breaches of Payor-Defendants' duties under the

Plan, Trust, Law and Equity and the Plan's, Trust's, Contracts' and/or Insurance Policies'

obligations and duties which are beneficial, due and owing to Plaintiff, Heather Toche, among

others - as will be shown in greater detail in discovery and at trial here; and all other relief that

Toche may have.

## VIII.      Payor-Defendants' Negligence, Negligent Misrepresentations, Negligent Interferences and Other Forms of Negligence:

39.      Plaintiff re-alleges and incorporates all above and within said allegations here.

40.      Toche files this action versus all Payor-Defendants for Payor-Defendants'

**Negligence** [*inter alia*, negligent claims handling] and **Negligent Misrepresentations** of material

facts to the Plaintiff, *inter alia*, **Payor-Defendants'** Negligence and/or Gross Negligence, *inter*

*alia*, in the Hiring, Training, Control, Supervision and Retention of Payor-Defendants' Agents,

Employees, Contractors, Adjusters, Claims Personnel, Claims Supervisors, Staff, Associates,

Administrators and Doe Defendants Herein; **Payor-Defendants'** Other Gross Negligence to be

discovered; **Payor-Defendants'** Non-Disclosure, Concealment; **Payor-Defendants'** Negligent

and/or Grossly-Negligent Breach of Contracts, Promises and Express & Implied Contract & Trust

34

Duties; **Payor-Defendants'** Negligent and/or Grossly-Negligent Misrepresentations; **Payor-Defendants'** Negligent and/or Grossly-Negligent Inducement in Contracting; **Payor-Defendants'** Negligent and/or Grossly-Negligent Non-Disclosure of Material Facts Due Beneficiaries and Insureds; **Payor-Defendants'** Negligent and/or Grossly-Negligent Non-Disclosure of Rights, Claims and/or Interests of Insureds and Beneficiaries; **Payor-Defendants'** Negligent and/or Grossly-Negligent Concealment of Material Facts Due Insureds and Beneficiaries; **Payor-Defendants'** Negligent and/or Grossly-Negligent Concealment of Payor-Defendants' Breaches of Payor-Defendants' Contract and Trust Duties and/or Equitable and Legal Duties Owed to Insureds and Beneficiaries; **Payor-Defendants'** Bad Faith Breaches of Trust, Contracts, Implied Contracts, Trusts' & Contracts' Duties & Covenants of Loyalty, Good Faith, Fair Dealing and Other Duties Arising by Equity, Trust, Contract and/or Law; **Payor-Defendants'** Breach of Warranties, Express and/or Implied; **Payor-Defendants'** Negligent and/or Grossly-Negligent Interference with Insureds' and Beneficiaries' Contracts, Rights, Privileges and Interests, *inter alia*, Past, Existing and/or Prospective Pecuniary Interests; **Payor-Defendants'** Continuing Tortuous Interference with Rights, Privileges, Interests of Insureds & Beneficiaries; **Payor-Defendants'** Deceit and Misrepresentations; Among Other of **Payor-Defendants' Wrongs To Be Shown**, Payor-Defendants' negligent misrepresentations of plan benefits, coverages, limits, beneficiaries' remedies, and other factual misrepresentations on which a reasonable fact-finder could conclude that Payor-Defendants' misrepresentations to Plaintiff about plan benefits, limits, etc. harmed Plaintiff, Toche.

## IX.    **Equitable Estoppel and Waiver**

41.    Plaintiff re-alleges and incorporates all above and within said allegations here.

42.    A.    Toche files this action for judgments of **detrimental reliance, Equitable Estoppel and Waiver** of Payor-Defendants' conditions, requirements, defenses, exclusions and limitations versus Payor-Defendants, *inter alia,* to the extent that M. D. Anderson Cancer Center's $100,000+ of proton beam therapy for Toche is alleged by Payor- Defendants not to be

35

covered by the Plan - contrary to Payor-Defendants' representations to Toche that M. D. Anderson's Proton Therapy was covered and approved, yet, later wrongly rejected in **Hub's 12-22-14 "reversal letter"** in **Exhibit 1** hereto, stating:

"Fox-Everett, Inc. has completed a review for the **prior approval of Proton Radiation Therapy**" Part of **Exhibit 1** hereto.

B. Payor-Defendants **made "approval" representations** to Toche - before 12-22-14, inter alia, that M.D. Anderson Center's Proton Therapy was approved as Toche's brain cancer treatement - on which Toche relied. Said and other of Payor-Defendants' misrepresentations to Toche and Toche's Health Providers are **actionable under common law** (see FN 6), given the first element required for **Equitable Estoppel,** [8] i.e., "**(1)** Toche's just belief and reliance on the Payor-Defendants' express representation That **Proton Therapy was approved** (or covered).

C. Also, Toche did not obtain less-costly, better, available, PPACA Health Coverages, due to Toche's just reliance on the Payor-Defendants' express and implied representations and promises to Toche of Payor-Defendants' Health Plan medical and hospital coverage covering her brain cancer treatments in exchange for Toche's payment of premiums for same; and given **Payor-Defendants'** implied representations of good faith and fair dealing in their administration, authorization and payment of Toche's brain cancer treatments claims. **Payor-Defendants'** misrepresentations to Toche and Toche's Health Providers are **actionable**

---

[8] *Access Mediquip LLC v. UnitedHealthcare Ins.*, 662 F. 3d at 383 (5th Cir. 2011) states: "*Transitional Hospitals Corp. v. Blue Cross*, 164 F.3d 952, 955 (5th Cir.1999) held: "THC's state-law claims alleging **common law misrepresentation** and statutory misrepresentation under the Texas Insurance Code Art. 21.21 are not dependent on or derived from Davis's right to recover benefits under the [patient's employer's] plan. Rather, THC alleged that, 'to the extent that Davis is not covered by the Policy as represented by Blue Cross to THC,' **Defendants made misrepresentations actionable under common law** and the Texas Insurance Code. Id. at 955 (footnote omitted)." Id.

**under common law** (see FN 6), given the 2nd and 3rd elements required for **Equitable Estoppel,** i.e.: **(2)** Toche's change of position as a result thereof, *inter alia,* Toche's [a] election and [b] payments for said Payor-Defendants' Plan's coverages - instead of *other available* health plan medical and hospital coverage, *inter alia, other available* health plan medical and hospital coverage *available* to Toche (at little cost, given Toche's meager income) provided under the Affordable Care Act ("ACA"), *inter alia,* via Mississippi's *Magnolia Health Insurance* Plan; **and (3)** Toche's substantial $100,000+ financial cost and other detriment or prejudice caused by the change of position." See *Eagle Mgmt. LLC v. Parks*, 938 So. 2d 899, 904 (¶13) (Miss. 2006).

D.      The Payor-Defendants' committed other misrepresentations and wrongs which injured and damaged Toche - as will be shown at trial hereof.

**X.      Other Declaratory, Restitutionary and Related Relief Due Toche**

43.      Plaintiff re-alleges and incorporates all above and within said allegations here.

44.      Toche files this action for **Declaration, Restitution and Recovery** of all benefits, sums, losses and damages of every kind due from *Payor-Defendants* to Plaintiff, Heather Toche, for all of the *Payor-Defendants'* wrongs shown here and in discovery and trial, *inter alia,*

A)      for all of the Plaintiff's injuries, losses, damages accrued and accruing by *Payor-Defendants'* breaches of Contract, Equity, Trust and other Equitable and Law Duties,

B)      for all of the Plaintiff's consequential losses, attorneys' fees, accounting fees, actuarial fees, pre-judgment and post-judgment interest, and other related actual, compensatory, exemplary damages, Equitable relief and Equitable remedies and other relief and remedies recoverable here flowing from the *Payor-Defendants'* breaches of Contract, Equity, Law, Trust and *Payor-Defendants'* breaches of other duties owed to the Plaintiff.

45.      Toche seeks all remedies and relief she may have, *inter alia,* judgment determining and **Declaring** all of the Payor-Defendants' duties, obligations, sums and relief owed to Toche

37

in Equity and by Law and **all actual, consequential, compensatory, exemplary and other Damages** from and against **Payor-Defendants.**

## XI.    Recovery In Equity & State Law [and, *Alternatively*, ERISA, *If* ERISA Applies]

46.     Plaintiff re-alleges and incorporates all above and within said allegations here.

47.     A.     Toche incorporates all other rights, remedies and relief she may have under Equity and under State (*inter alia*, Mississippi and Texas) Laws and shows [a] *if*, and only *if*, *Payor-Defendants establish*: [i] that there is no "stop loss coverage", and [ii] all of the Plan was funded solely by assets contributed by the Employer, and, *if*, and only *if*, *Payor-Defendants establish*: [iii] that none of the Plan was funded by employees' [i.e., William R. Toche's] payroll deductions, and [iv] that ERISA actually applies, then, and **Alternatively**,

B.     Toche's action here is [a] *not only* one to recover benefits and enforce rights under Equity and State Law, *but also*, [b] one under ERISA [*inter alia*, under 29 U.S.C. § 1132(a)(I)(B)] and for all penalties, attorneys fees, costs and remedies recoverable under ERISA versus Payor-Defendants, *inter alia*, [c] for all of the Payor-Defendants' misconduct in wrongfully failing and refusing to authorize, pay and provide more than $100,000+ of brain cancer treatments, and [d] for all of the Payor-Defendants' misconduct, *inter alia*,

1.     by Payor-Defendants' wrongful failure to timely, fully provide full true copies of The Plan [aka The Master Plan and Trust Documents] to Toche on her requests; and

2.     By Payor-Defendants' wrongful failure to fully, adequately, correctly and timely provide notice of

[a]     Toche's Appeal rights and time limits and

[b]     Toche's Suit rights and time limits. [9]

---

9

"[W]hen a plan administrator denies a request for benefits, it **must set forth a "description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action."** . . . Appellant Dr. Neville Mirza received a benefits denial letter advising him of his right to judicial review, but it did not mention the time limit for doing so. The principal question we address is whether plan administrators must inform claimants, of **plan-imposed deadlines**

48.      A.      Pursuant to Equity and Law, Toche has exhausted all of the purported
(but, futile, misleading, self-serving, dilatory) "administrative remedies afforded by the plan"
before filing this action in this Court, which has jurisdiction of the parties and subject matter;

         B.      Pursuant to Equity and Law, Toche, as a participant in the Plan, is entitled
to sue for judicial determination and enforcement of benefits on the bases above on which
Payor-Defendants wrongly denied Toche's claims for health benefits owed to Toche under the
Plan, in contravention of the Plan, Equity, law;

         C.      Toche has no other adequate remedy at law to address the injuries Toche
has suffered as a result of Payor-Defendants' wrongful denial of benefits;

         D.      As a further result of Payor-Defendants' refusal to provide benefits, Toche has
been forced to retain legal counsel to represent Toche in this matter and is accordingly entitled
to recover her actual attorney's fees and costs pursuant to Equity and Law as well as all
penalties recoverable here for the Payor-Defendants' breaches, failures and neglect.

**XII.      Payor-Defendants' Breaches of Payor-Defendants' _Fiduciary Duties_ to Toche**

49.      A.      Plaintiff re-alleges and incorporates all above and within said allegations here.

         B.      Plaintiff shows that all of the **Payor-Defendants** breached their fiduciary
duties to Toche by all of the **Payor-Defendants' failure** to comply with Disclosure requirements
that Law and Equity required of all of the **Payor-Defendants** to provide to Toche, *inter alia*,

               1.      Disclosure requirements in **The Plan** [aka The Master Plan document];

               2.      Disclosure requirements in the **Summary Plan Description** ("SPD") ;

               3.      Disclosure requirements in **Payor-Defendants' failed "Notices" and**

**Denials**: More specifically, the Plaintiff shows, among other of **Payor-Defendants'** failures that:

---

**for judicial review, in their notifications denying benefits. We hold that they must**, and that the
**appropriate remedy for this regulatory violation is to set aside the plan's time limit and apply the
limitations period from the most analogous state-law cause of action."**

*Mirza v. Ins. Adm'r of America, Inc.,* 800 F.3d 129, 134 (3rd Cir. 2015). Accord, *Harris Methodist Fort
Worth v. Sales Sup. Servs., Inc., Emp. Health Care Plan,* 426 F.3d 330, 337 (**5th Cir. 2005**): Held that
a mother's assignment of benefits was sufficient to give the hospital standing to sue for treatment given
to her premature twins as well. Further, the term "loss" was ambiguous in the plan requirement of proof
of loss within ninety days, so that the hospital's suit was **filed within three years after** the twins were
**discharged** was timely. The court rejected the plan's argument that each day's hospitalization counted
as a separate "loss," which would have made all but two days' claims untimely. *Harris,* at 337, *Id.*

a.     No Master Plan was provided Toche after Toche's Requests to the

Plan sponsor/co-Administrator [**Exhibits 2, 3, 4, 5** hereto] despite the requirements of law, *inter alia, CIGNA Corp v. Amara*, 131 S. Ct. 1866 (2011);

b.     the Plan sponsor/co-Administrator **sent the wrong SPD** (i.e., sent a

2017 SPD, and did not send the Requested 2014-2016 SPDs) in an intentional or negligent effort to mislead Toche - (after purportedly conferring with their counsel, per Hub's 12-12-17-letter) [see **Exhibits 2, 3, 4, 5** hereto];

c.     the limited Definitions of "experimental"/"investigational" and

"not medically necessary" used by Payor-Defendants are vague, ambiguous and lead to the gross abuses seen in Toche's case;

> d.     **Payor-Defendants "Notices" and Denials failed to comply with**
>
>> - Model Notice of Final External Review Decision – Revised June 22, 2011
>>
>> - Model Notice of Final External Review Decision – Revised July 3, 2014
>>
>> - Model Notice of Final Internal Adverse Benefit Determination – Revised as
>> of July 3, 2014
>>
>> - Model Notice of Adverse Benefit Determination – Revised as of July 3, 2014
>
> e.     **Payor-Defendants** wrongfullyly misled Toche and wrongfully

misrepresented material facts and *other* material matters to Toche.

## XIII.     **Payor-Defendants' Other Breaches**

50.     A.     Plaintiff re-alleges and incorporates all above and within said allegations here.

B.     Plaintiff sues Payor-Defendants for their other latent breaches and injuries not specified here - *inter alia*, those breaches and injuries not yet Discovered.

51.     Payor-Defendants are charged by law, Equity and Payor-Defendants' contracts, Plans and Trusts with certain duties of due care owed to Plaintiff as Payor-Defendants' Insured, Member and/or Beneficiary and as beneficiary of Payor-Defendants' contracts, policies, plans and by Equity, law, their contracts, policies, Plans and Trust, the Payor-Defendants are required to fully, faithfully, timely satisfy **duties** to **Toche**, *inter alia*:

- A.     Duty to Timely, Fully Disclose All Plan & Policy Coverages, Duties & Benefits
- B.     Duty to Hire, Train and Supervise Competent Personnel
- C.     Duty to Timely, Fully, Knowledgeably, Fairly Investigate/ Pay Just Claims
- D.     Duty to Avoid Conflicts & Arbitrary Conduct Harmful to Members/Beneficiaries.

52.    Payor-Defendants, acting individually, jointly and in concert, wantonly breached

(and continue to wantonly breach) said duties and other duties of due care which Payor-

Defendants owed and owe by contract, Equity and law to **Toche.**

53.    As a direct, proximate result of the Payor-Defendants' breaches of said duties

and other duties of due care which Payor-Defendants owed and owe to Plaintiff the said **Toche**

suffered (and continues to suffer) injuries and damages as will be shown at trial.

## XIII.    Partial Summary of Toche's Causes of Action

54.    Plaintiff re-alleges and incorporates all above and within said allegations here.

55.    The facts and documents show that the Payor-Defendants are guilty of

wanton, *continuing breaches* of due care and trusts which constitute wanton breaches of Trust

and Contracts, as well as constitute the following continuing torts. The facts show that the

injuries, losses and damages sustained by the Plaintiff, were the direct and proximate result of

the said and other negligent acts, omissions' and/or misconduct of the *Payor-Defendants*, which

gives rise to Plaintiff's multiple causes of action against the *Payor-Defendants* and to the *Payor-

Defendants'* joint and several liabilities to Plaintiff under Mississippi Law, i.e., for *Payor-

Defendants'* violations of **Trust, Equity, Contract and Law principles** providing Plaintiff's said

and other separate and just *Causes of Action, inter alia,*

A.    for **Discovery** from *Payor-Defendants* of all plan benefits due her, pursuant to

*Equity*, Law and Miss. Const. Ann. Art. 6, § 159, and,

B.    for **Accountings** from **ALL Defendants** of all sums, contracts, contractors' and

attorneys' fees, and benefits paid and received (by any and all parties here) relative to the Plan

and *the Payor-Defendants'* handling and administration of the claims of Heather Toche. [10]

---

[10]

"  When an attorney advises a plan administrator or other fiduciary concerning plan
administration, **the attorney's clients are the plan beneficiaries** for whom the fiduciary acts,
**not the plan administrator.** *Washington-Baltimore Newspaper Guild, Local 35 v. Washington*

41

C.    for judgment of detrimental reliance, **Estoppel** and **Waiver** versus Payor-Defendants,

D.    for Payor-Defendants' **Breaches of Promises, Breaches of Contract, Fiduciary, Trust and Other Duties** to Plaintiff, *inter alia*, under M. C. A. §§ 91-8-101, et seq., §§ 91-8-203, et seq., §§ 91-8-1001, et seq., Miss. Const. Ann. Art. 6, § 159, and **Equity** and otherwise provided by law, *inter alia*, for **Surcharge** versus Payor-Defendants,

E.    for **Reformation and Rescission** versus Payor-Defendants,

F.    for **Declaration, Restitution and Recovery** of all benefits, costs and other sums, losses and damages due unto Plaintiff from Payor-Defendants, jointly and severally, *inter alia*,

a)    more than $100,000+ that Toche incurred in **detrimental reliance** on said Payor-Defendants' said **approval, authorizations** and **promises**;

b)    all benefits due Plaintiff,

c)    all gains that would have accrued but for *Payor-Defendants'* negligent and tortuous interferences aforesaid and Payor-Defendants' breaches of Contract, Trust, Fiduciary, Equitable, legal and other Duties,

d)    all losses incurred, *inter alia*, all sums lost by *Payor-Defendants'* negligent and tortuous interferences aforesaid and Payor-Defendants' breaches,

e)    all other damages allowed, *inter alia*, attorneys' fees, accounting fees, actuarial fees, experts' fees and other related costs, fees, losses, Equitable relief, Equitable remedies and other relief and remedies flowing from the *Payor-Defendants'* negligent and tortuous interferences aforesaid and *Payor-Defendants'* breaches of Trust (fiduciary) Duties to Plaintiff, arising thereby or by the Payor-Defendants' many and varied *wrongs*, *inter alia*, said and other of *Payor-Defendants'* known negligence, breaches of trust and wrongful conduct, i.e.

A.    *Payor-Defendants'* Negligence, Negligence *per se* and Gross Negligence, *inter alia,* negligent hiring, negligent training and preparation, negligent control, negligent

---

*Star Co.*, 543 F.Supp. 906, 909 (D.D.C.1982). Therefore, a fiduciary **cannot assert the attorney-client privilege** against a plan beneficiary about legal advice dealing with plan administration. Id. "*Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 645 (5th Cir.1992). *Accord, Becher v. Long Island Lighting Co. (LILCO)*, 129 F.3d 268, 272 (2d Cir.1997); *Fausek v. White*, 965 F.2d 126, 132-33 (6th Cir.1992); *Bland v. Fiatallis North Am. Inc.*, 401 F.3d 779, 787-88 (7th Cir.2005); *United States v. Mett*, 178 F.3d 1058, 1062 (9th Cir.1999); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1415-16 (11th Cir. 1994); *In re Lindsey*, 158 F.3d 1263, 1276 (D.C.Cir.1998), *cert. denied*, 525 U.S. 996, 119 S.Ct. 466, 142 L.Ed.2d 418 (1998).

supervision and negligent retention of Payor-Defendants' agents, employees, contractors, adjusters, claims personnel, claims supervisors, staff, associates, administrators and *Doe Defendants* herein;

B.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Breaches of Laws, Contracts, Promises and Express and Implied Contract and Trust Duties;

C.   *Payor-Defendants'* Negligent & Grossly-Negligent Misrepresentations; Negligent and/or Grossly-Negligent Inducement in Contracting;

D.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Non-Disclosure of Material Facts Due Insureds and Beneficiaries;

E.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Non-Disclosure of Rights, Claims and/or Interests of Insureds and Beneficiaries;

F.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Concealment of Material Facts Due Insureds and Beneficiaries;

G.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Concealment of Rights, Claims and/or Interests of Insureds and Beneficiaries;

H.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Concealment of Payor-Defendants' Breaches of Payor-Defendants' Contract Duties and/or Legal Duties Owed to Insureds and Beneficiaries;

I.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Concealment of Plaintiffs' Claims and/or Causes of Action Versus Payor-Defendants and/or Others;

J.   *Payor-Defendants'* Continuing Torts, i.e., of Negligence, Gross Negligence, Non-Disclosure, Concealment, Deceit, Misrepresentation, among others to be shown;

K.   *Payor-Defendants'* Bad Faith Breaches of Trust, Contracts, Implied Contracts, Trusts' & Contracts' Duties & Covenants of Loyalty, Good Faith, Fair Dealing and Other Duties Arising by Equity, Trust, Contract and/or Law;

L.   *Payor-Defendants'* Breach of Warranties, Express and/or Implied;

M.   *Payor-Defendants'* Negligent and/or Grossly-Negligent Interference with Insureds' and Beneficiaries' Contracts, Rights, Privileges and Interests, *inter alia,* Past, Existing and/or Prospective Pecuniary Interests;

N.   *Payor-Defendants' Continuing* Tortuous Interference with Rights, Privileges, Interests of Insures & Beneficiaries;

O.   *Payor-Defendants' said and other Statutory and Constitutional Violations;*

P.   *Payor-Defendants' Other Violations of Equity and Law,*

Q.   *Payor-Defendants' Other* Wrongs giving Plaintiff other *causes of action.*

43

## XIV. Partial Summary of Toche's Injuries, Losses, Damages, Remedies and Relief

56.     Plaintiff re-alleges and incorporates all above and within said allegations here.

57.     Payor-Defendants' wrongful breaches, acts, omissions, violations and

misconduct caused Plaintiff to suffer, and to continue to suffer, injuries, losses, damages, *inter alia*, further, physical, emotional, economic injuries, losses, damages, past and future, *inter alia,*

A.     Aggravation of Plaintiff's condition, injuries, losses, impairments, past & future;

B.     Extensive, unpaid, Medical, Hospital and Related Costs and expenses; past & future;

C.     Loss of Income & Earning Capacity, other Economic Injuries, Losses, past & future;

D.     Loss of Consortium,  past and future;

E.     Loss of Society, Companionship, Nurture, Support, past & future;

F.     Continuing, Physical & Emotional Pain, Suffering, Anxiety, past & future;

G.     Continuing Loss of Value of *Plan's, Trusts', Contracts' & Policies' Benefits* Due by Equity & Law, past & future;

H.     Loss of Pre-Judgment Compound *Interest* of 1.5%/month on *such Plan's, Trusts', Contracts' and Policy Benefits*/Money Withheld by Payor-Defendants from Toche;

I.     Loss of Economic Advantage, Existing and Prospective Pecuniary Interests, and other Economic and Contract damages and losses, past & future;

J.     Attorneys' Fees, Litigation Expenses and Suit Costs, past and future;

K.     Pre-judgment Interest at the rate of 1 and ½ % per month pursuant to law, *inter alia*, Miss. Code Ann. §§ 83-9-5 (1) (h) (3), et seq. (2017) and post-judgment interest on unpaid Benefits due, among other damages shown and to be shown, and Post-judgment Interest on all losses, fees, costs and other damages until paid in full;

L.     Disgorgement of Payor-Defendants' gains by Payor-Defendants' misconduct

M.     All Actual, Exemplary and/or Punitive Damages which may be recovered, due to the wanton, egregious, reckless nature of Payor-Defendants' misconduct, rising to the level of an intentional tort, for which exemplary damages are due in order to prevent such misconduct in the future, and

N.     Recovery by Plaintiff of all benefits, interest, other actual and exemplary damages flowing from Payor-Defendants' Breaches of Contract, Trust and Other Duties to Plaintiff and others, per M. C. A. §§ 91-8-101, et seq., §§ 91-8-203, et seq., §§ 91-8-1001, et seq., Miss. Const. Art. 6 §159, and *Equity*, and,

O.     Surcharge versus Payor-Defendants and their assets in order to Fund the Plan and Trust and reimburse Plaintiff and others similarly situated, in Equity and Law as will be shown.

**WHEREFORE,** Plaintiff, **Heather Toche**, incorporates all averments and exhibits, and

**I.** Plaintiff demands **Accountings** from **ALL Defendants**, *inter alia*,

VT Halter Marine, Inc. Employee Welfare Benefit Plan [aka VT Halter Marine, Inc. Group Benefit Plan]; VT Halter Marine, Inc.; Hub International, Inc.; Hub International Healthcare Solutions, LLC; MCMC, LLC; American Health Holding, Inc.; Doe Defendants 1-9; [Herein *"The Payor-Defendants"*]; and

M.D. Anderson Cancer Center and The Gardens Pharmacy, LLC [*"The Payee-Defendants"*] and

**II.** Plaintiff demands **Judgment** against *The Payor-Defendants*, VT Halter Marine, Inc. Employee Welfare Benefit Plan [aka VT Halter Marine, Inc. Group Benefit Plan]; VT Halter Marine, Inc.; Hub International, Inc.; Hub International Healthcare Solutions, LLC; MCMC, LLC; American Health Holding, Inc. and Doe Defendants 1-5, jointly and severally, for all sums and relief Heather Toche may recover from *The Payor-Defendants*, *inter alia*,

**1.**    More than $100,000 medical benefits incurred and paid by and o/b/o Toche which *The Payor-Defendants* wrongfully, arbitrarily, erroneously denied unto Toche - though due and owing by *The Payor-Defendants* to Toche;

**2.**    Toche's attorneys' fees, costs, expenses;

**3.**    Penalties owed by *The Payor-Defendants* to Toche of $110/day x 4 Toches x 4 2015-2018 Requests - accruing **from date** of **each** of Toche's Requests **until paid**;

**4.**    all consequential, compensatory, exemplary and other damages recoverable here versus *The Payor-Defendants* by Toche, *inter alia*, all Trust, Plan, Contract, Equity and Law benefits, relief, remedies, costs, damages allowed, and

**5.**    pre-judgment, 1.5% /mo., compound interest on all penalties, fees, costs and damages awarded - per law, *inter alia*, M. C. A. §§ 83-9-5 (1)(h)(3), et seq., and

**6.**    post-judgment interest on all awards - plus such other and further relief and remedies Toche may have by law and in Equity.

Respectfully submitted, July 12, 2018.

**Heather Toche**, Plaintiff

By: *Matt G. Lyons, Esq.*

Matt G. Lyons, Esq. (MS Bar #1743)

Matt G. Lyons, Esq. (MS Bar #1743)
910 Washington Avenue
Ocean Springs, MS 39564
Tele: (228) 872-1855
E-mail: MATTGLYONS@AOL.COM

1.

## OHIO LAW REQUIREMENTS-9. Qualifications of Reviewer.

"The HIC retains an accredited IRO to conduct an independent external review. The IRO selects experts to conduct the reviews. For each case, the IRO selects a panel to conduct the review. The panel shall be composed of at least 3 physicians, with stated exceptions, or other providers who are experts in the treatment of the enrollee's medical condition and knowledgeable about the requested therapy. If the IRO is an academic medical center, the panel may include experts affiliated with or employed by the academic center. Neither the HIC nor the enrollee shall choose, or control the choice of, the physician or other provider experts. If the IRO retained by the HIC is an academic medical center, the panel may include experts affiliated with or employed by the academic medical center. A panel of two physicians or other providers may conduct the review if the enrollee consents in writing. A single physician or provider may conduct the review if only one expert physician or other provider is available for the review. Neither the HIC nor the enrollee shall choose, or control the choice of physicians or other provider experts. HICs are not precluded from paying for the expert's review."

See NATIONAL ASSN OF INSURANCE COMMISSIONERS [NAIC] REPORT, *ISSUES INVOLVING EXTERNAL REVIEW PROCEDURES*, Adopted by NAIC June 7, 1999; Updated November 2000; Updated and Adopted by NAIC December 7, 2003.

 **FOX|EVERETT**

A Division of HUB International
Pam.Rogers@hubinternational.com
Direct: 601-607-5443
Fax: 601-607-5643
Pam.Rogers@hubinternational.com

300 Concourse Boulevard
Suite 300
Ridgeland, MS 39157-2051

December 22, 2014

MD Anderson Cancer Center
The Proton Therapy Center
1840 Old Spanish Trail
Houston TX 77054

RE: Patient: Heather Toche
    Member#: FE5700698-31
    Proposed Service: Proton Radiation Therapy

Dear: Sir or Madam:

Fox-Everett, Inc. has completed a review for the prior approval of Proton Radiation Therapy. Based upon the documentation submitted with your request, we are unable to approve this procedure because it is not considered medically necessary for this patient's treatment. Unless given in a clinical study, this procedure is not recognized as a standard of care treatment.

This information was provided to us by a physician advisor, Board Certified in Radiation Oncology.

We regret this decision could not be more favorable. If you have any questions, please call customer service at 877-476-6327.

Sincerely,

Pam Rogers
Employee Benefits Department



EXHIBIT
1

# LUCKEY & MULLINS, P.L.L.C.

**ALWYN H. LUCKEY**
**STEPHEN W. MULLINS***

of Counsel: KEITH MILLER

\* ALSO ADMITTED IN LOUISIANA AND
ALABAMA

\*\* PLEASE DIRECT ALL COMMUNICATIONS
TO MISSISSIPPI OFFICE.

MISSISSIPPI
2016 BIENVILLE BLVD (39564)
POST OFFICE BOX 690
OCEAN SPRINGS, MISSISSIPPI 39586
OFFICE (228) 875-3175
FACSIMILE (228) 872-4719

ALABAMA
POST OFFICE BOX 214
MOBILE, AL 36608
WWW.LUCKEYANDMULLINS.COM
INFO@LUCKEYANDMULLINS.COM

January 9, 2015

Via Electronic Mail & U. S. Mail

Fox Evertt
**Attn.: Pam Rogers**
300 Concourse Boulevard, Suite 300
Ridgeland, MS  39157
Pascagoula Mississippi

> Re:   Our Client:  Heather Toche
>        Member No.: FE5700698-31

Dear Ms. Rogers:

It is my understanding that you are the third party administrator (TPA) for the carrier that provides an ERISA qualified group medical care plan to the employees of VT Halter Marine. Please be advised we represent the interests of Heather Toche who is a covered member of the plan through her husband's employment with VT Halter Marine. It is our understanding from discussions with Mrs. Toche that Fox Everett, as the TPA for said plan, is denying a request by a duly qualified cancer medical center, namely, the MD Anderson Center in Houston, for necessary medical treatment for her life threatening left frontal anaplastic astrocytoma. I have attached a copy of the denial letter for your easy reference.

I am not sure what the basis of the denial is other than you may be alleging that it is not medically necessary? Obviously we are interested in and entitled to any and all information that you're basing this belief on, as well as names and address, and the qualifications of any individuals that are or were involved in the decision-making process. Obviously, the position paper by MD Anderson, a copy of which I am enclosing herewith, fully establishes the medical necessity of these procedures, and to be frank, we've never heard of an insurance plan questioning an MD Anderson cancer treatment plan as they are generally accepted at the gold standard, not only in the South, but in the United States.

In order to fully represent our client in this matter, please accept this letter as an official request for a certified  copy of the insurance policy that's involved in this matter, together with a copy of the "Summary Plan Description" (SPD), and full disclosure from the adverse benefit determination, including how the claim determination was made, who reviewed the claim, documents used in the decision, the credentials of the reviewer, fee schedules of those involved, and the methodology used

Fox Everett
January 9, 2015
Page Two

to determine the breakdowns etc., as required by 29 USC Section 1024, and by 29
USC Section 1132(c); and 29 CFR Section 2575.502(c).

As I am sure from the nature of MD Anderson's letter to you, Ms. Toche is
critically and gravely ill with a significant cancer. Any and all efforts by you to deny
her treatment that has been approved by such a distinguished cancer facility like MD
Anderson is putting her life at further risk, as well as causing extreme psychological
damage and stress for her family.

We ask that you immediately review the attached letter from MD. Anderson and
reinstate these benefits immediately so that she can seek this critically needed life
saving treatment that has been indicated by this preeminent cancer facility.

Thanking you in advance for your prompt attention to this matter, I am

Sincerely yours,

LUCKEY & MULLINS, PLLC

Stephen W. Mullins

SWM/lls
Enclosures (as stated)

*tes grosters from the two s*

• •

Proton Therapy

December 31, 2014

RE:        Toche, Heather
MDACC:   1072873
Policy #:  FE570069810
Group #:  570
DOB:      02/27/1985

Appeal / Urgent: Please Expedite

To Whom It May Concern:

ICD9 code:  191.1
CPT Codes:  77523 (30), 77421 (30), 77417 (6), 77427 (6), 77336(6), 77263(1), 77470(1), 77321 (1), 77370 (1), 77290(1), 77280(6), 77293(1), 77295(2), 77300(6), 77334(13)
Provider:   UT MD Anderson – Proton Therapy Center
Address:   1840 Old Spanish Trail, Houston, TX 77054
MD:        Amol J. Ghia, MD
Tax ID:    760679446

On behalf of Ms. Heather, Toche, we are appealing the denial of her proton therapy for her life threatening left frontal anaplastic astrocytoma which Fox Everett considers as not medically necessary for the patient's treatment as stated in the denial letter dated 12/22/14. The medical reviewer notes that proton beam therapy is not standard care as photon remains to be standard choice of treatment for high grade diagnosis and the patient has low grade diagnosis.

Ms. Toche has rare and life-threatening diagnosis of left frontal anaplastic astrocytoma, WHO grade 3, IDH1 mutated, 1p/19 q intact, post gross total resection. Given her young age 29, and the IDH1 mutated status I as her radiation oncologist, highly recommend proton beam therapy as medically necessary and the optimal and best radiation therapy for her diagnosis, as it is paramount in her case as proton beam would be able to significantly limit dose to the contralateral brain as well as the temporal lobe. This likely reduces her risks for late side effects from radiation therapy. Proton beam therapy is medically necessary for Ms. Toche for local control and increase the likelihood of overall survival considering her young age 29 with life expectancy 10 years and her pre-existing significant co-morbidities which include history PVC's, history of vasovagal syncope confirmed via tilt table test on 10/14. She is dispositioned to be treated with intensity-modulated proton therapy to a dose of 57 CGE in 30 fractions to the high risk region and 50 CGE in 30 fractions to an intermediate risk region utilizing simultaneous integrated boost techniques to best suit her disease.

Proton therapy is medically necessary and not experimental or investigational or unproven for Ms. Toche's rare and life threatening anaplastic astrocytoma. With her challenging clinical presentation and location of the tumor with critical structures in the immediate vicinity, proton beam therapy, instead of photons, will provide the optimum dose to targeted area allowing for greater sparing of the normal brain tissues, particularly in the low dose region, the ipsilateral



THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

cochlea, the supratentorial structures like the hippocampus, and reducing the volume of the brainstem radiation exposure, thus, preventing potential serious normal tissue toxicity.

According to the National Center for Advancing Translational Sciences / Office of Rare Diseases Research (ORDR), astrocytoma is considered rare diseases. Please see article below from ORDR regarding their position on the insurance coverage for gliomas.

*Insurance Issues*

*The Social Security Administration has included this condition in their Compassionate Allowances Initiative. This initiative speeds up the processing of disability claims for applicants with certain medical conditions that cause severe disability. More information about Compassionate Allowances and applying for Social Security disability is available online.*

http://rarediseases.info.nih.gov/gard/6513/glioma/resources/1 retrieved 12/23/14

Below are the dosimetric results showing the comparison between proton and IMRT with the unnecessary radiation exposure the patient will get if IMRT is used. We cannot allow Ms. Toche to have this unnecessary radiation exposure if she is going to receive IMRT.



Based on two large randomized trials conducted in Europe and North America by EORTC and RTOG, patients with anaplastic astrocytoma with 1p19q deletion had a median survival of 15 years. Given their projected long survival, it is therefore absolutely critical to do everything possible to minimize the

THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

late toxicities of radiation, which include but not limited short-term memory loss, impaired cognitive function, deterioration of fine motor skills, hearing loss and radiation-induced second cancer. In this regard, proton treatment has the advantage of better sparing uninvolved normal brain and critical normal structures such as brainstem and optic chiasm, and this is clearly demonstrated for this patient in the attached comparison plans between proton and IMRT. We would therefore request proton coverage based on patient's projected long-survival and the ability of proton treatment to better spare normal brain and uninvolved normal structures than photon treatment.

ASTRO Model Policies for Proton Beam Therapy (PBT) as of 5/2014. PBT is considered reasonable in instances where sparing the surrounding normal tissue cannot be adequately achieved with photon-based radiotherapy and is of added clinical benefit to the patient. Examples of such advantage might be:

   1. The target volume is in close proximity to one or more critical structures and a steep dose structure(s).

   2. A decrease in the amount of dose inhomogeneity in a large treatment volume is required to avoid an excessive dose "hotspot" within the treated volume to lessen the risk of excessive early or late normal tissue toxicity.

   3. A photon-based technique would increase the probability of clinically meaningful normal tissue toxicity by exceeding an integral dose-based metric associated toxicity...
   https://www.astro.org/uploadedFiles/Main_Site/Practice_Management/Reimbursemen
   t/ASTRO%20PBT%20Model%20Policy%20FINAL.pdf retrieved 12/29/14

**********************************************************************************

Ms. Toche has rare and life-threatening diagnosis of left frontal lobe anaplastic astrocytoma and I, her radiation oncologist, highly recommend proton beam therapy as medically necessary and the optimal and best radiation therapy for her diagnosis. Proton beam therapy I an accepted treatment option for astrocytoma. This form of treatment will provide optimum radiation dose to the targeted area while minimizing radiation dose to the optic chiasm, optic nerves and temporal lobes. The standard treatment for astrocytoma includes surgery, which is generally not curative because of difficulty obtaining clear margins. The best results have been obtained using proton bean therapy. Again as I noted above, it is paramount in his case to put an effort to minimize radiation to the uninvolved brain and normal critical structures such as brain stem and optic structures, and therefore reduce radiation toxicities, particularly late toxicities, such as impaired memory, declined cognitive function, hearing loss and vision disturbance for this young 29 year old patient.

In addition we are rebutting the reason for denial by Fox Everett that Proton beam therapy is considered as unproven, experimental and investigational for Ms. Toche' s life threatening diagnosis of left frontal anaplastic astrocytoma. The fact is Proton Beam Therapy is a Proven Therapy; it has been used to successfully treat patients in this country for decades since 1954

THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

and was approved by US FDA in 1988. Therefore, the use of the terms "investigational" and "experimental," to describe proton beam therapy, is misleading. The following are the sources that endorse this service.

1. **Food and Drug Administration: Proton therapy is FDA-approved as a safe and reliable treatment for cancer patients. Therefore it is not experimental.** According to the FDA approval, *"a proton beam irradiation system, which provides a therapeutic proton beam for clinical treatment. It is designed to deliver a proton beam with the prescribed dose, dose distribution and directed to the prescribed patient treatment site. The Proton Beam Therapy System (PBTS) is designed to be safe and reliable."*

   As part of the documentations included in the FDA approval letter for the PTCH's Hitachi's PROBEAT (K053280) with DSSS, or common name: Proton Beam Therapy System ("PBST") dated December 10, 2007, stated:
   *"Intended use: The PROBEAT with DSSS is a medical device designed to produce and deliver a proton beam for the treatment of patients with localized tumors and other conditions susceptible to treatment by radiation.*

   *Technological characteristics: The PROBEAT with DSSS is a proton beam irradiation system, which provides a therapeutic proton beam for clinical treatment. It is designed to deliver a proton beam with the prescribed dose, does distribution and directed to the prescribed patient treatment site. The PBTS is designed to be safe and reliable. The equipment to perform the above work is comprised of two main components. One is a beam delivery system whose primary responsibility is to ensure that the desired prescription parameters are properly delivered. The other is the equipment necessary to generate the proton beam and direct it to the beam delivery system."*

2. Proton therapy is not subject to review and/or approval by any institutional review board for the proposed use. It has been approved by FDA as a safe and reliable treatment for cancers.

3. *Recent External Medical Review: 8/26/14 Proton Beam Therapy was under scrutiny in a separate and unrelated claim by Cigna wand was overturned denial by IRO for proton beam therapy stating, "recent reports have also found radiation treatments to have higher incidence of other secondary cancer associated with it. Mr.___ has a skin cancer condition which could potentially be aggravated by conventional radiation treatment. Furthermore, the higher cost is justified because of lower long term morbidity associated with proton beam ... For this patient I would recommend that he undergoes treatment with proton beam therapy as he would benefit from a radiation treatment with less " scatter" because of his skin cancer and can potentially be cured through this form of treatment. Please take into consideration of Ms. Toshe on this case.*

THE UNIVERSITY OF TEXAS
MDAnderson
Cancer Center
Proton Therapy

4. **Recent External Medical Review:** Proton beam radiation was under scrutiny in a separate and unrelated claim by Blue Cross Blue Shield of Texas and was overturned in the appeal process by an outside medical reviewer. In the approval letter dated 2/5/14, he stated that *"...the proposed treatment consisting of 77523 (Proton Treatment Delivery Intermediate) is not experimental, investigational, and unproven ... Protons are a type of particle radiation therapy which utilizes positively charged subatomic particles. Proton beam have the ability to penetrate deep into tissues to reach tumors, while delivering less radiation to superficial tissues such as the skin. This may make PBRT (proton beam radiation therapy) more effective in inoperable tumors or for those patients in which damage to healthy organs is unacceptable. They differ from photon RT due to unique properties including minimal scatter as particle beams pass through tissues and deposition of ionizing energy at precise depth called Bragg Peak. Thus, radiation exposure of surrounding normal tissues is minimized. The theoretical advantages of proton may improve outcomes in following conditions: 1) Conventional treatments do not provide adequate local tumor control. 2) Local tumor response depends on the dose of radiation delivered. 3) Delivery of adequate RT doses to the tumor is limited by the proximity of vital radiosensitive structure. The primary advantage of proton therapy is the precision of the radiation and control of dosage delivered to tumor site. The proton beam can be delivered to cancer site with significantly reduced or no damage to surrounding organs at risk.*

   *Proton will give the lowest dose to normal tissue while delivering full dose to cancer areas."*

5. **Articles supporting use of proton therapy for intracranial and skull base tumors:**

   a. **Abstract:** Radiotherapy is widely used for treating malignant and benign intracranial or skull base tumors because of the difficulty in performing wide or complete tumor resection due to the involvement of eloquent areas, vital vessels, or cranial nerves. Similarly, local radiotherapy with conventional methods may sometimes be inefficient for treating brain tumors because the tolerance doses for the optic nerves, eyes, and brainstem are strictly limited. Under the circumstances, particle radiotherapy with proton or carbon ion beams has excellent dose localization to the target volume owing to the sharp Bragg peak ionization in the human body. With this property, it is possible to deliver higher doses to tumors of various shapes while preserving the surrounding critical brain structures. Although the efficacy of proton beam therapy (PBT) has been suggested for skull base chordoma and unresectable meningioma, further clinical evidence is required for optimization and standardization of the therapy. In refractory tumors such as glioblastoma multiforme and anaplastic meningioma, it is necessary to deliver high doses to improve tumor control.

THE UNIVERSITY OF TEXAS
MDAnderson
Cancer Center
Proton Therapy

Under these circumstances, protons or carbon ions have potential to deliver sufficient doses to the target while keeping the healthy brain intact. In this context, we focus on the current status of proton beam radiotherapy for treating intracranial and skull base tumors.

http://www.thetcr.org/article/view/1120/pdf retrieved 12/29/14

b. **Abstract: To analyze clinical concepts, toxicity and treatment outcome in patients with brain and skull base tumors treated with photons and particle therapy.** *Material and methods:* In total 260 patients with brain tumors and tumors of the skull base were treated at the Heidelberg Ion Therapy Center (HIT). Patients enrolled in and randomized within prospective clinical trials as well as bony or soft tissue tumors are not included in this analysis. Treatment was delivered as protons, carbon ions, or combinations of photons and a carbon ion boost. All patients are included in a tight follow-up program. The median follow-up time is 12 months (range 2 – 39 months).

*Results:* Main histologies included meningioma (n _ 107) for skull base lesions, pituitary adenomas (n _ 14), low-grade gliomas (n _ 51) as well as high-grade gliomas (n _ 55) for brain tumors. In all patients treatment could be completed without any unexpected severe toxicities. No side effects _ CTC Grade III was observed. To date, no severe late toxicities were observed, however, for endpoints such as secondary malignancies or neurocognitive side effects follow-up time still remains too short. Local recurrences were mainly seen in the group of high grade gliomas or atypical meningiomas; for benign skull base meningiomas, to date, no recurrences were observed during follow-up. *Conclusion:* The specific benefit of particle therapy will potentially reduce the risk of secondary malignancies as well as improve neurocognitive outcome and quality of life (QOL); thus, longer follow-up will be necessary to confirm these endpoints. Indication-specific trials on meningiomas and gliomas are underway to elucidate the role of protons and carbon ions in these indications.

http://informahealthcare.com/doi/pdf/10.3109/0284186X.2013.818255 retrieved 12/29/14

6. **With proton therapy, radiotherapy side-effects and complications can be prevented due to its ability to spare the surrounding critical and delicate organs and tissues from the unnecessary exposure to radiation.**

According to the article by B. Furlow, published in the Oncology Nurse Advisor – May/June 2012 – www.OncologyNurseAdvisor.com, entitled "*Radiosensivity: A new focus on cardiovascular sequelae, an increased risk of coronary artery stenosis in cancer survivors may be a long-term post treatment effect of chest radiotherapy*" noted:

THE UNIVERSITY OF TEXAS
MD Anderson
~~Cancer~~ Center
Proton Therapy

"*Secondary cancers are widely recognized as possible outcomes of cancer therapy. However, radiotherapy and chemotherapy can also trigger life-threatening vascular accidents or initiate or hasten progression of cardiovascular disease, which increases the risk of vascular events in cancer survivors. New research highlights the importance of careful radiotherapy planning to avert avoidable sequelae in the coronary arteries of some cancer patients. The risks of cardiovascular and cerebrovascular events (e.g. thromboembolism, ischemia, heart attack, and stroke) appear elevated in cancer patients receiving certain treatments. Coronary artery thrombosis occurs up to 5 times more often in cancer patients with existing atherosclerotic disease receiving radiation therapy to the chest. Radiotherapy for Hodgkin disease and breast, lung, and head and neck tumors can initiate or accelerate atherosclerotic disease of the coronary and carotid arteries, posing a threat to patients' lives decades after treatment is completed. ....*"

The article further expounded further by stating: "*Preventive Measures: For the time being, increased emphasis should be placed on prevention and post radiotherapy monitoring for coronary or carotid arterial stenosis because treatment of cardiovascular disease can be complicated and less successful in cancer survivors. Primary prevention is crucial for younger patients who face the highest lifetime risk of post radiotherapy cardiovascular disease and depends on appropriate use of contemporary technologies, quality control techniques, and radiotherapy planning tools that minimize avoidable irradiation of the coronary and carotid arteries. Secondary prevention efforts on reducing risk among patients whose coronary vasculature is irradiated during therapy.*" ( As in case of Ms. Toche is has co-morbid and extensive cardiovascular morbidities as PVC's and vasovagal syndrome)

*http://www.oncologynurseadvisor.com* _____ */radiosensitivity-a-new-focus-on-cardiovascular-sequelae/article/245084/* - retrieved 12/29/14

With all the supporting documents noted above, we are requesting Fox Everett to approve Ms. Toche' s proton therapy, which is FDA approved and is not experimental and investigational and medically necessary for her life-threatening anaplastic astrocytoma with disposition for definitive radiation therapy with proton beam. <u>Proton beam therapy is medically necessary and the best radiation treatment option since proton therapy can uniquely deliver high doses necessary for control of these tumors, while sparing the remaining uninvolved brain. This is particularly relevant for her considering her young age of 29 years old, her life expectancy of more than 10 years with her pre-existing delicate co-morbidities.</u>

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Clinical Information:

12/15/2014
·

THE UNIVERSITY OF TEXAS
MDAnderson
Cancer Center
Proton Therapy

Referring Physician:
Monica E. Loghin, MD

Identification:
Ms. Toche is a 29-year-old woman with anaplastic astrocytoma of the left frontal lobe.
Consultation requested for consideration of radiation therapy.

History Of Present Illness:
Ms. Toche is a 29-year-old woman, who developed lightheadedness, tingling, numbness, and
difficulties with cognition in September 2014. Workup was performed and imaging in October
2014, showed a left frontal mass. On 11/04/14, she underwent a craniotomy at an outside
institution with a gross total resection. Pathology reviewed at our institution revealed
anaplastic astrocytoma, WHO grade 3, IDH1 mutated, 1p/19q intact. She has recovered well
from the surgery without any complications. She visited with Dr. Loghin, and is now referred to
us for consideration of radiation treatment. The patient denies headaches, double vision,
blurry vision, or progressive focal neurological deficits. The patient was seen with Glady Busch,
please refer to her note dated 12/15/14 for details regarding the HPI, PMH, PSH, allergies,
medications, family history, and social history.

Physical Examination:
Vital Signs: Stable.
General: She is in no acute distress. She is alert. She is fluent.
Neurologic: Cranial nerves II through XII are intact. She has no pronator drift. She has 5/5
strength throughout upper and lower extremities. She ambulates without difficulty.

Imaging:
MRI scan of the brain with and without contrast performed on 12/09/14 was personally
reviewed for the purpose of this consultation and shows a gross totally resected left frontal
lesion with a small amount of T2 hyperintensity posterior to the cavity tracking to the ventricle.

Impression:
Ms. Toche is a 29-year-old woman with anaplastic astrocytoma of the left frontal lobe status
post gross total resection. We discussed various treatment options with Ms. Toche. Given the
location, her age, and the IDH1 mutated status, I think she would be a very good candidate
for proton radiotherapy to significantly limit dose to the contralateral brain as well as the
temporal lobes. This likely reduces her risk for late side effects from radiation therapy. We
discussed risks, benefits, and alternatives of proton radiotherapy with Ms. Toche.   Her
questions were answered and she wished to proceed.

Plan:

INL UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

We will perform a simulation and plan on treating Ms. Toche with intensity-modulated proton therapy to a dose of 57 CGE in 30 fractions to the high risk region and 50 CGE in 30 fractions to an Intermediate risk region utilizing simultaneous integrated boost techniques. Her questions were answered. She wished to proceed.

AMOL J GHIA, MD., 12778
Dictated By: AMOL J GHIA , MD., 12778
D: 12/19/2014 17:17:13 T: 12/20/2014 03:38:49

Electronically Signed By: AMOL J GHIA, MD. on 12/22/2014 15:31:24

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Presentation of all facts and theories supporting proton therapy as the best treatment for Ms. Toche's life-threatening and rare diagnosis of anaplastic astrocytoma:

1. Astrocytomas (Glioma) are tumors that arise from astrocytes—star-shaped cells that make up the supportive tissue of the brain. These tumors are graded on a scale from I to IV based on how normal or abnormal the cells look. There are low-grade astrocytomas and high-grade astrocytomas. Low-grade astrocytomas are usually localized and grow slowly. High-grade astrocytoma's grow at a rapid pace and require a different course of treatment. Most astrocytoma tumors in children are low grade. In adults, the majority are high grade.

ASTROCYTE

**Astrocytes are the cells that make up the "glue-like" or supportive tissue of the brain.**



Below are descriptions of the various grades of these tumors:

- Pilocytic Astrocytoma *(also called Juvenile Pilocytic Astrocytoma)*—these grade I astrocytomas typically stay in the area where they started and do not spread. They are

THE UNIVERSITY OF TEXAS
MDAnderson
Cancer Center
Proton Therapy

considered the "most benign" (noncancerous) of all the astrocytomas. Two other, less well known grade I astrocytoma's are cerebellar astrocytoma and desmoplastic infantile astrocytoma.

- **Diffuse Astrocytoma** *(also called Low-Grade or Astrocytoma Grade II) Types: Fibrillary, Gemistocytic, Protoplasmic Astrocytoma*—these grade II astrocytoma's tend to invade surrounding tissue and grow at a relatively slow pace.
- <u>Anaplastic Astrocytoma—an anaplastic astrocytoma is a grade III tumor: These rare tumors require more aggressive treatment than benign pilocytic astrocytoma. Ms. Francel has this type of astrocytoma</u>
- **Astrocytoma Grade IV** *(also called Glioblastoma, previously named "Glioblastoma Multiforme," "Grade IV Glioblastoma," and "GBM")* — There are **two** types of astrocytoma grade IV—primary, or *de novo*, and secondary. Primary tumors are very aggressive and the most common form of astrocytoma grade IV. The secondary tumors are those which originate as a lower-grade tumor and evolve into a grade IV tumor.
- **Subependymal Giant Cell Astrocytoma**—Subependymal giant cell astrocytoma are ventricular tumors associated with tuberculous sclerosis.

Location - Astrocytomas can appear in various parts of the brain and nervous system, including the cerebellum, the cerebrum, and the central areas of the brain, the brainstem, and the spinal cord.

### Description:

Pilocytic Astrocytomas generally form sacs of fluid (cysts), or may be enclosed within a cyst. Although they are usually slow-growing, these tumors can become very large.

Diffuse Astrocytomas tend to contain micro cysts and mucous-like fluid. They are grouped by the appearance and behavior of the cells for which they are named.

<u>Anaplastic Astrocytomas tend to have tentacle-like projections that grow into surrounding tissue, making them difficult to completely remove during surgery.</u>

Astrocytoma Grade IV (glioblastoma) may contain cystic material, calcium deposits, blood vessels, and/or a mixed grade of cells.

Symptoms - Headaches, seizures, memory loss, and changes in behavior are the most common early symptoms of astrocytoma. Other symptoms may occur depending on the size and location of the tumor.

THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

Treatment - Treatment options depend on the type, size, and location of the tumor, if and how far it has spread, previous treatment received, and the patient's overall health. Treatment methods for the various types of astrocytoma's are briefly explained below.

- **Pilocytic Astrocytoma:** These tumors are often removed by surgery alone. In adults and older children, radiation may follow surgery if the tumor cannot be completely removed. Or, the patient may be watched carefully for signs that the tumor has returned.
- **Diffuse Astrocytoma:** If the tumor is accessible and can be completely removed, the only additional care required is follow-up scans. In adults and older children, radiation may be suggested in addition to surgery. Radiation may also be used to treat an unresectable low-grade astrocytoma. The role of chemotherapy in treating these tumors is being investigated.
- <u>**Anaplastic Astrocytoma:** The first step in treatment of anaplastic astrocytoma is surgery. Radiation is then used to treat the remaining tumor. Chemotherapy may be recommended immediately after radiation or when and if the tumor recurs.</u>
- **Astrocytoma Grade IV:** The first treatment step is surgery to remove as much tumor as possible. Surgery is almost always followed by radiation. Chemotherapy is often given at the same time as radiation and may be used to delay radiation in young children. http://www.abta.org/brain-tumor-information/types-of-tumors/astrocytoma.html - retrieved 12/29/14

    2. According to the <u>draft</u> of the <u>new Texas Medicare LCD DL33093 – Proton Beam Therapy</u>,

    *"Proton beam therapy will be considered medically reasonable and necessary for the following conditions:*
    - *Benign or malignant central nervous system tumors to include but not limited to primary and <u>variant forms of astrocytoma, glioblastoma,</u> medulloblastoma, acoustic neuroma, craniopharyngioma, benign and*

    - *atypical meningioma's, pineal gland tumors, and arteriovenous malformations*

    - *Solid tumors in children up to age 18*
    https://www.novitas-solutions.com/policy/jh/dl33093.html - Retrieved 12/29/14

3. **Aim of Radiation Therapy** – "is to deliver a precisely measured dose of irradiation to a defined tumor volume with as <u>minimal damage as possible to surrounding healthy tissue, resulting in eradication of the tumor, a high quality of life, and prolongation of survival at competitive cost.</u>" Edward C. Halperin, Carlos A Perez, et al, "Perez and Brady's Principles and Practice of Radiation Oncology" [Hardcover book], Fifth Edition, Section 1 entitled "Overview and Basic Science

THE UNIVERSITY OF TEXAS

MDAnderson

Cancer Center

Proton Therapy

Radiation Oncology," "Chapter 1 – The Discipline of Radiation Oncology" page 4, published by Lippincott Williams and Wilkins, a Wolters Kluwer business, 2008.

Due to Ms. Tochel's type of astrocytoma, proton therapy is deemed medically necessary, and the best radiation treatment option for her to spare the critical surrounding organs and tissues from unnecessary radiation exposure, considering previous radiation and also to prevent major toxicities and allowing for a long good quality of life for her, for the rest of lifetime, considering young age of 29.

4.  Brain tumors most appropriate for proton therapy:
    - Glioma (Astrocytoma)
    - Oligodendroglioma
    - Ependymoma
    - Medulloblastoma
    - Pineoblastoma
    - Supratentorial PNET
    - Germ cell tumors
    - Pituitary gland tumors
    - Almost all pediatric brain tumors

 **BRAIN TUMOR COMPARISON** 



CONVENTIONAL RADIATION/X-rays/IMRT –



5.  Proton radiation therapy, which <u>only uses two fields; delivers less radiation dose to the whole brain</u> when compared to X-ray treatment, including IMRT, which requires 8 fields (<u>see sample figures below</u>). Proton therapy "delivers precisely measured dose

THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

of irradiation to a defined tumor volume with minimal damage to surrounding healthy tissues" following the aim of radiation therapy noted above.



Proton Therapy for Pediatric Brain tumor

Photon Therapy for Pediatric Brain Tumor

6. Proton therapy is FDA-approved and is neither investigational nor experimental radiation treatment. Proton therapy has been used to successfully treat pediatric cancer patients and other solid cancerous tumors in this country for decades.

7. A study by C. S. Chung, et al, published in the International Journal Radiation Oncology Biology Physics In 2008, as noted below, showed that conventional photon therapy was significantly associated with an increased risk of secondary malignancy as compared to proton therapy.

Comparative Analysis of Secondary Malignancy Risk In Patients treated with Proton Therapy versus Conventional Photon Therapy

MD Anderson
Cancer Center
Proton Therapy

| By: C. S Chung, et al<br>(International Journal Radiation Oncology Biology Physics, Vol. 72, Supplement, 2008, abstract # 17) | | |
|---|---|---|
| Matched retrospective cohort study of patients treated with<br>**Proton Radiation Therapy (503 patients) and photon therapy (1591 patients)**<br>from 1974 - 2001 | | |
|  | **Proton Therapy** | **Photon Therapy** |
| Developed secondary malignancy | 6.4 % (32 patients) | 12.8% (203 patients) |
| Median duration follow-up | 7.7 years of proton cohort | 6.1 years of photon cohort |
| Median age at treatment | 56 years old | 59 years old |
| *"After adjusting for gender and age at treatment, treatment with photon therapy was significantly associated with an increased risk of secondary malignancy."* | | |

8. It should be noted: 1) <u>Guidelines (including medical insurance coverage guidelines) often become outdated as they do not adjust at the same rate as scientific discovery. Proton beam therapy is a prime example of this condition.</u>
2) <u>Guidelines and Medical Policy are not meant to replace clinical judgment.</u>

Therefore, Ms. Toche's proton therapy should be approved according to the clinical judgment of her radiation oncologist, Dr. Amol Ghia. Proton beam therapy (PBT) is an accepted treatment option for glioblastoma. This form of treatment will provide optimum radiation dose to targeted area while minimizing radiation dose to the insults nearby cochlea, brainstem, hippocampi, spinal cord, and other uninvolved surrounding brain structures. This will translate into preservation of hearing and balance, and cognitive function. The best target coverage and thus the highest likelihood of local control are obtained with proton therapy, which allows for delivery of curative doses while maximally sparing nearby critical structures.

MD Anderson Cancer Center is an international leader in the treatment of cancer and the use of proton beam therapy. We are a National Cancer Institute designated Comprehensive Cancer Center and have one of the nation's largest programs for the

THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

treatment of pediatric cancer like astrocytoma and other malignancies. <u>We have developed successively safer and more effective therapy regimens including the use of proton beam irradiation. These regimens are designed to eradicate the malignancy and to eliminate residual malignant cells that survive treatment with chemotherapy.</u> Proton therapy is an example of a modality utilized at our institution that is used in select patients such as Ms. Toche.

9. The National Cancer Institute 2009 states that standard treatment for astrocytoma which includes surgery which is generally not curative because of difficulty obtaining clear margins. The best results have been obtained using proton therapy.

10. Radiation therapy may lead to increased treatment side effects if special radiation planning and techniques are not employed. With conventional X-ray therapy (i.e. photon therapy), the risk of serious (grade 3-4) long-term side effects in patients undergoing radiation and surgery is 53%, as shown in the attached study by Das et al. By reducing normal tissue exposed to radiation, proton therapy can lower this risk of serious complications. Proton beam radiation therapy has been shown to deliver less radiation dose to the area as a whole, when compared to X-ray treatment, including intensity modulated radiation therapy (IMRT). Hence, we believe that it is medically necessary that Ms. Toche receive proton therapy for treatment of her life-threatening and rare astrocytoma. <u>Indeed, it would allow for tumor control for several years to maintain quality of life and neurocognitive functioning and possibly to cure her.</u>

11. Proton therapy is FDA-approved and is neither investigational nor experimental. It has the potential to expedite patient recovery after treatment and reduces the potential morbidities that may result from irradiating surrounding organs with more conventional techniques such as x-ray therapy. This approach minimizes toxicity to the patient and results in a more rapid recovery from the treatment of her life-threatening anaplastic astrocytoma resulting in less cost to her and to you (as her insurer). Specifically, proton therapy will be an outpatient treatment and will not require hospitalizations due to his disease or treatment-related side effects.

12. The request for proton therapy is in accordance with the Aim of Radiation Therapy. The target is in close proximity to the delicate and critical organs and tissue such as the brainstem, temporal lobes, cochlea, optic chiasm, base of the skull, and spinal cord. Other radio therapeutic techniques like the IMRT can potentially result in adverse effects on Ms. Toche' s neurocognitive functioning, hearing, and long-term quality of life, which will be so expensive for Fox Everrett to maintain.

The primary goal of Ms. Toche's radiation treatment is to improve the local control of her tumor. Secondary goals are to: 1) improve progression free survival, disease

THE UNIVERSITY OF TEXAS
MD Anderson
~~Cancer~~ Center
Proton Therapy

specific survival and disease free survival; 2) Decrease grade 3 and above toxicities to this young 28 years old with life expectancy of more than 10 years and her pre-existing significant neurological co-morbidities and melanoma.

Furthermore, considering the nature of his tumor, it requires a high total dose and that could only be delivered safely with proton therapy. With proton therapy, surrounding normal structures including but not limited to the delicate and critical tissues and organs in the brain area, and spinal cord would be avoided from radiation exposure to the greatest degree possible and focus the clinical target volume to the area of concern. Considering the potentially deleterious effective high dose of radiation therapy with either 3D conformal x-ray treatment or intensity-modulated radiation therapy as shown in the studies of the radiation therapy oncology groups, proton therapy is medically necessary and is the only radiation treatment option for him in that it would reduce Central Nervous System toxicities along with other related complications. This regimen has translated into cost-effective and improved outcomes for many patients. The risk of toxicity to adjacent normal tissues, as noted above, is significantly minimized.

At our institution, we agree that not all patients are better served with proton therapy, and we are therefore very selective in who is dispositioned to receive this treatment. We are requesting proton therapy for his life-threatening astrocytoma due to the fact that proton therapy has been shown to be safe and effective for central nervous system tumors which are very close to critical and delicate organs and tissues of such as the optic nerve, brain stem, spinal cord, and base of the skull. Proton therapy has the ability of precise tumor target while sparing the surrounding structures from the unnecessary radiation exposure, thus lessening the toxic effects on his neurocognitive functioning, hearing, and total quality of life.

Proton therapy has been used to successfully treat patients in this country for decades. Therefore, the use of the terms "Investigational" and "experimental," to describe proton beam therapy, is misleading. The pace of new advances is rapid and keeping abreast of new developments that help patients is challenging. According to Dr. Elizabeth F. Brown, the former Director of the Department of Technology Management for the American Medical Association, the practice of medicine and particularly the field of oncology are rapidly evolving. "Nowhere is this truer than in the field of oncology where new combinations and doses of drugs and radiation therapy are always under study." She also added that many third-party payors require evidence from well-controlled clinical trials published in peer-reviewed medical literature to support the non-investigational status of a medical service. She stated that this type of interpretation does not recognize the fact that the literature often lags at least one year behind actual clinical practice and that for many medical services these types of controlled studies may never be available. The consensus of the M.D. Anderson Cancer Center clinical team involved with Ms. Toche's care is that proton therapy is medically necessary and the best medical treatment option for her rare and life-threatening anaplastic astrocytoma in her current challenging clinical status.

THE UNIVERSITY OF TEXAS
MDAnderson
Cancer Center
Proton Therapy

In summary, proton therapy was the best treatment and the only radiation treatment option for his life-threatening glioblastoma given his young age of 29 years old, pre-existing extensive and delicate neurological co-morbidities. We strongly believe that proton therapy would expose her to less risk of central nervous system toxicities and complications, along with other related complications. The side effects with the proton are not expected to be as extensive as with the photon radiotherapy or IMRT.

Overall, the use of proton therapy follows the Aim of Radiation Therapy – "Is to deliver a precisely measured dose of irradiation to a defined tumor volume with as minimal damage as possible to surrounding healthy tissue, resulting in eradication of the tumor, a high quality of life, and prolongation of survival at competitive cost." Edward C. Halperin, Carlos A Perez, et al, "Perez and Brady's Principles and Practice of Radiation Oncology" [Hardcover book], Fifth Edition, Section 1 entitled "Overview and Basic Science Radiation Oncology," "Chapter 1 - The Discipline of Radiation Oncology" page 4, published by Lippincott Williams and Wilkins, a Wolters Kluwer business, 2008.

We respectfully request that you review medical coverage on an individual basis rather than a blanket denial or contractual exclusion and provide Ms. Toche the approval for her proton therapy for her life-threatening and rare astrocytoma.

I, her radiation oncologist would like to request a CNS radiation oncologist with past experience in handling cases like astrocytoma to review this case. This will provide Ms. Toche a fair review of her request for reconsideration for the review of proton therapy, which I, her radiation oncologist, and the rest of the multidisciplinary team involved in her care, deemed medically necessary, the best and the optimal radiation treatment for her rare and life-threatening astrocytoma in her current significantly challenging clinical status.

Enclosed are supporting articles and the letter of Dr. Elizabeth Brown expounding on the terms "experimental."

Should additional clinical information be required, please contact Rosemarie Hontiveros, MBA, BSN, RN, VP of Denials Management and Education, at 713-745-9822 and Fax (713) 563-0862, Adel Leonida, BSN, RN, CCM, ACM, OCN, Denials Management Coordinator, at 713-563-9388, and Maria Teresa Demavivas, MSN, RN, FNP-C, at 713-563-4198.

Please return/forward all correspondence to:

The University of Texas M.D. Anderson Cancer Center
Dept. of Radiation Oncology– Proton Therapy Center
1840 Old Spanish Trail
Houston, Texas 77054
Attention:     Rosemarie Hontiveros, MBA, BSN, RN
               Adelwisa Leonida, BSN, RN, CCM, ACM, OCN
               Maria Teresa Demavivas MSN, RN, FNP-C

THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

Sincerely,

Amol Ghia, MD,
Assistant Professor
Department Radiation Oncology
The University of Texas MD Anderson Cancer Center

**FOX | EVERETT**

300 Concourse Boulevard
Suite 300
Ridgeland, MS 39157-2051

A Division of HUB International
Pam.Rogers@hubInternational.com
Direct: 601-607-5443
Fax: 601-607-5643
Pam.Rogers@hubInternational.com

December 22, 2014

MD Anderson Cancer Center
The Proton Therapy Center
1840 Old Spanish Trail
Houston TX 77054

RE: Patient: Heather Toche
    Member#: FE5700698-31
    Proposed Service: Proton Radiation Therapy

Dear: Sir or Madam:

Fox-Everett, Inc. has completed a review for the prior approval of Proton Radiation Therapy. Based upon the documentation submitted with your request, we are unable to approve this procedure because it is not considered medically necessary for this patient's treatment. Unless given in a clinical study, this procedure is not recognized as a standard of care treatment.

This information was provided to us by a physician advisor, Board Certified in Radiation Oncology.

We regret this decision could not be more favorable. If you have any questions, please call customer service at 877-476-6327.

Sincerely,

Pam Rogers
Employee Benefits Department



## AmericanHealth
American Health Holding Inc

HEATHER TOCHE
112 STENNIS AVE
OCEAN SPRINGS, MS 39564

CONFIDENTIAL
1/7/2015

| Ref. Number: | 2946227 | Member Id: | FE5700698-10 |
|---|---|---|---|
| Patient: | HEATHER TOCHE | Physician: | Dr. A.J. Ghia |
| Group: | V.T. Halter Marine, Inc. | Facility/Provider: | MD Anderson Cancer Center |
| Service: | RADIATION TREATMENT AID(S) | | |

We received a request regarding a determination for medical necessity concerning RADIATION TREATMENT (PBT). The service reviewed was based on information provided against general medical necessity guidelines and we are not able to conclude that the service satisfies those guidelines because there is insufficient medical evidence to support the clinical effectiveness of this treatment. There are no current phase III studies to demonstrate the advantages for grade 3 disease with PBT. Further, current studies lack data for long term toxicities for young patients like this 29 year old patient. Dr. Ghia presented DVH of comparison plan. The comparison plan reviewed (1/7/15). Several organs at risk have lower dosages with PBT (proton beam therapy) compared to IMRT plan. However, at the same time both eyes and lens will receive much higher dosages with PBT plan compared to IMRT plan. There is no long term data for PBT in young glioma patients. Current standard of care for this group of patients is photon IMRT. Patient is not currently enrolled in a clinical study. Safety of PBT for this patient is NOT established. NO change in my opinion.

If you have any questions regarding this determination, you may contact us at (866) 614-4244 Ext: 9376362.

This response does not mean HEATHER TOCHE should not receive or continue to receive the medical service. Those decisions rest with the treating medical professional and the patient. Because the Plan does not require a precertification for this service, this determination was based only on general medical necessity guidelines. Therefore, this inquiry about medical necessity is not considered a formal claim for benefits under the Plan.

If you elect or have elected to proceed with this medical service and the claim is denied, your Claims Administrator will advise you of your appeal rights, if any. Questions related to filing a formal claim for Plan benefits concerning the medical service, the health Plan's particular medical necessity definition, the patient's eligibility for Plan coverage, or any other applicable terms of the Plan should be directed to Customer Service, at (877) 476-6327.

Sincerely,

7400 West Campus Road, F-510 ■ New Albany, OH 43054-8725 ■ Phone: 614-933-8000 ■ Fax 866-440-3487

Patricia Daddurno, RN
CM-99

 **mcmc**

1451 Rockville Pike, Ste 440   Rockville, MD 20852   [T] 301-652-1818 [F] 301-652-1250

January 16, 2016 – CONFIDENTIAL – via Mail page 1 of 5

Heather Toche (or representative)
112 Stennis Ave
Ocean Springs, MS 39564

Dear Heather Toche (or representative):

Re:     External review for enrollee of VT Halter Marine Medical Plan (MCMC ID 2098-3344)

MCMC was requested to provide an external review of the subject case.

We have enclosed the following results of the external review:
• Appeal determination summary page
• Experts' review(s)

shika at'ohwol ninisingo, kwiijigo holne' 866-337-8812

obtener asistencia en Español, llame al 855-872-6560

如果您要中文的帮助，请拨打这个号码 866-337-1343

Kung kailangan ninyo ang tulong sa Tagalog tumawag sa 866-337-6577

A copy of the contents of this letter and attachments were forwarded to the health plan, and to
the provider (if applicable).

Sincerely,

*Beth Cucchi, RN*

Beth Cucchi, R.N.
Federal and Independent Review

 **mcmc**

1451 Rockville Pike, Ste 440   Rockville, MD 20852   [T] 301-652-1818 [F] 301-652-1250

## Decision Notification

### Case Information:

| | | | |
|---|---|---|---|
| Date: | 01/16/2015 | MCMC Case#: | 2098-3344 |
| Patient Name: | Heather Toche | Diagnosis: | 191.1 Malignant neoplasm of frontal lobe |
| Claim # (if available): | Not Applicable | Service: | Proton Beam Therapy |
| Health plan ref #: | 2946227 | Provider: | Amul Ghia, MD |

| | |
|---|---|
| Date MCMC received review request: | 01/15/2015 |
| Date MCMC received records from health plan: | 01/16/2015 |
| Date MCMC received additional records: Date/From: | N/A |
| Date of the requested service: | Pre-service |

**Appeal determination:**  Health plan denial of coverage: **Upheld.** (The attached review report(s) provide rationale for this decision)

### Important Information about Your Appeal Rights:

**What if I need help understanding this decision?**
Contact MCMC at 301-652-1818 if you need assistance understanding this notice.

**What happens now?** The determination is binding. This means, if we have overturned the denial, your plan or health insurance issuer will now provide service or payment. If we have upheld the denial, there is no further review available under the appeals process. However, you may have other remedies available under State or Federal law, such as filing a lawsuit.

**Other resources to help you:** For questions about your appeal rights, this notice, or for assistance, you can contact the Employee Benefits Security Administration at 1-866-444-EBSA (3272).


**mcmc**

1451 Rockville Pike, Ste 440   Rockville, MD 20852   [T] 301-652-1818 [F] 301-652-1250

Date:                        January 16, 2015
Patient Name:                Heather Toche
Health Plan:                 VT Halter Marine Medical Plan
Reviewer ID:                 32801
MCMC ID:                     2098-3344

To Whom It May Concern:

As requested by MCMC, I have reviewed the subject case.

**Clinical summary:**
The patient is a 29 year-old female with a recent diagnosis of anaplastic astrocytoma s/p gross
total resection.  Adjuvant radiation therapy was recommended, and proton beam radiation
therapy was requested.

**Issue under review:**
Proton Beam Therapy

**Records reviewed:**
Appeal letter, denial letter, correspondence, medical records, and the Summary Plan
Description.

**Review Question:**
**Is the requested Proton Beam Therapy a Plan/Benefit exclusion as defined by the
Summary Plan Description**

Yes. The requested Proton Beam Therapy a Plan/Benefit exclusion as defined by the Summary
Plan Description because it is considered experimental/investigational.

The Plan defines experimental/investigational as:
"Experimental and/or Investigational means services, supplies, drugs, care and treatment which
does not constitute accepted medical practice properly within the range of appropriate medical
practice under the standards of the case and by the standards of a reasonably substantial,
qualified, responsible, relevant segment of the medical community or government oversight
agencies at the time services were rendered.

The Plan Administrator must make an independent evaluation of the
experimental/nonexperimental standings of specific technologies. The Plan Administrator shall
be guided by a reasonable interpretation of Plan provisions. The decisions shall be made in
good faith and rendered following a detailed factual background investigation of the claim and
the proposed treatment. The decision of the Plan Administrator will be final and binding on the
Plan. The Plan Administrator will be guided by the following principles:



1451 Rockville Pike, Ste 440   Rockville, MD 20852   [T] 301-652-1818 [F] 301-652-1250

Date:                 January 16, 2015
Patient Name:         Heather Toche
Health Plan:          VT Halter Marine Medical Plan
Reviewer ID:          32901
MCMC ID:              2098-3344

- if the drug or device cannot be lawfully marketed without approval of the U.S. Food and Drug
- Administration and approval for marketing has not been given at the time the drug or device is furnished; or
- if the drug, device, medical treatment or procedure, or the patient informed consent document
- utilized with the drug, device, treatment or procedure, was reviewed and approved by the treating facility's Institutional Review Board or other body serving a similar function, or if federal law requires such review or approval; or
- if Reliable Evidence shows that the drug, device, medical treatment or procedure is the subject of on-going phase I or phase II clinical trials, is the research, experimental, study or investigational arm of on-going phase III clinical trials, or is otherwise under study to determine its maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis; or
- if Reliable Evidence shows that the prevailing opinion among experts regarding the drug, device, medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis.

Reliable Evidence shall mean only published reports and articles in the authoritative medical and scientific literature; the written protocol or protocols used by the treating facility or the protocol(s) of another facility studying substantially the same drug, service, medical treatment or procedure; or the written informed consent used by the treating facility or by another facility studying substantially the same drug, device, medical treatment or procedure."

In this case, the patient is a 29 year-old female with a recent diagnosis of anaplastic astrocytoma status post gross total resection. Adjuvant radiation therapy was recommended, and proton beam radiation therapy was requested. However, per Plan language, the requested proton therapy is considered experimental/investigational.

Proton beam radiation therapy is a type of very precise external radiation treatment in which protons are used to treat cancer and other conditions. Compared to photon, a proton beam that is delivered with sufficient energy has a low "entrance dose". A proton beam also has a high-dose "Bragg peak" region, which is designed to cover the entire tumor and there is no "exit dose" beyond the tumor involved in proton radiation therapy. Because of this unique property, proton beam therapy is highly successful in minimizing damage to normal tissue and surrounding organs, resulting in fewer side effects. Proton beam radiation therapy is an FDA approved procedure and is not subject to IRB review.



1451 Rockville Pike, Ste 440   Rockville, MD 20852   [T] 301-652-1816 [F] 301-652-1250

Date:                    January 16, 2015
Patient Name:            Heather Toche
Health Plan:             VT Halter Marine Medical Plan
Reviewer ID:             32901
MCMC ID:                 2098-3344

Although proton beam radiation therapy has been shown to be safe and effective for the
treatment of intracranial lesions, there is insufficient clinical data in the medical literature to
show that proton is equivalent or superior to other treatment options such as photon therapy for
astrocytomas. There are several ongoing trials evaluating the role of proton therapy for primary
brain tumors. Proton beam radiation therapy for brain tumor, therefore, is not considered
medically necessary due to insufficient peer-reviewed data in the literature and per Plan
language it is considered experimental/investigational.

### References:

- Proton radiation therapy. Archambeau JO, Bennett GW, Levine GS, Cowen R, Akanuma A.
  *Radiology.* 1974 Feb;110(2):445-57. No abstract available.

- Some aspects of the use of protons in the treatment of experimental brain tumors. Nyström
  SH. *Naturwissenschaften.* 1966 Mar;53(6):159-60. No abstract available.

- Dose conformation of intensity-modulated stereotactic photon beams, proton beams, and
  intensity-modulated proton beams for intracranial lesions. Baumert BG, Norton IA, Lomax
  AJ, Davis JB. *Int J Radiat Oncol Biol Phys.* 2004 Nov 15;60(4):1314-24.

- Proton therapy for low-grade gliomas: Results from a prospective trial. Shih HA, Sherman
  JC, Nachtigall LB, Colvin MK, Fullerton BC, Daartz J, Winrich BK, Batchelor TT, Thornton
  LT, Mancuso SM, Saums MK, Oh KS, Curry WT, Loeffler JS, Yeap BY. *Cancer.* 2015 Jan
  13. doi: 10.1002/cncr.29237.

- Clinical outcomes and late endocrine, neurocognitive, and visual profiles of proton radiation
  for pediatric low-grade gliomas. Greenberger BA, Pulsifer MB, Ebb DH, MacDonald SM,
  Jones RM, Butler WE, Huang MS, Marcus KJ, Oberg JA, Tarbell NJ, Yock TI. *Int J Radiat
  Oncol Biol Phys.* 2014 Aug 1;89(5):1060-8. doi: 10.1016/j.ijrobp.2014.04.053. Epub 2014 Jul
  8.

### Reviewer #32901:

I am board certified in Radiation Oncology. Currently, I am in private practice. My areas of
expertise include radiation oncology and general oncology including stereotactic radiosurgery,
brachytherapy, prostate seed implant, intravascular brachytherapy, total body irradiation, total
skin electron therapy, and pediatric radiation oncology. I am a member of the American Society
for Therapeutic Radiology and Oncology and the Radiological Society of North America.



THE UNIVERSITY OF TEXAS
MD Anderson
Cancer Center
Proton Therapy

Making Cancer History*

---

# FAX COVER SHEET

Date: _____ $1-22-18$

**PLEASE DELIVER TO:**

NAME: _____ Mony

COMPANY: _____

PHONE: _____

FAX: _____ $228 - 872 - 3315$

**MATERIAL SENT FROM:**

Rosemarie L. Hontiveros, MBA, BSN, RN - Vice President of Denials Management and Education **T 713-745-9822**
Adelwisa Leonida, BSN, RN, CCM, ACM, OCN - Denials Management Coordinator - **T 713-563-9388**
Maria Teresa Demavivas, MSN, RN, FNP - Denials Management Coordinator - **T 713- 563-4198**
Proton Therapy Center, Division of Radiation Oncology
**F 713-563-0862**
***************************************************************************************************
**NUMBER OF PAGES (INCLUDING COVER PAGE___**

PATIENT'S NAME: _____ MDACC #: _____

COMMENTS: _____

***************** ALL PROTOCOL SUBMISSIONS ARE CONFIDENTIAL *********************

### CONFIDENTIAL NOTICE

The documents accompanying this facsimile transmission contain confidential information belonging to the sender. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance of the contents of this facsimile information is strictly prohibited. If you have received this facsimile in error, please telephone the sender immediately to arrange for return of the original documentation.

CARING   •   INTEGRITY   •   DISCOVERY
1840 OLD SPANISH TRAIL •HOUSTON, TEXAS 77054
M.D. Anderson Switchboard (713) 792-2121 • www.mdanderson.org
A Comprehensive Cancer Center Designated by the National Cancer Institute located in the Texas Medical Center

RECEIVED JAN 2 0 2015



**managing care. managing claims.**

**facsimile transmission**

| | | | |
|---|---|---|---|
| *To:* | AMOL GHIA | *Pages:* | 7 |
| *Fax Number:* | 17135631521 | *Date:* | 1/16/2015 |
| *From:* | For questions, call Team M at 888-313-6267 | *Time:* | 3:18 PM |
| *Subject:* | Case Number 983344 | | |

*For expeditious resolution of all non-clinical questions,*
*call the MCMC Customer Service team in Bethesda at the number listed in the 'From' line above.*
*Our representatives are trained to assist you with all inquiries such as case status updates, fax*
*problems, changes in Attending Physician telephone numbers, and any other non-clinical questions.*

This transmittal is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this transmittal is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal service. You will be reimbursed for your postage expense. Thank you.



medical-care-ombudsman-program

1451 Rockville Pike, Suite 440 Rockville, MD 20852  (T) 301-652-1818 (F) 301-652-1320

**ATTENTION:**

Amul Ghia, MD

Regarding:

Heather Toche

**HUB** *FOX | EVERETT*
International

*A Division of HUB International*

300 Concourse Boulevard
Suite 300
Ridgeland, MS 39157-2051

www.hubinternational.com
Direct: 601-607-5531
Fax: 601-607-5731
Melanie.O'Gwynn@hubinternational.com

February 9, 2015

Stephen W. Mullins
PO Box 990
Ocean Springs, MS 39566

Re: Heather Toche (FE5700698-31)
    VT Halter Marine Medical Plan

Dear Mr. Mullins,

We are in receipt of your letter regarding Heather Toche's Proton Beam Therapy.   American Health Holding is the UR/Large Case Management vendor for the VT Halter Marine Medical Plan.

The initial request for coverage of the Proton Beam Therapy was made on January 5, 2015 and was reviewed by American Health Holding, who issued a non certification of the proposed services. On January 5th, a Peer to Peer consult was requested by Dr. Ming Zeng, MD.  The peer to peer consult was performed on January 6th with an American Health Holding Board Certified Radiation Oncologist.  Based on the Peer to Peer consult, there are no current phase III studies to demonstrate the advantages for grade 3 disease with Proton Beam Therapy.  Further, current studies lack data for long term toxicities for young patients like 29 year old Heather. Dr. Zeng submitted a comparison plan for review.  The information was reviewed by the American Health Holdings Physician Reviewer.  It was determined that there is no long term data for Proton Beam Therapy in younger glioma patients.  The current standard of care for this group of patients is photon IMRT.   The results of the Peer to Peer Review were released on January 7, which upheld the original denial of Proton Beam Therapy.

The VT Halter Medical Plan is a Non Grandfathered Medical Plan, therefore subject to the Affordable Care Act External Appeals.  Under the Affordable Care Act, the patient has the right to request an external appeal.  Based on the information that had been sent in to Fox/Everett, we felt that the case the case should be sent to an Independent Review Organization for an external review, even though it had not been requested by the member. The case was reviewed by MCMC and the denial was upheld.  The attached notice was sent to Mrs. Toche  on January 16, 2015 by MCMC.  I have attached a copy of that letter for you to review.

At this time, all information has been reviewed and the non-recommendation of Proton Beam Therapy stands. Please fee free to contact me at 601-607-5531 if you have any further questions.

Sincerely,
Melanie O'Gwynn
Melanie O'Gwynn
Director of Claims

# LUCKEY & MULLINS, P.L.L.C.

ALWYN H. LUCKEY
STEPHEN W. MULLINS*

of Counsel: KEITH MILLER

* ALSO ADMITTED IN LOUISIANA AND
ALABAMA

1629 GOVERNMENT ST.
POST OFFICE BOX 990
OCEAN SPRINGS, MISSISSIPPI 39566
OFFICE (228) 875-3175
FACSIMILE (228) 872-4719
WWW.LUCKEYANDMULLINS.COM

December 17, 2015

Via Electronic Mail & U. S. Mail

Fox Evertt
**Attn.: Pam Rogers**
300 Concourse Boulevard, Suite 300.
Ridgeland, MS 39157
Pascagoula Mississippi

> Re: Our Client: Heather Toche
> Member No.: FE5700698-31

Dear Ms. Rogers:

It is my understanding that you are the third party administrator (TPA) for the carrier that provides an ERISA qualified group medical care plan to the employees of VT Halter Marine. Please be advised we represent the interests of Heather Toche who is a covered member of the plan through her husband's employment with VT Halter Marine.

It is our understanding from discussions with Mrs. Toche that Fox Everett, as the TPA for said plan, denied a request by a duly qualified cancer medical center, namely, the MD Anderson Center in Houston, for necessary medical treatment for her life threatening left frontal anaplastic astrocytoma.

Subsequently, you had MCMC perform an external review, and the denial was upheld. In response to that decision in furtherance of my client's position, I would now like to submit a letter from her treating physician in Mississippi who also recommends the proton beam therapy that was administered at MD Anderson Center.

We ask that you immediately review the attached letter from Dr. Persing and reinstate these benefits retroactively to pay for the treatment she has received so far and so that she can seek further life saving treatment that has been recommended by her doctor.

Fox Everett
December 17, 2015
Page Two

Thanking you in advance for your prompt attention to this matter, I am

Sincerely yours,

LUCKEY & MULLINS, PLLC

Stephen W. Mullins

SWM/lls
Enclosure (as stated)

# SINGING RIVER HEALTH SYSTEM

OCEAN SPRINGS HOSPITAL | SINGING RIVER HOSPITAL
*REGIONAL CANCER CENTER*
2809 DENNY AVE | PASCAGOULA, MS 39581 | WWW.MYSRHS.COM
PHONE: (228) 809-5251 | FAX: (228) 809-5255

**PHYSICIAN CORRESPONDENCE - October 26, 2015**

To Whom It May Concern:

**RE: Heather A Toche**
**MR#: 10310107**

I am presently taking care of Heather Toche (DOB ⬛⬛⬛⬛. She is presently under my care for the administration of adjuvant temozolomide for her underlying Grade III anaplastic astrocytoma. At the present time she is doing remarkably well. My understanding is that there was a component of her radiation that was not covered based on evidence-based medicine regarding proton beam therapy that was administered out at MD Anderson. Certainly, while proton beam may not be considered a standard therapy for anaplastic astrocytomas except in the pediatric population, there is understanding that its long term toxicities are likely less, but certainly there is absolutely no evidence at the present time that it is inferior to IMRT-based radiation. Even so, IMRT radiation carries with it toxicities that can be modified by proton beam. One of the biggest hurdles we have in oncology at the present time is the newer therapies that are available are making advances on therapies that are already doing well for many of these patients and therefore changes in the standard of care can take quite some time to evolve. Certainly issues with long term toxicity in radiation may require somewhere between 10 and 20 years of follow up before there is determination whether one may be superior to another from a residual toxicity standpoint. Moreover, proton beam therapy is noted not to be inferior to IMRT at this point in time and they are equivalent in outcomes with the potential for reduced toxicity. In a female that is 29 years of age that is caring for children at home, obviously, the less toxicity she experiences over time and the better she will be able to function is of paramount importance. Moreover, even if she had not had proton beam therapy, she still would have required, at minimum, IMRT-based radiation. My understanding is that appeals from MD Anderson, which is considered a regionally most advanced medical oncology center, recommended proton therapy. While not a radiation oncologist, if an academic center feels that this therapy is most appropriate for this individual patient, namely Ms. Toche, then we would be in support of that modality for therapy, especially given the potential long term complications from radiation that have not yet fully been elucidated or proved to be better with proton because of the general lag time between the therapy and the development of these toxicities.

Thank you kindly for your time and consideration to this matter. Please feel free to contact me if you have any questions.

Sincerely,

*[signature]*

Brian E. Persing, M.D.

DD: 10/29/2015
DT: 11/2/2015
Trans ID: dg

Electronically signed by: Brian E. Persing, M.D.

In the interests of communicating this information expeditiously, this annotation is being mailed without signature.

October 31, 2017

V T Halter Marine, Inc. Employee Welfare Benefit Plan
V T Halter Marine, Inc., Plan Administrator
Attn: Melissa Sheffield and D. Margaret Gambrell
900 Bayou Casotte Parkway
Pascagoula, MS 39581          **Via Certified Mail-Restricted Delivery**

Re:   **Heather Toche** [Mrs. William R. Toche]
      SSN: ▮▮▮▮▮▮
      Member No.: FE5700698-31

I am a dependent beneficiary of the VT Halter Marine, Inc. Employee Welfare Benefit Plan.

I. Please send me full, true copies of the **2013-through-2015 versions** of the following needed documents:

1. the VT Halter Marine, Inc. Employee Welfare Benefit **Plan Document** [aka 'Master Plan Document']
2. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Plan Descriptions** [aka "SPDs"]
3. the latest VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Annual Report**;
4. the latest **Terminal Report**;
5. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Trust Agreement**;
6. the contracts between VT Halter Marine, Inc. Employee Welfare Benefit Plan [or VT Halter Marine, Inc.]
   and [A] Fox-Everett, Inc. [now HUB International, Inc.]
   and [B] MCMC, LLC
   and [C] other third-party administrators, claims administrators, vendors, contractors of the said **Plan**.

II.  Please send me full, true copies of the following, needed documents:
7.  All evidence  the VT Halter Marine, Inc. Employee Welfare Benefit **Plan** is wholly-funded by
    VT Halter Marine, Inc. **assets** - and
8.  All evidence of the sums of health, medical, hospital insurance **premiums** paid during the years **2013-through-2015**
    [a] paid by VT Halter Marine, Inc.,
    [b] paid by/on behalf of Heather Toche, including that paid by my husband, Wm R Toche, by payroll deductions,
    [c] paid by other employees of VT Halter Marine, Inc.
9.  All documents pertaining to me, **Heather Toche**, and pertaining to claims for health, medical, hospital and cancer
    treatment benefits for and/or on behalf of me, **Heather Toche** - including my entire **Benefits Files** and **Claims Files** and
10. All other documents relating to the denials of more than $100,000 of unpaid cancer treatments of Heather Toche.

Failure to comply with these requests may result in a penalty assessment versus you of up to $110 per day.

I look forward to receiving all of the above documents within 30 days.

Sincerely,


**Heather Toche**
2724 N. 6th St.
Ocean Springs, MS 39564



Heather Toche
2724 N. 6th St.
Ocean Springs, MS
- 39564 -

VT Halter Marine Inc. Employee Welfare Benefit Plan
VT Halter Marine Inc. Plan Administrator
ATTN: Melissa Sheffield & D. Margaret Gambrell
900 Bayou Casotte Parkway
Pascagoula, MS - 39581 -

October 31, 2017

V T Halter Marine, Inc. Employee Welfare Benefit Plan
V T Halter Marine, Inc. Plan Administrator
Attn: Melissa Sheffield and D. Margaret Gambrell
900 Bayou Casotte Parkway
Pascagoula, MS 39581                    Via Certified Mail-Restricted Delivery

Re:    Heather Toche [Mrs. William R. Toche]
       SSN
       Member No. FE5700695-31

I am a dependent beneficiary of the VT Halter Marine, Inc. Employee Welfare Benefit Plan.

I. Please send me full, true copies of the 2013-through-2016 versions of the following needed documents:

1. the VT Halter Marine, Inc. Employee Welfare Benefit Plan Document [aka 'Master Plan Document']
2. the VT Halter Marine, Inc. Employee Welfare Benefit Plan Summary Plan Descriptions [aka "SPDs"]
3. the latest VT Halter Marine, Inc. Employee Welfare Benefit Plan Summary Annual Report;
4. the latest Terminal Report;
5. the VT Halter Marine, Inc. Employee Welfare Benefit Plan Trust Agreement;
6. the contracts between VT Halter Marine, Inc. Employee Welfare Benefit Plan [or VT Halter Marine, Inc.]
   and [A] Fox-Everett, Inc. [now HUB International, Inc.]
   and [B] HCMC, LLC
   and [C] other third-party administrators, claims administrators, vendors, contractors of the said Plan.

II. Please send me full, true copies of the following, needed documents:
7. All evidence that the VT Halter Marine, Inc. Employee Welfare Benefit Plan is wholly-funded by
   VT Halter Marine, Inc. assets - and
8. All evidence of the sums of health, medical, hospital insurance premiums paid during the years 2013-through-2016
   [i] paid by VT Halter Marine, Inc.
   [ii] paid by, on behalf of Heather Toche, including that paid by my husband, Wm R Toche, by pay-roll deduction,
   [iii] paid by/for, on engagement/VT Halter Marine, Inc.
9. All documents pertaining to any Heather Toche, and pertaining to claims for health, medical, hospital and cancer
   treatment benefits/assurance on behalf of me, Heather Toche - including my entire Benefits Plan and Claims Files and
10. All other documents relating to the denials of more than $700,000 of unpaid cancer treatments of Heather Toche.

Failure to comply with these requests may result in a penalty assessment against you of up to $110 per day.

I look forward to receiving all of the above discussions within 30 days.

Sincerely,

Heather Toche

Heather Toche
2724 N. 6th St.
Ocean Springs, MS 39564

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

V.T. Halter Marine Inc.   Employee Welfare
Attn: Melissa Sheffield's   Benefit Plan &
Plan Admin
900 Bayou Casotte Parkway   Margaret
Pascagoula, MS 39581   Gambrell

9590 9402 2505 6308 6337 15

2. Article Number (Transfer from service label)

7017 1450 0001 2064 6340

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

Case: 30CH1:17-cv-02072-DNH   Document #: 6-3   Filed: 07/12/2018   Page 1 of 1

December 5, 2017

V T Halter Marine, Inc. Employee Welfare Benefit Plan
V T Halter Marine, Inc., Plan Administrator
900 Bayou Casotte Parkway
Pascagoula, MS 39581

HUB International, Inc. [Gulf South]
300 Concourse Blvd. Suite 300
Ridgeland MS 39157

American Health Holding Inc.
7400 W. Campus Rd. F-510
New Albany, Ohio 43054-8725

MCMC, LLC
1461 Rockville Pike, Ste 440
Rockville, MD 20852

Re:   **Heather Toche** [Mrs. William R. Toche]
      SSN:
      Member No.: FE5700698-31

## To: VT Halter Marine Plan Administrator; HUB Int'l, Inc.; American Health Holding, Inc.; MCMC, LLC:

I am a dependent beneficiary of the VT Halter Marine, Inc. Employee Welfare Benefit Plan and your "subject".

I. Please send me full, true copies of the **2013-through-2015 versions** of the following needed documents:

1. the VT Halter Marine, Inc. Employee Welfare Benefit **Plan Document** [aka 'Master Plan Document']
2. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Plan Descriptions** [aka "SPDs"]
3. the latest VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Annual Report**;
4. the latest **Terminal Report**;
5. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Trust Agreement**;
6. the correspondence and contracts by, between, among VT Halter Marine, Inc. Employee Welfare
Benefit Plan [and VT Halter Marine, Inc.]
   and [A] Fox-Everett, Inc. [now HUB International, Inc.]
   and [B] MCMC, LLC
   and [C] other third-party administrators, claims administrators, vendors, contractors of the said **Plan**.

II.  Please send me full, true copies of the following, needed documents:
7.  All evidence  the VT Halter Marine, Inc. Employee Welfare Benefit **Plan** is wholly-funded by
VT Halter Marine, Inc. **assets** - and
8.  All evidence of the sums of health, medical, hospital insurance **premiums** paid during the years **2013-through-2015**
[a] paid by VT Halter Marine, Inc.,
   [b] paid by/on behalf of Heather Toche, including that paid by my husband, Wm R Toche, by payroll deductions,
   [c] paid by other employees of VT Halter Marine, Inc.
9.  All documents pertaining to me, **Heather Toche**, and pertaining to claims for health, medical, hospital and cancer
treatment benefits for and/or on behalf of me, **Heather Toche** - including my entire **Benefits Files**, **Claims Files** and all
documents relating to me generated by HUB International Inc.; MCMC, LLC & American Health Holding Inc in 2014-15.
10. All other documents relating to the denials of more than $100,000 of unpaid M D Anderson Cancer Center's and Singing
River Health System's Cancer Center's cancer treatments of Heather Toche in 2014-15.

Failure to comply with these requests may result in a penalty assessment versus you of up to $110 per day.
I look forward to prompt receipt all of the above documents. Sincerely,

**Heather Toche**
2724 N. 6th St.
Ocean Springs, MS 39564



EXHIBIT
**3**

July 9, 2018

V T Halter Marine, Inc. Employee Welfare Benefit Plan
V T Halter Marine, Inc., Plan Administrator
900 Bayou Casotte Parkway
Pascagoula, MS 39581

HUB International, Inc. [Gulf South]
300 Concourse Blvd. Suite 300
Ridgeland MS 39157

American Health Holding Inc.
7400 W. Campus Rd. F-510
New Albany, Ohio 43054-8725

MCMC, LLC
1461 Rockville Pike, Ste 440
Rockville, MD 20852

Re:    **Heather Toche** [Mrs. William R. Toche]
       SSN: ▮▮▮▮▮▮
       Member No.: FE5700698-31

## To: VT Halter Marine Plan Administrator; HUB Int'l, Inc.; American Health Holding, Inc.; MCMC, LLC:

I am a dependent beneficiary of the VT Halter Marine, Inc. Employee Welfare Benefit Plan and your "subject".

I. Please send me full, true copies of the **2013-through-2015 versions** of the following needed documents:

1. the VT Halter Marine, Inc. Employee Welfare Benefit **Plan Document** [aka 'Master Plan Document']
2. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Plan Descriptions** [aka "SPDs"]
3. the latest VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Annual Report**;
4. the latest **Terminal Report**;
5. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Trust Agreement**;
6. the correspondence and contracts by, between, among VT Halter Marine, Inc. Employee Welfare Benefit Plan [and VT Halter Marine, Inc.]
   and [A] Fox-Everett, Inc. [now HUB International, Inc.]
   and [B] MCMC, LLC
   and [C] other third-party administrators, claims administrators, vendors, contractors of the said **Plan**.

II.  Please send me full, true copies of the following, needed documents:
7. All evidence the VT Halter Marine, Inc. Employee Welfare Benefit **Plan** is wholly-funded by VT Halter Marine, Inc. **assets** - and
8. All evidence of the sums of health, medical, hospital insurance **premiums** paid during the years **2013-through-2015**
   [a] paid by VT Halter Marine, Inc.,
   [b] paid by/on behalf of Heather Toche, including that paid by my husband, Wm R Toche, by payroll deductions,
   [c] paid by other employees of VT Halter Marine, Inc.
9. All documents pertaining to me, **Heather Toche**, and pertaining to claims for health, medical, hospital and cancer treatment benefits for and/or on behalf of me, **Heather Toche** - including my entire **Benefits Files, Claims Files** and all documents relating to me generated by HUB International Inc.; MCMC, LLC & American Health Holding Inc in 2014-15.
10. All other documents relating to the denials of more than $100,000 of unpaid M D Anderson Cancer Center's and Singing River Health System's Cancer Center's cancer treatments of Heather Toche in 2014-15.

Failure to comply with these requests may result in a penalty assessment versus you of up to $110 per day.
I look forward to prompt receipt all of the above documents. Sincerely,

**Heather Toche**
2724 N. 6th St.
Ocean Springs, MS 39564


EXHIBIT
4



**VT Halter Marine**

November 29, 2017

Heather Toche
2724 N. 6th St.
Ocean Springs, MS 39564

Dear Mrs. Toche,

In response to your correspondence dated October 31, 2017, VT Halter Marine, Inc.
terminated its contract with Fox Everett/Hub International on December 31, 2015;
therefore, the company doesn't have any affiliation with or accesses to information at Fox
Everett/Hub International. VT Halter Marine's current TPA/carrier is UMR/UHC. Please
refer to the enclosed 2015 and 2016 Annual Reports of the VT Halter Marine Employee
Welfare Benefit Plan, and the latest 2017 Health Benefit Summary Plan Description.

Regarding your request for insurance premiums paid by or on behalf of you, this
information was supplied and is currently supplied to your spouse, William Toche, via pay
stubs which are provided to him on a weekly basis. Also, Mr. Toche has been provided an
IRS 1095-C for 2015 and 2016 which delineates proof of medical coverage and all
dependents covered.

Effective January 1, 2016, all medical benefit and claims information may be accessed
through UMR's website at www.umr.com.

Sincerely,

Melissa Sheffield
Benefit Manager

Enclosures

**EXHIBIT**

**5**

VT Halter Marine, Inc.
900 Bayou Casotte Parkway
Pascagoula, MS 39581
T. (228) 696-6888   F  (228) 696-6899
www.vthaltermarine.com

Your Trusted Partner



*A Division of HUB International*

300 Concourse Boulevard
Suite 300
Ridgeland, MS 39157-2051

www.hubinternational.com
Direct: 601-607-5429
Larry.Vance@hubinternational.com

December 12, 2017

Ms. Heather Toche
2724 North 6th Street
Ocean Springs, Mississippi  39564

    Re:   Written request dated December 5, 2017 – received December 11, 2017

Dear Ms. Toche:

I am in receipt of your request for certain documents regarding the VT Halter Marine, Inc. Employee Welfare Benefit Plan. Although our contract terminated December 31, 2015, and our run-out contract with VT Halter expired December 31, 2016, we have forwarded the following documents to Melissa Sheffield, Benefits Manager/Human Resources for VT Halter:

1. 2012 plan document/summary plan description and amendments 1 – 4.
2. Correspondence/record of findings & decision from MCMC, LLC, an external review organization, which was sent to you directly. Note: This was sent by the TPA to MCMC, LLC as a precautionary measure. We do not have a record of your requesting an appeal of their/our decision
3. Contracts with VT Halter and our other vendors are considered proprietary. At present, we see no reason to disclose the terms of these agreements.
4. VT Halter has a copy of the claims information you are requesting. We have advised Melissa Sheffield that we will forward any claims information to her upon her request or to you at her instruction.

We remain silent regarding requests of which we have/had no knowledge or which we deem appropriate for VT Halter to address directly. It is our understanding that VT Halter has consulted with legal counsel and has provided the documents they deem legally obligated to provide to you.

Sincerely,

C. Larry Vance, President
Hub International Healthcare Solutions LLC dba Fox Everett

Enclosures

Case: 30CH1:17-cv-02072-DNH   Document #: 6-5   Filed: 07/12/2018   Page 3 of 3

December 5, 2017

V T Halter Marine, Inc. Employee Welfare Benefit Plan
V T Halter Marine, Inc., Plan Administrator
900 Bayou Casotte Parkway
Pascagoula, MS 39581

American Health Holding Inc.
7400 W. Campus Rd. F-510
New Albany, Ohio 43054-8725

HUB International, Inc. [Gulf South]
300 Concourse Blvd. Suite 300
Ridgeland MS 39157

RECEIVE
DEC 1 1 2017

BY: .......................

MCMC, LLC
1461 Rockville Pike, Ste 440
Rockville, MD 20852

Re:  **Heather Toche** [Mrs. William R. Toche]
     SSN:
     Member No.: FE5700698-31

## To: VT Halter Marine Plan Administrator; HUB Int'l, Inc.; American Health Holding, Inc.; MCMC, LLC:

I am a dependent beneficiary of the VT Halter Marine, Inc. Employee Welfare Benefit Plan and your "subject".

I. Please send me full, true copies of the **2013-through-2015 versions** of the following needed documents:

1. the VT Halter Marine, Inc. Employee Welfare Benefit **Plan Document** [aka 'Master Plan Document']
2. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Plan Descriptions** [aka "SPDs"]
3. the latest VT Halter Marine, Inc. Employee Welfare Benefit Plan **Summary Annual Report**;
4. the latest **Terminal Report**;
5. the VT Halter Marine, Inc. Employee Welfare Benefit Plan **Trust Agreement**;
6. the correspondence and contracts by, between, among VT Halter Marine, Inc. Employee Welfare
Benefit Plan [and VT Halter Marine, Inc.]
   and [A] Fox-Everett, Inc. [now HUB International, Inc.]
   and [B] MCMC, LLC
   and [C] other third-party administrators, claims administrators, vendors, contractors of the said **Plan**.

II.  Please send me full, true copies of the following, needed documents:
7.  All evidence the VT Halter Marine, Inc. Employee Welfare Benefit **Plan** is wholly-funded by
VT Halter Marine, Inc. **assets** - and
8.  All evidence of the sums of health, medical, hospital insurance **premiums** paid during the years **2013-through-2015**
-    [a] paid by VT Halter Marine, Inc.,
     [b] paid by/on behalf of Heather Toche, including that paid by my husband, Wm R Toche, by payroll deductions,
     [c] paid by other employees of VT Halter Marine, Inc.
9.  All documents pertaining to me, **Heather Toche**, and pertaining to claims for health, medical, hospital and cancer
treatment benefits for and/or on behalf of me, **Heather Toche** - including my entire **Benefits Files**, **Claims Files** and all
documents relating to me generated by HUB International Inc.; MCMC, LLC & American Health Holding Inc in 2014-15.
10. All other documents relating to the denials of more than $100,000 of unpaid M D Anderson Cancer Center's and Singing
River Health System's Cancer Center's cancer treatments of Heather Toche in 2014-15.

Failure to comply with these requests may result in a penalty assessment versus you of up to $110 per day.
I look forward to prompt receipt all of the above documents. Sincerely,

**Heather Toche**
2724 N. 6th St.
Ocean Springs, MS 39564



# TEXAS MEDICAL BOARD

# PUBLIC VERIFICATION / PHYSICIAN PROFILE

## PHYSICIAN

**NAME:** AMOL JITENDRA GHIA   MD             **DATE:** 07/10/2018

---

### THE INFORMATION IN THIS BOX HAS BEEN VERIFIED
### BY THE TEXAS MEDICAL BOARD

**Date of Birth:** 1978
**License Number:** P2650 Full Medical License
**Issuance Date:** 04/02/2012
**Expiration Date of Physician's Registration Permit:** 05/31/2020

**Registration Status:** ACTIVE              **Registration Date:** 04/13/2012
**Disciplinary Status:** NONE                **Disciplinary Date:** NONE
**Licensure Status:** NONE                   **Licensure Date:** NONE

**Medical School of Graduation:**
At the time of licensure, TMB verified the physician's graduation from medical school as follows:
UNIV OF COLORADO SCHOOL OF MEDICINE, DENVER

**Medical School Graduation Year:** 2004


**TMB Filings, Actions and License Restrictions**
The Texas Medical Board has the following board actions against this physician. (This may include any formal complaints filed by TMB, as well as petitions and/or responses related to licensure contested matters, at the State Office of Administrative Hearings.)

NONE


**Investigations by TMB of Medical Malpractice**
Section 164.201 of the Act requires that: the board review information relating to a physician against whom three or more malpractice claims have been reported within a five year period. Based on these reviews, the following investigations were conducted with the listed resolutions.

NONE



EXHIBIT
**6**

---

## Status History

Status history contains entries for any updates to the individual's registration, licensure or disciplinary status types (beginning with 1/1/78, when the board's records were first automated). Entries are in reverse chronological order; new entries of each type supersede the previous entry of that same type. These records do not display status type. Should you have any questions, please contact our Customer Information Center at 512-305-7030 or verifcic@tmb.state.tx.us

**Status Code:** AC                          **Effective Date:** 04/13/2012
**Description:** ACTIVE

**Status Code:** LI                          **Effective Date:** 04/02/2012
**Description:** LICENSE ISSUED

---

### THE INFORMATION IN THIS BOX WAS REPORTED BY THE LICENSEE AND HAS NOT BEEN VERIFIED BY THE TEXAS MEDICAL BOARD

**Gender:** MALE

**\*Ethnicity:** DID NOT ANSWER

**Race:** ASIAN

\* We are in the process of transitioning from the current ethnic origin values to federal standards for race and Hispanic origin. The transition period will allow time for individuals to submit updated race and Hispanic origin data to the TMB.

**Place of Birth:** INDIA

**Current Primary Practice Address:**

1515 HOLCOMBE BLVD.
UNIT 97
HOUSTON , TX  77030

**Years of Active Practice in the U.S. or Canada:**

The physician reports that he/she has actively practiced medicine in the United States or Canada for **4** year(s).

**Years of Active Practice in Texas:**

The physician reports that, of the above years he/she has actively practiced in the State of Texas for **4** year(s).

### Specialty Board Certification

The physician reports that he/she holds the following specialty certifications issued by a board that is a member of the American Board of Medical Specialties or the Bureau of Osteopathic Specialists:

**Specialty Certification:** AMERICAN BOARD OF RADIOLOGY/RADIATION ONCOLOGY
**Date:** 2013

## Primary Specialty

The physician reports his/her primary practice is in the area of RADIATION ONCOLOGY.

## Secondary Specialty

The physician did not report a secondary practice area.

## Name, Location and Graduation Date of All Medical Schools Attended

**Name:** UNIV OF COLORADO SCHOOL OF MEDICINE, DENVER
**Location:**
**Graduation Date:** 06/2004

## Graduate Medical Education In The United States Or Canada

**Program Name:** UNIVERSITY OF UTAH
**Location:** SALT LAKE CITY/UT       **Begin Date:** 07/2008
**Type:** RESIDENCY       **End Date:** 06/2012
**Specialty:** RADIATION ONCOLOGY

**Program Name:** UNIVERESITY OF WISCONSIN
**Location:** MADISON/WI       **Begin Date:** 07/2005
**Type:** RESIDENCY       **End Date:** 06/2006
**Specialty:** NEUROLOGICAL SURGERY

**Program Name:** UNIVERSITY OF WISCONSIN
**Location:** MADISON/WI       **Begin Date:** 07/2004
**Type:** INTERNSHIP       **End Date:** 06/2005
**Specialty:** GENERAL SURGERY

## Hospital Privileges

The physician reports that he/she has hospital privileges in the following in the State of Texas:

**Hospital:** MD ANDERSON CANCER CENTER
**Location:** HOUSTON

## Utilization Review

The physician did not report whether he/she provides utilization review.

NONE REPORTED

## Patient Services

**Accessibility:** The physician reports that the patient service area is accessible to persons with disabilities as defined by federal law.

**Language Translation Services:** The physician reports that the following language translation services are provided for patients: ALL

**Medicaid Participant:** The physician reports that he/she does participate in the Medicaid program.

## Awards, Honors, Publications and Academic Appointments

**Optional Information**
The physician may optionally report descriptions of up to five such honors and has reported the following:

**Description:** ASSITANT PROFESSOR, DIVISION OF RADIATION ONCOLOGY

## Malpractice Information

Section 154.006(b)(16) of the Act requires that: a physician profile display a description of any medical malpractice claim against the physician, not including a description of any offers by the physician to settle the claim, for which the physician was found liable, a jury awarded monetary damages to the claimant, and the award has been determined to be final and not subject to further appeal. The physician has the following reportable claims.

**Description:** NONE

## Criminal History

**Self-Reported Criminal Offenses:** The physician is required to report a description of (1) "any conviction for an offense constituting a felony, a Class A or Class B misdemeanor, or a Class C misdemeanor involving moral turpitude" and (2) "any charges reported to the board to which the physician has pleaded no contest, for which the physician is the subject of deferred adjudication or pretrial diversion, or in which sufficient facts of guilt were found and the matter was continued by a court of competent jurisdiction."

The physician has reported the following:

**Description:** NONE

**Criminal history information is also obtained by TMB from the Texas Department of Public Safety. Resulting action, if any, will be reported under the TMB Action and Non-Disciplinary Restrictions section above.**

## Disciplinary Actions By Other State Medical Boards

The physician has reported the following:

**Description:** NONE

**Physician Assistant Supervision**

To obtain
primary
source
verifications,
click name

**Description:** NONE

**Advanced Practice Nurse Delegation**

To obtain
primary
source
verifications,
click name

**APN Name:** WILSON, SHIBY APN
**APN License Number:** AP124323
**Delegation Location Type:** Licensed Hospital
**Approve Date:** 7/14/2014
**Hours Supervised:** 40
**Dangerous Drugs:** YES
**Controlled Substances:** YES

**APN Name:** POULOSE, DEEPA APN
**APN License Number:** AP125997
**Delegation Location Type:** Licensed Hospital
**Approve Date:** 11/8/2017
**Hours Supervised:** 20
**Dangerous Drugs:** NO
**Controlled Substances:** YES

**APN Name:** LOPEZ, RACHEL APN
**APN License Number:** AP133823
**Delegation Location Type:** Licensed Hospital
**Approve Date:** 11/8/2017
**Hours Supervised:** 5
**Dangerous Drugs:** NO
**Controlled Substances:** YES

**APN Name:** VAKIL, NIMISHA APN
**APN License Number:** AP128932
**Delegation Location Type:** Practice Site
**Approve Date:** 12/13/2017
**Hours Supervised:** 20
**Dangerous Drugs:** NO

Controlled Substances: YES

**Summary of all License/Permit Types**

**Issue Date:**
04/02/2012

**Type:**
LICENSED PHYSICIAN

Contact Us | Privacy Policy | Accessibility Policy | Compact with Texans | Website Linking Policy

Please contact Pre-Licensure, Registration and Consumer Services at (512) 305-7030 for assistance.

**T.C. Summary Opinion 2010-77**

### MING ZENG, Petitioner,

v.

### COMMISSIONER OF INTERNAL REVENUE, Respondent.

#### No. 18492-08S.

**United States Tax Court.**

Filed June 17, 2010.

Ming Zeng, pro se.

Nancy P. Klingshirn, for respondent.

RUWE, Judge.

This case was heard pursuant to the provisions of section 7463[1] of the Internal Revenue Code in effect when the petition was filed. Pursuant to section 7463(b), the decision to *2 be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a $2,256 deficiency in petitioner's 2005 Federal income tax. We must decide: (1) Whether petitioner is entitled to a deduction claimed on Schedule C, Profit or Loss From Business, for meals and entertainment expenses of $312; (2) whether petitioner is entitled to a Schedule C deduction for travel expenses of $3,850; and (3) whether petitioner is entitled to a Schedule C deduction for car and truck expenses of $2,283.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference.

At the time the petition was filed, petitioner resided in Ohio.

Petitioner is a trained oncologist and cancer researcher.

In 2004 petitioner began a consulting business that he named Zymenn, Inc. The objectives of his consulting business were to transfer retired medical equipment from the United States to China and to train medical personnel from China.

On his timely filed 2005 Form 1040, U.S. Individual Income Tax Return, petitioner reported wage income of $288,276. Included with petitioner's Form 1040 was a Schedule C wherein he reported a net loss of $12,110 from Zymenn, Inc. Petitioner *3 reported zero gross receipts and zero gross income from Zymenn, Inc., during 2005. Zymenn, Inc., was not profitable because petitioner was not able to transfer any medical equipment to China on account of a change in government regulations.

Petitioner testified that government regulations in China changed in 2005 and when this happened he could not make any money. The $12,110 net loss was computed entirely from petitioner's Schedule C claimed expenses. Petitioner claimed the following Schedule C expenses related to Zymenn Inc.:

| Expense | Amount |
| --- | --- |
| Advertising | $540 |
| Car and truck | 2,283 |
| Commissions and fees | -0- |
| Contract labor | -0- |
| Insurance | 200 |



EXHIBIT
7

| | |
|---|---|
| Mortgage | -0- |
| Other | -0- |
| Legal and professional services | 375 |
| Office expense | 100 |
| Rent or lease: | |
| Vehicles, machinery, and equipment | -0- |
| Other business property | -0- |
| Repairs and maintenance | 250 |
| Supplies | 100 |
| Taxes and licenses | 365 |
| Travel | 3,850 |
| Deductible meals and entertainment | 312 |
| Utilities | 240 |
| Other expenses | 860 |
| Business use of home | 2,635 |
| Total | 12,110 |

On June 10, 2008, respondent issued to petitioner a notice of deficiency denying some, but not all, of petitioner's Schedule
4   C deductions related to Zymenn, Inc. Respondent disallowed *4 petitioner's claimed deductions for meals and entertainment
of $312, travel of $3,850, and car and truck of $2,283. These deductions were disallowed for lack of substantiation and/or
failure to establish a business benefit or purpose.

During 2005 petitioner made seven trips to China. Some of the trips were for both business and personal purposes, but
three of the trips to China were pure business trips. The purpose of the three trips was to talk with the staff at a hospital in
China to determine how petitioner could help the hospital. During these three trips to China petitioner made contact with and
talked with medical professionals in an internal medicine department, a cancer institute, and an oncology department. The
business trips were taken in January, April, and August 2005. Airfare receipts for the three business trips indicate that the
costs of the airfare were $1,400, $1,080, and $1,407.63, respectively. Receipts for the April and August 2005 trips indicate
issue dates during 2005; the receipt for the January 2005 trip indicates that it was issued on December 10, 2004.

## Discussion

A taxpayer must substantiate amounts claimed as deductions by maintaining the records necessary to establish that he is
entitled to the deductions. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Section 162(a) allows as a deduction all the
5   ordinary and necessary expenses paid or incurred in carrying on a trade or *5 business. The determination of whether an
expenditure satisfies the requirements for deductibility under section 162 is a question of fact. Commissioner v. Heininger,
320 U.S. 467, 475 (1943). In general, an expense is ordinary if it is considered normal, usual, or customary in the context of
the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495 (1940). Generally, an expense is
necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business. Commissioner v. Tellier, 383
U.S. 687, 689 (1966).

Section 274(d) imposes heightened substantiation requirements for any claimed deduction under section 162 or 212 for any
traveling expense (including meals and lodging while away from home) and for listed property. See sec. 274(d)(1), (4).
Listed property includes passenger automobiles. Sec. 280F(d)(4)(A)(i). Under the heightened substantiation requirements a
taxpayer must substantiate his expenses by either "adequate records" or "sufficient evidence corroborating the taxpayer's
own statement". Sec. 274(d); sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). "To
meet the `adequate records' requirements of section 274(d), a taxpayer shall maintain an account book, diary, log,
statement of expense, trip sheets, or similar record * * *, and documentary evidence". Sec. 1.274-5T(c)(2)(i), Temporary
6   Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). Generally, corroborative *6 evidence must be direct evidence, such
as a statement in writing or the oral testimony of witnesses involved in the event in relation to which a deduction is claimed,
or documentary evidence such as described in section 1.274-5T(c)(2), Temporary Income Tax Regs., supra. Sec. 1.274-

5 (app)(i), Income Tax Regs., Fed. Reg. (Nov. 6, 1985). To prove a trade or business purpose of an
expenditure, the corroborative evidence may be circumstantial. Id.

## Traveling Expenses (Including Meals and Entertainment)

Under the heightened substantiation requirements for traveling expenses (including meals and lodging while away from home) a taxpayer must prove the following elements: (i) The amount of each separate expenditure for traveling away from home; (ii) the dates of departure and return for each trip away from home spent on business; (iii) the destinations or locality of travel, described by name of city or town or other similar designation; and (iv) the business reason for travel or nature of the business benefit derived or expected to be derived as a result of travel. Sec. 1.274-5T(b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

7     On his 2005 Federal income tax return, petitioner claimed $312 of deductible meals and entertainment expenses. See sec. 274(n). Petitioner neither testified about nor proffered any substantiation or other documentary evidence establishing the *7 claimed $312 of meals and entertainment expenses. Respondent's determination to disallow the $312 of meals and entertainment expenses is sustained.

As to the $3,850 of traveling expenses, petitioner testified that although he made seven trips to China during 2005 he claimed a deduction only for the three trips which were "pure business trips." Moreover, the only traveling expenses claimed were expenditures for the airfare purchased for the three trips. Petitioner provided copies of receipts, boarding passes, and his passport to substantiate the expense and dates of travel to and from China. Petitioner's receipts indicate that airfare for two of the three so-called pure business trips was purchased during 2005; however, the airfare for the January 2005 trip was purchased in 2004. Section 461(a) provides that "The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Because petitioner used the cash method of accounting for his consulting business and purchased the airfare for the January 2005 trip during 2004, that expense is not properly deductible for the year at issue. With respect to the April and August 2005 trips to China, petitioner credibly testified that the trips were necessary for him to establish a working

8     relationship with hospitals and medical personnel in China for his consulting *8 business. We find that petitioner has demonstrated a business purpose for the April and August 2005 trips to China and that he has established the cost of the airfare, the dates of the travel, and the location to which he traveled. Therefore, we hold that petitioner is entitled to deduct the traveling expenses of $1,080 and $1,407.63 for the April and August 2005 trips, respectively.

## Car and Truck Expenses

Under the heightened substantiation requirements for car and truck expenses a taxpayer must prove the following elements: (i)(A) The amount of each separate expenditure; (i)(B) the amount of each business/investment use (i.e., mileage for automobiles) and the total use for the taxable period; (ii) the date of the expenditure or use with respect to the automobile; and (iii) the business or investment purpose for an expenditure or use with respect to the automobile. Sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).

On his 2005 Federal income tax return petitioner claimed car and truck expenses of $2,283. To substantiate his business expenses for the use of his vehicle petitioner prepared and proffered a mileage summary, which indicates that he claimed to have driven 5,000 miles for business during 2005. Petitioner testified that he prepared the mileage summary only after having received correspondence from the Internal Revenue Service and that he prepared it from "Memory, and some of it

9     was from—well, *9 my calendars and my memory." Furthermore, petitioner has not established the dates of use[2] or the business purpose for each use of his automobile. Thus, petitioner failed to establish eligibility for a deduction for car and truck expenses. Consequently, we sustain respondent's determination to disallow petitioner's claimed car and truck expenses.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.

Case 3:17-cv-02077-DNH   Document #: 6-7   Filed: 07/12/2018   Page 4 of 4

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioner's mileage summary provides a total of the business mileage for each month during 2005 but does not otherwise indicate the date of use of petitioner's automobile or the business purpose for each use during the months represented in the mileage summary.

Save trees - read court opinions online on Google Scholar.



# Variations in Proton Therapy Coverage in the State of Texas: Defining Medical Necessity for a Safe and Effective Treatment

Nikhil G. Thaker, MD[1]; Ankit Agarwal, BA[2]; Matthew Palmer, MBA[1]; Rosemarie Hontiveros, MBA, BSN[1]; Stephen M. Hahn, MD[1]; Bruce D. Minsky, MD[1]; Ronald Walters, MD[3]; John Bingham, MHA[4]; Thomas W. Feeley, MD[5]; Thomas A. Buchholz, MD[1]; and Steven J. Frank, MD[1]

[1]Department of Radiation Oncology, The University of Texas MD Anderson Cancer Center, Houston, TX, USA
[2]Department of Radiation Oncology, Boston University School of Medicine, Boston, MA, USA
[3]Medical Operations and Informatics, The University of Texas MD Anderson Cancer Center, Houston, TX, USA
[4]Office of Performance Improvement, The University of Texas MD Anderson Cancer Center, Houston, TX, USA
[5]Institute for Cancer Care Innovation, The University of Texas MD Anderson Cancer Center, Houston, TX, USA

Submitted 05 Aug 2015
Accepted 10 Nov 2015
Published 24 Mar 2016

Corresponding author:
Steven J. Frank
Department of Radiation
Oncology, Unit 0097
The University of Texas MD
Anderson Cancer Center
1515 Holcombe Blvd
Houston, TX 77030, USA
Phone: +1 (713) 563-2364
Fax: +1 (713) 563-2366
sjfrank@mdanderson.org

Original Article

DOI
10.14338/IJPT-15-00029.1

©Copyright
2016 International Journal of
Particle Therapy

Distributed under
Creative Commons CC-BY

OPEN ACCESS

http://theijpt.org

## Abstract

**Purpose:** The definition of medical necessity and indications for coverage of proton beam therapy (PBT) for the treatment of cancer can vary greatly among different professional societies (PSs) and payors. Variations in policies introduce substantial inefficiencies and limit access for patients who may clinically benefit from PBT. The purpose of this study was to analyze differences in medical necessity and coverage policies among payors and a PS.

**Materials and Methods:** Peer-reviewed references and coverage decisions were abstracted from the coverage policies of each of the major payors in the state of Texas (Aetna-TX, UnitedHealthcare-TX, Blue Cross Blue Shield-TX) as well as from a representative PS, the Particle Therapy Cooperative Group. Differences in number and quality of references as well as coverage decisions were analyzed with descriptive statistics.

**Results:** Proton beam therapy coverage in the state of Texas varied among payors and the PS for several disease sites, including the central nervous system, eyes, and prostate. The PS cited more references and higher levels of evidence than payor policies ($P < .01$). Levels of evidence were inconsistent between policies. Interestingly, only 18% to 29% of cited references overlapped between policies.

**Conclusions:** Payors and PSs have independent and nonstandardized processes for determining PBT coverage, which result in variations in both coverage and evidence cited. These differences can lead to clinical inefficiencies and may reduce access to PBT based on payor status rather than clinical utility. A collaborative approach among all stakeholders would help create a more consistent, equitable, and patient-centered PBT policy that could identify areas for further evidence development.

**Keywords:** insurance policy; coverage; proton therapy; radiation oncology



EXHIBIT
8


## Introduction

Medical necessity is an elusively defined concept that is used to describe health care that is reasonable, necessary, appropriate, and based on evidence-based clinical standards of care. The concept of medical necessity serves as a "gatekeeper" for health care service utilization, because services that are considered medically necessary are often covered by payors [1]. The process of defining medical necessity has been decentralized, nonstandardized, and typically ceded to payors for local coverage determination [2, 3]. In effect, payors and providers have had different working definitions of medical necessity, with some definitions incorporating cost and cost effectiveness rather than quality or clinical effectiveness. A particular area of controversy centers on coverage of advanced medical technologies. Although innovations in medical technology have, in part, contributed to superior outcomes in several areas, including cancer care [3–5], coverage decisions and definitions of medical necessity for advanced technologies have remained inconsistent across payors and professional societies.

Radiation oncology, in particular, has relied on innovations in technology to improve outcomes for patients with cancer by more effectively delivering radiation therapy (RT) dose to tumor cells and sparing normal healthy tissues [6–8]. Radiation therapy technology has evolved from 2-dimensional to 3-dimensional and, more recently, to intensity-modulated RT (IMRT). Each successive generation of new technology has held promise for improved outcomes but has also become increasingly expensive for providers, given the progressively complex machinery and skilled personnel required.

Proton beam therapy (PBT) is an evolution in RT delivery technology that is considered both safe and effective [9, 10]. Proton beam therapy has superior ability to spare surrounding normal healthy tissues owing to its unique physical properties as compared with traditional photon RT, such as IMRT [11]. Studies have shown that extraneous irradiation can have long-term detrimental effects, including secondary cancers [12]. Given the greater expense of delivering PBT, reimbursements have often been higher than for traditional photon RT. Although the potential advantage of PBT over photon therapy is strong, the data on the clinical utility of PBT continue to develop by disease site.

Despite a significant body of published evidence regarding PBT, coverage policies vary significantly between different payors and professional societies, and payors are becoming transparent about the incorporation of costs into coverage decisions. Using PBT as a case example of the controversy surrounding coverage and costs of advanced technologies, we examined the sources of coverage variations among PBT policies in the state of Texas and have proposed solutions toward a more uniform and collaborative approach to determining medical necessity.

## Methods and Materials

Proton beam therapy policies that cover a large proportion of patients in the state of Texas, where our institution resides, were chosen for this analysis. These policies included Aetna-TX (policy last updated in August 2014) [13], Blue Cross Blue Shield of Texas (BCBS, policy last updated in May 2011), and UnitedHealthcare-TX (UHC, policy last updated in September 2014) [14]. All policies were last reviewed by the study authors in January 2015. The recently proposed Health Care Services Corporation (HCSC)-TX policy may be adopted by BCBS-TX in 2015 as replacement of the 2011 policy and was included for comparisons between successive BCBS policies. The current Medicare policy [15], which allows the treating radiation oncologist to make a determination of what is reasonable and medically necessary, was also used for comparison. Between 2006 and 2014, 75% of patients from the state of Texas treated with PBT at our institution were covered under 1 of these 4 plans. The model policy of the large professional medical society Particle Therapy Cooperative Group – North America (PTCOG, current policy last reviewed in March 2014) [16] was also included as a representative professional society policy.

Indications for medical necessity by disease site were abstracted from each reviewed version of the PBT policies. All literature references that were cited by each policy to justify their coverage decisions were individually abstracted. References were stratified by year of publication, disease site (ie, breast cancer, pediatric cancer), whether the reference was PubMed-indexed, whether the reference pertained to PBT, and level of evidence (LOE). PubMed indexing of citations implies that the references were from higher quality primary or peer-reviewed literature. The LOE schema (Table 1) was adapted by internal consensus at this institution from an existing stratification algorithm of the Oxford Centre for Evidence-Based Medicine [17]. Higher level numbers (ie, levels 6 to 8) were considered weaker LOE. Systematic reviews and meta-analyses were ranked on the basis of the underlying LOE of the reviewed studies.

The cumulative numbers of PubMed-indexed citations were graphed by year of publication from 1990 to 2014 and compared across all policies. The number of PubMed-indexed references by disease site was also compared across policies

Table 1. Levels of evidence for the cited literature.

| Level of evidence | Type of study |
|---|---|
| Level 1 | Large multi-institutional prospective randomized clinical trials |
| Level 2 | Single-institution randomized controlled studies |
| Level 3 | Well-conducted single-arm studies |
| Level 4 | Prospective registries |
| Level 5 | Well-structured retrospective studies and systematic review of lower-level evidence |
| Level 6 | Population or claims-based studies, and smaller case series |
| Level 7 | Anecdotal patient case reports, dosimetric studies, mechanism based |
| Level 8 | Clinical reviews |

The levels of evidence schema was adapted from an existing stratification algorithm created by the Oxford Centre for Evidence-Based Medicine and modified for proton beam therapy by internal consensus at our institution.

with descriptive statistics. The LOEs of PubMed-indexed references were compared across policies by using the Kruskal-Wallis test. All tests were 2-sided and $P$ values less than .05 were deemed statistically significant.

## Results

Indications of PBT medical necessity per disease type varied among the reviewed state of Texas PBT policies (Table 2). For instance, PBT is considered medically necessary for cancers of the central nervous system and for localized prostate cancers under the BCBS-TX, Medicare, and PTCOG policies, but not under the Aetna-TX or UHC-TX policies.

The total number of cited references and PubMed-indexed references also varied among policies. Of PTCOG's 346 total references, 340 (98%) were also indexed in the PubMed database, a significantly higher percentage ($X^2$, $P < .01$) than Aetna (80 of 109, 73%), BCBS (20 of 28, 71%), or UHC (64 of 91, 70%). Most PubMed-indexed references were PBT-specific (rather than pertaining to general radiation oncology or oncology), ranging from 90% of BCBS references to 99% of PTCOG references.

Table 2. State of Texas medical necessity determinations for PBT for various disease sites.

| Disease site | Aetna | BCBS | Proposed HCSC policy | UHC | PTCOG-NA |
|---|---|---|---|---|---|
| Chordomas and chondrosarcomas of the skull/cervical spine | X | X | X | X | X |
| Uveal melanomas (confined to globe) | X | X | X | X | X |
| Ocular tumors (other) | | | X | X | X |
| HCCs (liver) | | | X | | X |
| GI tract cancers (non-HCC) | | | | | X |
| Intracranial arteriovenous malformations | | X | X | X | X |
| Pediatric solid tumors | X[a] | X[c] | X[e] | X[c] | X[b] |
| Breast cancers | | | | | |
| CNS cancers | | X | X | | X |
| Head and neck cancers | | | | | X |
| Lung cancers | | | X | | X |
| Hematologic cancers | | | | | |
| Prostate cancer (localized) | | X | | | X |
| Urinary tract cancers | | | | | X |
| Gynecologic cancers | | | | | X |
| Unresectable retroperitoneal sarcoma | | | | | X |

Abbreviations: PBT, proton beam therapy; BCBS, Blue Cross Blue Shield; HCSC, Healthcare Services Corporation; UHC, UnitedHealthcare; PTCOG-NA, Particle Therapy Cooperative Group – North America; X, considered medically necessary; HCC, hepatocellular carcinoma; GI, gastrointestinal; CNS, central nervous system.

Note: This list is not all-inclusive, but illustrative of the heterogeneity between policies with regard to definitions of medical necessity for PBT.

[a] Age ≤ 21 years for Aetna policy.

[b] Age up to 18 years for PTCOG policy.

[c] Age < 19 years for UnitedHealthcare and BCBS policies.



30CH1:17-cv-02072-DNH    Document #: 6-8    Filed: 07/12/2018    Page 4 of 10

**Variations in proton therapy coverage**

Figure 1. (A) Cumulative
number of PubMed cited
references from 1990-2014 for
Texas policies. (B) Number of
PubMed cited references per
disease site for Texas policies
(ordered by total number of
disease site references).
**Abbreviations:** BCBS, Blue
Cross Blue Shield; CNS,
central nervous system; GI,
gastrointestinal; GU,
genitourinary; PTCOG,
Particle Therapy Cooperative
Group – North America.





Interestingly, 30%, 29%, and 27% of references in the UHC, BCBS, and Aetna policies, respectively, were not PubMed-indexed. Many of these references pertained to consensus statements or general reviews, such as those of the National Comprehensive Cancer Network (13 references), Blue Cross Blue Shield Technology Evaluation Center (10), the Agency for Healthcare Research and Quality (8), UpToDate (8), the ECRI Institute (6), the American College of Radiology Appropriateness Criteria (2), American Society for Radiation Oncology position statements, and others.

Overall, the PTCOG policy cited more references and included a greater number of PBT-specific PubMed-indexed references published from 2012 to 2014 than any other policy (**Figure 1A**), whereas Aetna, BCBS, and UHC had fewer total references and fewer citations from the more recent 2012 to 2014 period. Because the reviewed BCBS policy was updated last in 2011, no references were published from the more recent 2012 to 2014 period.

Across all policies, the most number of references pertained to prostate cancer (85 references), followed by central nervous system (55), ocular melanoma (53), and pediatrics (53). The number of references per disease site varied across policies, with PTCOG citing more PBT-specific PubMed-indexed literature for each disease site than other policies (**Figure 1B**).

The LOE of the cited references also varied between policies. PTCOG cited more level 2 through 8 evidence than any other policy (**Figure 2A**). The mean LOE was 5.3 for PTCOG, 6.0 for Aetna, 5.1 for UHC, and 5.4 for BCBS. These differences were statistically significant (analysis of variance, $P < .01$). Similar variations were observed for each disease site, such as for prostate cancer (**Figure 2B**). Interestingly, overlap of PubMed references between policies was limited. PTCOG's policy had 62 references (18.3%) that had any overlap with the other 3 policies. Twenty-five percent of references from the BCBS policy overlapped with Aetna; 20% of BCBS overlapped with UHC; and 29% of UHC overlapped with Aetna.



**Figure 2.** (A) Levels of evidence per policy for Texas policies. (B) Levels of evidence per policy for prostate cancer for Texas policies. Abbreviations: BCBS, Blue Cross Blue Shield; PTCOG, Particle Therapy Cooperative Group – North America.

There were several key differences between the 2011 BCBS-TX policy and the proposed 2015 policy update. The proposed 2015 policy cites more references (**Figure 3A**) that pertain to more disease sites than the current 2011 policy (**Figure 3B**). Interestingly, the proposed policy cites fewer references for prostate cancer (11 in 2011 versus 4 in 2015) (**Figure 4**). Additionally, the proposed policy provides a different number of cited references and LOE for several disease sites. The 2015 proposed policy would now cover PBT for certain lung, liver, and ocular tumors but would no longer cover PBT for localized prostate cancer treatment.

Figure 3. (A) Cumulative number of PubMed cited references for currently effective BCBS-TX policy and proposed HCSC-TX policy. (B) Number of PubMed cited references per disease site for currently effective BCBS-TX policy and proposed HCSC-TX policy. Abbreviations: BCBS, Blue Cross Blue Shield; CNS, central nervous system; GI, gastrointestinal; GU, genitourinary; HCSC, Healthcare Services Corporation.







Figure 4. Levels of evidence per policy for prostate cancer for currently effective BCBS-TX policy and proposed HCSC-TX policy. Abbreviations: BCBS, Blue Cross Blue Shield; HCSC, Healthcare Services Corporation.

## Discussion

Despite the existence of a finite body of medical literature, we observed significant variations in the definitions of medical necessity for PBT among several major payors and a large professional society. In particular, the number and quality of references used in each policy to justify coverage decisions varied significantly, which implies underlying variation, inconsistency, and nonstandardization of the process for drafting coverage policies. Rather than decentralizing coverage decisions to individual payors and creating variable working definitions of medical necessity, we recommend a more collaborative and integrated approach, which will better unite the interests of all stakeholders. Our analysis exposes several problems with the current process of defining medical necessity and identifies several solutions with direct health policy implications.

### Problems

Policymakers tend to focus on access to care, the scope of care coverage, the delivery of care, and the cost of care [18]. Although in theory the scope of care coverage should be driven by the best available medical evidence, combinations of political, economic, and social pressures are real influences that ultimately shape coverage [19, 20]. The current payor-centric approach to defining medical necessity has introduced variations and differences in standards of care, which are readily evident by the high degree of heterogeneity among PBT coverage policies observed in this study. The American Medical Association defines medical necessity as health care services or products that a prudent physician would provide to a patient in a manner that is in accordance with generally accepted standards of medical practice, that is clinically appropriate in terms of type, frequency, extent, site, and duration, and that is not primarily for the economic benefit of the health plans and purchasers or convenience of any stakeholder [21]. Although both Aetna and BCBS have adopted the American Medical Association definition, UHC formally incorporates cost into the process for determining benefit coverage and/or provider payment for services, tests, or procedures [22]. The Stanford Center for Health Policy has concluded that some payor policies were willing to apply the criterion of cost-effectiveness in practice but do not include the clause in the contract owing to fear of litigation [23]. For instance, in a study that analyzed payor use of clinical evidence and cost information in coverage and medical necessity decision-making, 88% to 92% of payors were willing to consider cost in medical decision-making [24].

In the current system, the payor can be incentivized to create processes that reduce employer or subscriber premiums, whereas providers can be incentivized to maximize billing in a perceived zero-sum fee-for-service reimbursement system, which can lead to some inappropriate billing practices and resultant coverage limitations by payors. By relegating coverage decisions to any single stakeholder, coverage decisions are potentially shifted away from shared patient-provider decision making regarding quality, safety, and best evidence-based clinical practices. Because the insurance subscription process occurs annually, payor-defined coverage policies are also more aligned with short-term rather than long-term gains, which is where PBT may be more beneficial owing to fewer long-term effects [12, 25].



Given the rapidly evolving advances in medicine [26], medical policies are often outdated. Reliance on these outdated policies in the name of quality could, paradoxically, lead to lower quality care and a slower diffusion of best practices. We observed that currently active PBT policies contained several outdated references that did not account for the latest published evidence. For instance, several payors cited outdated consensus statements rather than modern and updated evidence-based guidelines to inform coverage decisions. In addition, we observed that updated policies, such as the proposed BCBS 2015 update, were inconsistent in the exclusion of old references and inclusion of new references, resulting in significant changes to coverage decisions. Such policies introduce dissonance among patients/providers and payors and detract from the delivery of patient-centered care.

An additional problem caused by nonstandardized coverage policies is the introduction of clinical workflow inefficiencies. Given the laborious, inconsistent, and often contentious process of payor-specific benefits authorization, providers may require full-time employees solely for the PBT authorization process [20]. Physician treatment decisions may also need to be modified depending on the patient's payor, rather than the patient's specific case. A recent analysis found that patient insurance status was the best predictor of PBT utilization, rather than primary clinical considerations [27]. Proton beam therapy is a costly investment [28, 29], and without standardized coverage indications, most treatment centers are faced with pressures to treat a high proportion of "simple" cases, often to the detriment of patients with higher prioritization scores [30]. Comparative dosimetric treatment plans for IMRT and PBT, which may be requested by payors and treating physicians, can further exacerbate departmental workflow inefficiencies, increase wait times, increase the overall cost of care, and have implications for equitable access. Although several groups have emphasized the value of clinical standardization and the dissemination of best practices through clinical pathways [31, 32], variations among coverage policies may limit the ability of providers to uniformly implement best practices.

## Solutions

Open collaboration, rather than competition, between expert providers, payors, employers, patients, and policy makers is a first step toward a unifying definition of medical necessity across all disease sites. Collaboration would reduce the substantial redundancy of multiple payor and professional society policies, complement the operational strengths of each stakeholder, and align coverage decisions with patient-centered prioritization of care. Such collaborations could better address how evidence should be used in decision-making, with an emphasis on LOE and if/how cost-effectiveness should contribute to the process [23]. The US Department of Health and Human Services has been tasked to oversee the processes of defining medical necessity under the Affordable Care Act, and such oversight should be designed with the input of all stakeholders involved in delivering health care. A possible shortcoming of a more centralized definition of medical necessity is perceived intrusion on the physician-patient relationship. However, this intrusion can be obviated by ensuring that policy decisions include providers from professional medical societies, such as PTCOG, the American Society for Radiation Oncology, the Institute of Medicine, or others, to help in determining medical necessity [33].

Open collaboration in oncology has recently led to innovative solutions, including clinical care pathways, IMRT guidelines, and episode-based payment models [34–36]. By creating clinical pathways that emphasize the use of treatment regimens that offer the greatest survival benefit at the lowest toxicity, pathways may result in improved outcomes and lower costs. Several early results from pathway collaborations have suggested that lower costs with good outcomes are achievable [35, 36]. For instance, in Massachusetts, collaboration between BCBS and providers resulted in consensus agreement to cover IMRT for many cancer types and ultimately reduced insurance delays for patients requiring IMRT [34]. These collaborations had appeals processes by which physicians could make treatment decisions outside of the specified guidelines if deemed medically necessary.

A pitfall of these collaborations, however, is the lack of a formal policy for coverage under evidence development [37]. Despite ongoing evidence development at the professional medical society level [16, 37], uniformly high LOE is not available for PBT for all disease sites. Indeed, it is expected that not all types of cancers may benefit from the current delivery methods of PBT, but the lack of clinical trials across many disease sites creates a challenge to identifying the sites that would benefit most. Strategic prioritization of resources to specific disease sites could close gaps in current knowledge. Currently, many payors' contractual language specifies noncoverage of "unproven" or "experimental" treatments. Rather than a blanket policy, providers and payors could enter a dialogue regarding which indications have highest priority (ie, through prioritization schema) for coverage under evidence development. Payors could partner with centers of excellence, such as those of the Alliance of Dedicated Cancer Centers, to allow high-performing practice units the opportunity to develop evidence in a controlled and robust way. Limitations of this collaborative approach could include the higher administrative cost and significant time investment required from all


stakeholders in order to implement these solutions. Although such a collaborative approach has the potential to raise some costs in the short term, such an approach would enable a more rational and transparent process to defining medical necessity, coverage decisions, and ultimately, the reimbursement of proton therapy services.

Providers and payors will ultimately need to focus on enhancing the value of care delivery [18, 26]. By evaluating treatment decisions through the lens of value, which can be broadly defined as outcomes divided by costs, payors and providers can identify treatments and clinical pathways that enhance the outcomes that truly matter to patients while reducing costs over the full care cycle rather than over a single intervention [18, 38]. Bundled payment for all cancer-related treatments and related complications over a specified period holds significant promise for improving value. Payors and providers would also be required to publicly report their risk-adjusted outcomes (and costs) for each patient, which would further incentivize competition on value and patient engagement. In such a system, a formal definition of medical necessity would be unnecessary, because only those treatments that maximize value would be delivered. Although value-based health care delivery may seem like a significant departure from the current system, collaboration among all stakeholders can galvanize rapid movement in this direction.

Newcomer (from UHC) and colleagues [39] recently reported the results of a pilot episode-based payment for chemotherapy. Although spending on chemotherapy actually increased under this arrangement, the total full cycle cost of care for pilot participants was 34% lower owing to lower rates of hospitalizations and complications [39]. Similar pilots are being conducted with advanced technologies and with multidisciplinary, rather than single-modality, care. If a costly technology raises the overall cost of care, competition on value would ensure that the increased cost is worth the improved quality of outcomes [18]. This work by Newcomer et al [39] is a good example of the benefits of a collaborative rather than adversarial relationship between payors and providers.

## Conclusion

We observed significant variations in PBT coverage decisions and definitions of medical necessity among several major payors and a large professional society. A unified and collaborative approach among providers, patients, payors, and policy makers would serve to create a consistent, equitable, and patient-centered PBT policy and help to identify strategic focus areas for further evidence development. The ultimate goal of such collaboration is to deliver medical care that enhances value for all patients over the full cycle of care, regardless of payor, rather than restricting access to best practices.

## ADDITIONAL INFORMATION AND DECLARATIONS

Conflicts of Interest: The authors have no conflicts of interest to disclose.
Acknowledgments: Oral presentation at the 54th Annual Conference of the Particle Therapy Cooperative Group, San Diego, California, May 18–23, 2015.

## References

1. Skinner D. Defining medical necessity under the Patient Protection and Affordable Care Act. *Public Adm Rev.* 2013;73: S49–59.
2. Langel SJ. Solving the value equation in health care. *Health Aff (Millwood).* 2013;32:526.
3. Pauly MV. Competition and new technology. *Health Aff (Millwood).* 2005;24:1523–35.
4. Squires DA. Explaining high health care spending in the United States: an international comparison of supply, utilization, prices, and quality. *Issue Brief (Commonw Fund).* 2012;10:1–14.
5. Pauly MV. What if technology never stops improving: Medicare's future under continuous cost increases. *Wash Lee Law Rev.* 2003;60:1233–50.
6. Chen AM, Daly ME, Farwell DG, Vazquez E, Courquin J, Lau DH, Purdy JA. Quality of life among long-term survivors of head and neck cancer treated by intensity-modulated radiotherapy. *JAMA Otolaryngol Head Neck Surg.* 2014;140:129–33.
7. Marta GN, Silva V, de Andrade Carvalho H, de Arruda FF, Hanna SA, Gadia R, da Silva JL, Correa SF, Vita Abreu CE, Riera R. Intensity-modulated radiation therapy for head and neck cancer: systematic review and meta-analysis. *Radiother Oncol.* 2014;110:9–15.
8. Rosenthal DI, Blanco AI. Head and neck squamous cell carcinoma: optimizing the therapeutic index. *Expert Rev Anticancer Ther.* 2005;5:501–14.


9. DeLaney TF. Proton therapy in the clinic. *Front Radiat Ther Oncol.* 2011;43:465–85.

10. SB0902. Tennessee Senate Commerce and Labor Committee. Tennessee General Assembly; 2015.

11. Kandula S, Zhu X, Garden AS, Gillin M, Rosenthal DI, Ang KK, Mohan R, Amin MV, Garcia JA, Wu R, Sahoo N, Frank SJ. Spot-scanning beam proton therapy vs intensity-modulated radiation therapy for ipsilateral head and neck malignancies: a treatment planning comparison. *Med Dosim.* 2013;38:390–4.

12. Sethi RV, Shih HA, Yeap BY, Mouw KW, Petersen R, Kim DY, Munzenrider JE, Grabowski E, Rodriguez-Galindo C, Yock TI, Tarbell NJ, Marcus KJ, Mukai S, MacDonald SM. Second nonocular tumors among survivors of retinoblastoma treated with contemporary photon and proton radiotherapy. *Cancer.* 2014;120:126–33.

13. Aetna. Clinical Policy Bulletin: Proton Beam and Neutron Beam Radiotherapy. 2014. http://www.aetna.com/cpb/medical/data/200_299/0270.html. Accessed December 9, 2015.

14. UnitedHealthcare. Proton beam radiation therapy. 2014. https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/Medical%20Policies/Medical%20Policies/Proton_Beam_Radiation_Therapy.pdf. Accessed December 9, 2015.

15. Medicare. Chapter 13: Local Coverage Determinations. 2014. http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c13.pdf. Accessed December 9, 2015.

16. Particle Therapy Cooperative Group. Model policy coverage of proton beam therapy. 2014. http://npc2014.com/wp-content/uploads/2014/03/Model-Proton-Beam-Therapy-Policy-3-31-2014.pdf. Accessed December 9, 2015.

17. Oxford Centre for Evidence-Based Medicine Levels of Evidence Working Group. The Oxford levels of evidence 2. 2011. http://www.cebm.net/index.aspx?o=5653. Accessed December 9, 2015.

18. Porter ME, Teisberg EO. *Redefining Health Care.* Boston, MA: Harvard Business School Press; 2006.

19. Winslow R, Martin TW. Prostate-cancer therapy comes under attack. *The Wall Street Journal.* 2013. http://online.wsj.com/news/articles/SB10001424127887324324404579041271367621000. Accessed December 9, 2015.

20. Kerstiens J, Johnstone PA. Proton therapy expansion under current United States reimbursement models. *Int J Radiat Oncol Biol Phys.* 2014;89:235–40.

21. Statement of the American Medical Association to the Institute of Medicine's Committee on Determination of Essential Health Benefits. 2011. http://www.iom.edu/~/media/8D03963CAEB24450947C1AEC0CAECD85.ashx. Accessed December 9, 2015.

22. UnitedHealthcare. Medical necessity frequently asked questions. 2011. https://www.uhctools.com/assets/M50195-B%20Member%20FAQs%20Medical%20Necessity.pdf. Accessed December 9, 2015.

23. Center for Health Policy, Stanford University. Decreasing Variation in Medical Necessity Decision Making. 1999. http://www.chcf.org/publications/1999/08/decreasing-variation-in-medical-necessity-decision-making. Accessed December 9, 2015.

24. Bergthold LA, Singer SS, Huang A, Gemperli M, Garber A, Osterhoff R. Changes in health care financing & organization: using evidence and cost in managed care decision-making. http://www.hcfo.org/publications/using-evidence-and-cost-managed-care-decision-making. Accessed December 9, 2015.

25. Arvold ND, Niemierko A, Broussard GP, Adams J, Fullerton B, Loeffler JS, Shih HA. Projected second tumor risk and dose to neurocognitive structures after proton versus photon radiotherapy for benign meningioma. *Int J Radiat Oncol Biol Phys.* 2012;83:e495–500.

26. Philipson T, Eber M, Lakdawalla DN, Corral M, Conti R, Goldman DP. An analysis of whether higher health care spending in the United States versus Europe is 'worth it' in the case of cancer. *Health Aff (Millwood).* 2012;31:667–75.

27. Bekelman JE, Asch DA, Tochner Z, Friedberg J, Vaughn DJ, Rash E, Raksowski K, Hahn SM. Principles and reality of proton therapy treatment allocation. *Int J Radiat Oncol Biol Phys.* 2014;89:499–508.

28. Grutters JP, Abrams KR, de Ruysscher D, Pijls-Johannesma M, Peters HJ, Beutner E, Lambin P, Joore MA. When to wait for more evidence: real options analysis in proton therapy. *Oncologist.* 2011;16:1752–61.

29. Foote RL, Stafford SL, Petersen IA, Pulido JS, Clarke MJ, Schild SE, Garces YI, Olivier KR, Miller RC, Haddock MG, Yan E, Laack NN, Arndt CA, Buskirk SJ, Miller VL, Brent CR, Kruse JJ, Ezzell GA, Herman MG, Gunderson LL, Erlichman C, Diasio RB. The clinical case for proton beam therapy. *Radiat Oncol.* 2012;7:174.


30. Johnstone PA, Kerstiens J, Richard H. Proton facility economics: the importance of "simple" treatments. *J Am Coll Radiol.* 2012;9:560–3.

31. Newcomer LN. Changing physician incentives for cancer care to reward better patient outcomes instead of use of more costly drugs. *Health Aff (Millwood).* 2012;31:780–5.

32. Farias M, Friedman KG, Lock JE, Rathod RH. Gathering and learning from relevant clinical data: a new framework. *Acad Med.* 2015;90:143–8.

33. Levit L, Balogh E, Nass S, Ganz PA. *Delivering High-Quality Cancer Care: Charting a New Course for a System in Crisis.* Washington, DC: National Academies Press; 2013.

34. Steingisser L, Acker B, Berman S, Brenner MJ, Bornstein BA, Busse P, FitzGerald TJ, Jacobson JO, Jekowsky E, Kachnic LA, Mamon H, McKee A, Shulman LN, Stevenson MA, Wazer D, Fallon JA. Bending the cost curve: a unique collaboration between radiation oncologists and Blue Cross Blue Shield of Massachusetts to optimize the use of advanced technology. *J Oncol Pract.* 2014;10:e321–7.

35. Feinberg BA, Lang J, Grzegorczyk J, Stark D, Rybarczyk T, Leyden T, Cooper J, Ruane T, Milligan S, Stella P, Scott JA. Implementation of cancer clinical care pathways: a successful model of collaboration between payers and providers. *J Oncol Pract.* 2012;8:e38s–43s.

36. Carlson B. Controlling the cost of care through clinical pathways. *Biotechnol Healthc.* 2009;6:23–6.

37. American Society for Radiation Oncology. ASTRO model policies: Proton Beam Therapy. 2014. http://www.astro.org/uploadedFiles/Main_Site/Practice_Management/Reimbursement/ASTRO%20PBT%20Model%20Policy%20FINAL.pdf. Accessed December 9, 2015.

38. Thaker NG, Guzman AB, Feeley TW, Jones TM, Incalcaterra JR, Kolom C, Tatum LS, Walters RS, Cantor SB, Rosenthal DI, Garden AS, Gunn GB, Fuller CD, Palmer MB, Frank SJ. Defining the value of proton therapy in an evolving healthcare system using time-driven activity-based costing. *Oncol Payers.* 2014;1:22–8.

39. Newcomer LN, Gould B, Page RD, Donelan SA, Perkins M. Changing physician incentives for affordable, quality cancer care: results of an episode payment model. *J Oncol Pract.* 2014;10:322–6.

# BUSINESS INSURANCE.

# Largest Case Management Providers

Posted On: Mar. 4, 2007 12:00 AM CST

## Largest Case Management Providers

**Ranked by 2006 gross revenues from case management services**

">

| Rank | Company | 2006 case mgmt. revenues |
|---|---|---|
| 1 | Intracorp/CareAllies | $393,000,000 |
| 2 | Coventry Workers' Comp Services | $177,000,000 |
| 3 | GENEX Services Inc. | $151,000,000 |
| 4 | CorVel Corp. | $108,000,000 |
| 5 | Broadspire Services Inc., a Crawford Co.* | $26,464,508 |
| 6 | Avidyn Health | $19,500,000 |
| 7 | MedInsights Inc. | $14,500,000 |
| 8 | FARA Health Management | $11,591,941 |
| 9 | American Health Holding Inc. | $9,405,510 |
| 10 | MCMC L.L.C. | $6,000,000 |



**EXHIBIT**

**9**

Source: *BI* survey

*Includes Broadspire Services Inc. and Crawford Integrated Services, which merged October 2006

Researched by Kevin Edison and Karen Tucker

Is your company listed in this ranking? Purchase a high-quality reprint of the ranking chart, as published in *Business Insurance*, to promote your achievement. Click here for details on all of our reprint services.

Case 1:18-cv-00270-HSO-JCG   Document 1-1   Filed 08/15/18   Page 114 of 119

12/8/2017                    Largest case management providers | Business Insurance
Case: 30CH1:17-cv-02072-DNH    Document #: 6-9    Filed: 07/12/2018    Page 2 of 2

# BUSINESS INSURANCE.

# Largest case management providers

Posted On: Mar. 18, 2011 12:00 AM CST

*Ranked by 2010 gross revenues from case management services*

| Rank | Company | 2010 case management revenues |
|------|---------|-------------------------------|
| 1 | GENEX Services Inc.[1] | $253,000,000 |
| 2 | Coventry Workers' Comp Services | $179,000,000 |
| 3 | Paradigm Management Services L.L.C. | $170,000,000 |
| 4 | CorVel Corp. | $112,000,000 |
| 5 | Broadspire Services Inc., a Crawford Co. | $74,989,000 |
| 6 | American Health Holding Inc. | $22,000,000 |
| 7 | M Hayes | $13,600,000 |
| 8 | MedInsights Inc. | $11,500,000 |
| 9 | MCMC L.L.C.[2] | $5,400,000 |
| 10 | TRISTAR Managed Care | $5,103,568 |

1 GENEX Services Inc. acquired Intracorp's workers compensation and disability management business in December 2010.

2 MCMC L.L.C. acquired Sherman Solutions in June 2010.

Source: *BI* survey
Researched by Kevin Edison and Karen Tucker

Entire contents © copyright 2011 by Crain Communications Inc. All rights reserved.

**STAT**

## Financial toxicity: 1 in 3 cancer patients have to turn to friends or family to pay for care

*By* Scott D. Ramsey *and* Veena Shankaran

November 2, 2016



*Chris Hondros/Getty Images*

Maria (not her real name) was terrified when her 5-year-old son, Rafe, was diagnosed with a rare form of cancer. She worried about his chances of survival and the side effects of the proposed treatment. What she *didn't* anticipate was the financial toll his illness would take on the family. As Rafe's medical needs intensified, caring for him became all-consuming and Maria quit her job. Although her husband was still employed, the family's income fell to half of what it had been, and they were faced with mounting medical bills on top of the normal day-to-day expenses like groceries and gas.

The financial stress ramped up quickly. Months into Rafe's treatment, with the family's savings obliterated, they fell behind on mortgage and utility payments. Neighbors held a fundraising drive, gathering nearly $10,000, but by then the bills were so great that the money was gone within a week. Then the power company came to shut off the electricity. By this time, Rafe was on a chemotherapy infusion pump, and the backup batteries would last only a few hours. Where to turn? What to do?

**EXHIBIT**

**10**

We heard about Maria's situation and similar crises at a recent retreat of <u>Family Reach</u>[1], a national nonprofit dedicated to providing assistance to families who have fallen into severe financial distress after a family member was diagnosed with cancer. Horrific stories like Maria's are becoming more common as the cost of treating cancer and caring for people with it grows more expensive. There is no silver bullet,

but measures that promote better cost management of treatment and well-targeted financial assistance could not only relieve financial distress but also produce better outcomes and improved quality of life.

Related: [2]
Cancer drugs, though cheaper in the developing world, remain unaffordable in poorer countries [2]

The National Cancer Institute advises physicians and patients to understand that cancer's financial impact affects both family budgets and patients' health. According to the institute[3], when a loved one develops cancer, the family's risk of significant financial hardship becomes startlingly high:

- Between 33 percent and 80 percent of cancer survivors exhaust their savings to finance medical expenses.
- Up to 34 percent borrow money from friends or family to pay for care.
- For those who fall into debt, the level of debt is substantial. In a study of colon cancer survivors in Washington state, the mean debt was $26,860[4].
- Bankruptcy rates among cancer survivors are 260 percent higher than among similar households without cancer.

The problem of paying for cancer care is so vast that it has a name, financial toxicity, representing the "other" toxic side effect of cancer treatment. Patients who get into financial difficulty suffer high rates of emotional distress and lower quality of life. In a study we conducted with several colleagues, cancer patients who filed for bankruptcy[5] had a 79 percent higher mortality rate compared to those who had the same cancer and did not file for bankruptcy.

With the revelations of significant problems with our health care system, it is tempting to point to a single group for blame. In reality, the problem appears to be quite complex. Rapidly rising drug and hospital costs, relatively weak insurance coverage, uneven and inadequate sick leave policies of most employers, and the generally poor financial state of many families in the United States all contribute to the problem. As a result, addressing financial toxicity will require tackling multiple issues simultaneously.

As part of the cancer moonshot initiative[6] launched by Vice President Joe Biden, Family Reach has launched the Financial Treatment Project[7]. It takes a multiple-pronged approach to addressing the financial health of patients and their families. Family Reach recently joined with our organization, the Hutchinson Institute for Cancer Outcomes Research, and Tufts Medical Center in Boston to measure the impact of the program on patients' financial health and medical outcomes.

We hope to find simple, nonjudgmental ways to identify when the family of a newly diagnosed cancer patient faces a high likelihood of falling into financial distress. We will also evaluate the different ways to address the problem once a high-risk case is identified, ranging from bringing in financial counselors to tapping pharmaceutical company patient assistance programs to signing up uninsured patients for the Affordable Care Act.

One option to help patients burdened by financial toxicity is to create a program like Social Security Disability Insurance or unemployment insurance that serves those least equipped to endure financial hardship. It would kick in at the onset of a major cancer diagnosis and provide cash assistance for a defined period. This would go beyond the cost of care, as many families say that loss of income plus out-of-pocket costs for transportation, childcare, and caregiving are even bigger burdens than the copays.

Another option aims to encourage cost-saving treatments — ones supported by evidence — to achieve the same outcomes. We should adopt policies that eliminate out-of-pocket spending for newly diagnosed

cancer patients provided that they and their doctors agreed to follow guideline-recommended treatment plans. "For many cancers, guidelines include options that are considered equivalent therapeutically, yet the costs of the treatments might vary by fiftyfold or more," said the National Cancer Institute[3].

The status quo is not acceptable. The number of Americans diagnosed with cancer is projected to rise nearly 75 percent between now and 2030. A focused effort to address the all-too-common problem of financial toxicity could help prevent at least some of the suffering that invariably comes with a cancer diagnosis.

*Scott D. Ramsey, MD, is the director of the Hutchinson Institute for Cancer Outcomes Research[10] in Seattle. Health economist Veena Shankaran, MD, is a medical oncologist and an associate member of the Hutchinson Institute for Cancer Outcomes Research.*

**About the Authors**

Scott D. Ramsey
sramsey@fredhutch.org[11]
Veena Shankaran
vshank@u.washington.edu[12]

**Tags**

# Links

1. https://familyreach.org/
2. https://www.statnews.com/2016/06/06/cancer-drug-prices-developing-world/
3. https://www.cancer.gov/about-cancer/managing-care/financial-toxicity-hp-pdq
4. http://ascopubs.org/doi/abs/10.1200/jco.2011.37.9511
5. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4933128/
6. https://www.statnews.com/2016/09/19/joe-biden-cancer-research-moonshot/
7. https://familyreach.org/blog/missionmonday-announcing-financial-treatment-project/
8. https://www.statnews.com/signup/
9. https://www.statnews.com/privacy/
10. http://www.fredhutch.org/en/labs/hicor/about.html
11. https://www.statnews.com/2016/11/02/cancer-treatment-financial-toxicity/mailto:sramsey@fredhutch.org
12. https://www.statnews.com/2016/11/02/cancer-treatment-financial-toxicity/mailto:vshank@u.washington.edu
13. https://www.statnews.com/tag/cancer/
14. https://www.statnews.com/tag/health-care/
15. https://www.statnews.com/tag/health-care-costs/

© 2018 STAT

# Patients Rising Releases New Survey Showing That Hikes in Insurance Premiums, Higher Co-Pays and Health Plan Restrictions Keep Many Cancer Patients from Getting Prescribe Treatments

*– Survey Conducted by CancerConnect – An Award-Winning Internet Portal and Social Media Platform for Cancer Patients, Survivors and Caregivers –*

June 06, 2016 08:06 AM Eastern Daylight Time

CHICAGO & WASHINGTON--(BUSINESS WIRE)--Patients Rising, in partnership with CancerConnect, released the findings from a new survey showing the extent to which insurance practices interfere with medical treatments of patients with cancer, despite rising costs of policies and higher deductibles. The national survey of patients with hard to-treat cancers finds health plans routinely deny claims, drop drugs from the formulary after the plan-year has begun and employ practices such as step-therapy or "fail first" to force patients to take less effective treatments despite the best advice from their physicians. At the same time, most patients (61%) report higher monthly premiums for their health coverage than a year ago, and a dramatic hike in their out-of-pocket payments. The findings of the survey wer made public at a forum hosted by Patients Rising during the 2016 American Society of Clinical Oncology (ASCO) annual meeting in Chicago and timed to coincide with the 2016 international convention of the Biotechnology Innovation Organization (BIO) in San Francisco.

"This comprehensive survey shows that because of many insurance practices, too often patients don't receive the type of care they pay for and deserve. The insurance industry needs to listen to these constructive complaints and improve the overall quality of its service."

Tweet this

The survey is entitled *Hea Insurance Barriers to Qua Cancer Care: The Real Lif Experiences of Patients Undergoing Treatment.* It puts a human face on the struggles that leave many patients feeling overwhelmed by the steps required to get their health plan to pay for the therapeutics or the diagnostic tests they need

Half of all respondents (47%) and a greater majority (73%) of those aged 18-44 say that dealing with insurance problems is time-consuming and stressful and 61% agree that cancer patients who have trouble affording co-insuranc payments will often take a different drug or no drug at all.

Jonathan Wilcox, Patients Rising policy director and co-founder stated, "This comprehensive survey shows that because of many insurance practices, too often patients don't receive the type of care they pay for and deserve. The insurance industry needs to listen to these constructive complaints and improve the overall quality of its service."

The survey was commissioned by CancerConnect, an online community for cancer patients, survivors and caregiver that regularly polls patients on their struggles and concerns. This survey involved over 400 insured patients, 18 and older, who are undergoing treatment for three hard-to-treat cancers: melanoma, multiple myeloma and non-small cel lung cancer.

Charles Weaver, MD, founder and executive editor of CancerConnect.com, a nationwide community of cancer patients, who conducted the poll added, "We see that a large majority of patients not only have negative experiences with insurance companies when it comes to the cost of and access to their treatment, but they experience unacceptable delays and unauthorized changes in their treatment when the insurance companies interfere with the doctor-patient relationship."

- Health insurance premiums for cancer patients are increasing. Among cancer patients between 18 and 44 years old, 91% have seen premium hikes over the past year, with 45% of them reporting increases of over $100 a mon

- At the same time, a majority of cancer patients (54%) say their medical insurance deductible has risen over the past 5 years. The average deductible increase is $898, with 18-44-year-olds seeing an increase of $1,549.

- Claim denials are a common occurrence. 57% of patients faced denied claims, and 27% of those aged 18-44 ha 5-6 rejected claims.

- Yet, 3 in 4 patients (74%) agree that most people don't know how to appeal a claim denied by their insurance provider, and even when they try they will often end up confused and give up.

Highlights of the poll regarding patients' concerns about access to new treatments:

- 86% of those surveyed want to have access to targeted therapies recently approved by the FDA called immunotherapies that free up the body's immune system to recognize and destroy specific cancer cells.

- 83% say "Not getting to take the drug your doctor prescribed can mean taking a less effective treatment or one with more side effects," and 35% of those surveyed say, "Many cancer patients are required by their insurance pl to take a different drug than the one their oncologist thought was best."

- 77% believe that "step therapy" or "fail first" causes cancer patients to take potentially ineffective treatments instead of the therapy prescribed by the oncologist.

- A majority of respondents, 52% say "prior authorization" is often reviewed by an insurance representative withou medical training.

- 70% of cancer patients surveyed say that when they began cancer treatments that they did not know which therapies were included in their health plan's formulary.

Dr. Weaver concludes, ""Cancer patients and their families deserve better. They deserve to be treated with dignity ar respect."

## ABOUT THIS POLL

The CancerConnect survey was conducted by the Clarus Research Group of Washington, DC, between May 24 and 31, 2016. 418 cancer patients, all with health insurance, completed by poll online. The results were released in Chicago, concurrent with the ASCO Cancer Conference.